**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MARKEL AMERICAN INSURANCE COMPANY, | |
|         Plaintiff, | |
| vs. | Case No.:  24-cv-7052 |
| SANFORD SCHMIDT; SCHMIDT ADVISORY SERVICES, INC., d/b/a CATALYST WEALTH MANAGEMENT, an Illinois corporation; SCHMIDT FINANCIAL GROUP, LLC, an Illinois limited liability company; ETHAN SCHMIDT; and JORDAN SCHMIDT, | |
|         Defendants. | |

## COMPLAINT FOR DECLARATORY JUDGMENT

NOW COMES the Plaintiff, Markel American Insurance Company ("MAIC"), by and through its attorneys, and for its Complaint for Declaratory Judgment against the Defendants Sanford Schmidt, Schmidt Advisory Services, Inc., d/b/a Catalyst Wealth Management ("Schmidt Advisory"), Schmidt Financial Group, LLC ("Schmidt Financial"), Ethan Schmidt, and Jordan Schmidt (collectively "Defendants" or the "Schmidt Defendants"), and states as follows:

## STATEMENT OF THE CASE

1.      This is a declaratory judgment action brought pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§2201 and 2202, for the purpose of determining a real and justiciable controversy between MAIC and the Defendants with respect to their rights and obligations under Investment Advisor, Professional Services, and Directors and Officers Liability Policy No. PL86085C (the "Policy"), that MAIC issued to Schmidt Advisory for the period January 30, 2023 to January 30, 2024 (the "**Policy Period**").  A copy of the Policy is attached hereto as Exhibit A.[1]

---

[1] Exhibit A is a copy of the Policy.  We note that the application to the Policy is incorporated by reference into the Policy.

2.      MAIC seeks a declaration that it owes no obligation to defend or indemnify the Schmidt Defendants in connection with the following three matters:

a.  *CBL Investments, LLC v. Sanford Schmidt, Schmidt Advisory Services, Inc., d/b/a Catalyst Wealth Management, and Schmidt Financial Group, LLC,* Case No. 2024L001179, filed on February 1, 2024 in the Circuit Court of Cook County, Illinois, (the "*Lorenzen* Lawsuit[2]") (A copy of the complaint in the *Lorenzen* Lawsuit is attached hereto as Exhibit B);

b.  *Diane Fowler, et al. v. Schmidt Advisory Services, Inc. d/b/a Catalyst Wealth Management, Sanford Schmidt, Ethan Schmidt, Jordan Schmidt, and Jason Cloth,* Case No. 2024CH01610 filed on March 5, 2024 in the Circuit Court of Cook County, Illinois, (the "*Fowler* Lawsuit[3]") (A copy of the complaint in the *Fowler* Lawsuit is attached hereto as Exhibit C); and

c.  A January 22, 2024 email from James P. Muraff to Sanford Schmidt requesting a tolling agreement from Schmidt Advisory and seeking information pertaining to Schmidt Advisory's insurance policy (the "Muraff Matter") (a copy of the January 22, 2024 email is attached hereto as Exhibit D)

(collectively, with the Lorenzen Demand and the Fowler Demand, the "Noticed Matters").

3.      As alleged more completely below, MAIC owes no obligation to defend or indemnify Defendants in connection with the Noticed Matters under the Policy.

## PARTIES

4.      MAIC is a corporation organized and existing under the laws of the State of Virginia, with its office and principal place of business located in Virginia.

5.      MAIC is a corporation organized and existing under the laws of the State of Virginia, with its office and principal place of business located in Virginia.

6.      Upon information and belief, Sanford Schmidt is an individual domiciled in Cook County, Illinois and is a citizen of the State of Illinois.

---

[2] The *Lorenzen* Lawsuit arises out of a demand letter sent on December 7, 2023 (the "Lorenzen Demand").
[3] The *Fowler* Lawsuit arises out of a demand letter sent January 18, 2024 (the "Fowler Demand").

7.     Schmidt Advisory is an Illinois corporation with its principal place of business in Northbrook, Illinois.

8.     Schmidt Financial Group, LLC is an Illinois limited liability company with its principal place of business in Northbrook, Illinois.

9.     Upon information and belief, Sanford Schmidt is the sole managing member of Schmidt Financial Group, LLC, and Sanford Schmidt is domiciled in Cook County, Illinois and is a citizen of the State of Illinois.

10.     Upon information and belief, Ethan Schmidt is an individual domiciled in Cook County, Illinois and is a citizen of the State of Illinois.

11.     Upon information and belief, Jordan Schmidt is an individual domiciled in Cook County, Illinois and is a citizen of the State of Illinois.

**JURISDICTION AND VENUE**

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 as Plaintiff MAIC is a citizen of Virginia while Sanford Schmidt, Schmidt Advisory, Schmidt Financial, Ethan Schmidt, and Jordan Schmidt are citizens of Illinois. There is complete diversity of citizenship between the Plaintiff and the Defendants.

13.     The amount in controversy exceeds $75,000.00 exclusive of costs and interest, including the potential costs of both defending and indemnifying the Schmidt Defendants in connection with the Noticed Matters.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because the Policy issued by MAIC was issued to Schmidt Advisory in this District, the *Lorenzen* Lawsuit and the *Fowler* Lawsuit are pending in this District, and a substantial part of the events giving rise to the allegations alleged in the *Lorenzen* Lawsuit and *Fowler* Lawsuit occurred in this District.

15.     An actual and justiciable controversy within the meaning of 28 U.S.C. § 2201 exists among the parties regarding the coverage provided under the Policy of insurance.

## FACTUAL BACKGROUND

### *Lorenzen* Lawsuit

16.     On February 1, 2024, CBL filed the *Lorenzen* Lawsuit against Sanford Schmidt, Schmidt Advisory, and Schmidt Financial. (*See* Ex. B)

17.     The *Lorenzen* Lawsuit alleges that Sanford Schmidt, personally and through his advisory and financial services companies, Schmidt Advisory and Schmidt Financial, allegedly deceived and defrauded investor CBL. (*See* Ex. B, Nature of the Action, ¶ 1.)

18.     The *Lorenzen* Lawsuit alleges that Sanford Schmidt held himself out as a Chicago-based investment advisor, wealth manager, and financial planner, and he is the President of Schmidt Advisory, which provides investment advice and management services.  (*See* Ex. B, Factual Allegations, ¶ 13.)

19.     The *Lorenzen* Lawsuit alleges that one of the investment funds that Sanford Schmidt manages is the Catalyst Wealth Management Media Fund I, LLC (the "Catalyst Wealth Fund").  According to the complaint, Schmidt Advisory serves as the Catalyst Wealth Fund's sole manager. (*See* Ex. B, Factual Allegations, ¶ 15.)

20.     According to the *Lorenzen* Lawsuit, the Catalyst Wealth Fund's strategic partners are the production company Bron Studios ("Bron") and film financing company Creative Wealth Media Finance Corporation ("CWM"). (*See* Ex. B, Factual Allegations, ¶ 16.)

21.     The *Lorenzen* Lawsuit alleges that on May 4, 2020, pursuant to a loan and security agreement, CWM agreed to loan to an entity called YBG Commercial Limited ("YBG Commercial") approximately $11,000,000 to fund the production of the Young Bear Grylls

4

("YBG") animated trilogy (the "YBG Trilogy"), with distribution to be handled by Bron. (*See* Ex. B, Factual Allegations, ¶ 18.)

22.     The *Lorenzen* Lawsuit alleges that in July of 2020, Sanford Schmidt prepared a confidential private placement memorandum ("PPM") concerning the offering for sale of interests in the Catalyst Wealth Fund and began recruiting investors through Schmidt Advisory and Schmidt Financial. (*See* Ex. B, Factual Allegations, ¶ 19.)

23.     The *Lorenzen* Lawsuit alleges that in late July or early August of 2020, Sanford Schmidt, through Schmidt Financial, approached CBL's sole managing member, Christopher Lorenzen, with an opportunity for CBL to become an investor in the financing of the YBG Trilogy. Through Lorenzen, Schmidt presented CBL with the PPM, a Catalyst Wealth Fund subscription agreement, a "Participation Agreement," and term sheet, as well as an advisory agreement with Schmidt Advisory. (*See* Ex. B, Factual Allegations, ¶ 20.)

24.     The *Lorenzen* Lawsuit alleges that Schmidt urged CBL to invest $1,000,000 in the Catalyst Wealth Fund and $1,000,000 in the YBG Trilogy, claiming that the profit estimates showed two times the amount of money invested in returns, and that both investments should provide "capital out" within 12 months, plus merchandising and licensing revenue. (*See* Ex. B, Factual Allegations, ¶ 22.)

25.     The *Lorenzen* Lawsuit alleges that through Schmidt Financial and Schmidt Advisory, Sanford Schmidt offered CBL the opportunity to purchase an undivided fractional interest in CWM's $11,000,000 loan to YBG Commercial. (*See* Ex. B, Factual Allegations, ¶ 24.)

26.     According to the *Lorenzen* Lawsuit, on August 17, 2020, Lorenzen, on behalf of CBL, entered into the Participation Agreement with CWM, in which it agreed to lend CWM $750,000 through a participation note. (*See* Ex. A, Factual Allegations, ¶ 24.)

27. The *Lorenzen* Lawsuit alleges that according to the term sheet included with the Participation Agreement, proceeds of the loan would be "used exclusively to finance the pre-production, production, post-production and delivery of the [YBG] project." The term sheet stated that the loan term was 18 months. (*See* Ex. B, Factual Allegations, ¶ 24.)

28. The *Lorenzen* Lawsuit alleges that in entering into the Participation Agreement, CBL relied on Sanford Schmidt's representations that CBL would receive "capital out" in 12 months. (*See* Ex. B, Factual Allegations, ¶ 25.)

29. The *Lorenzen* Lawsuit alleges that after securing funding for CWM's loan to YBG Commercial, Sanford Schmidt repeatedly made misrepresentations to CBL about the status of the films, the prospects for distribution, and the timeline for investors' exit. It is alleged that given Sanford Schmidt's close relationship to and involvement with the Catalyst Wealth Fund's strategic partners CWM and Bron, Sanford Schmidt knew, or reasonably should have known, these statements were false. (*See* Ex. B, Factual Allegations, ¶ 29.)

30. The *Lorenzen* Lawsuit alleges that on December 30, 2020, only a few months after CBL entered into the participation agreement, Sanford Schmidt falsely claimed to CBL and other investors that the "three Bear Grylls animated movies are well into production with 2 out of 3 complete," and that a bidding was imminent. (*See* Ex. B, Factual Allegations, ¶ 30.)

31. The *Lorenzen* Lawsuit alleges that on June 9, 2021, Sanford Schmidt again emailed investors, including CBL, advising them that production was "underway" and that there were ongoing "sales discussions" regarding distribution rights. (*See* Ex. B, Factual Allegations, ¶ 32.)

32. The *Lorenzen* Lawsuit alleges that around June 2021, lawsuits against Schmidt Advisory's strategic partners CWM and Bron began to percolate in the courts based on their failure to repay other investor loans. (*See* Ex. B, Factual Allegations, ¶ 33.)

33.     The *Lorenzen* Lawsuit alleges that Sanford Schmidt knew, or reasonably should have known, about these other lawsuits and the underlying misappropriation of investor funds; however, Sanford Schmidt did not disclose this information to investors. (*See* Ex. B, Factual Allegations, ¶ 33.)

34.     The *Lorenzen* Lawsuit alleges that on October 20, 2021, CWM provided funding to YBG Commercial for the last time. (*See* Ex. B, Factual Allegations, ¶ 34.)

35.     The *Lorenzen* Lawsuit alleges that on May 10, 2022, Sanford Schmidt emailed investors, including CBL, claiming that the YBG films were still "out for sale," this time at the Cannes Film Festival. (*See* Ex. B, Factual Allegations, ¶ 35.)

36.     According to the *Lorenzen* Lawsuit, Sanford Schmidt acknowledged that the timing of the investors' exit had been "misrepresented," but that as soon as Bron sold the films, their capital would be returned. (*See* Ex. B, Factual Allegations, ¶ 37.)

37.     It is alleged that Sanford Schmidt acknowledged that he had misrepresented the timing for investors' exit.  According to the *Lorenzen* Lawsuit, Schmidt knew, or reasonably should have known, that investors' funds were at risk and the YBG films were nowhere near completion. (*See* Ex. B, Factual Allegations, ¶ 38.)

38.     The *Lorenzen* Lawsuit alleges that YBG Films was never fully funded, as CWM only provided $7,550,000 to YBG Commercial, leaving a shortfall of approximately $3 million. The *Lorenzen* Lawsuit alleges that in or around July of 2023, Sanford Schmidt was unable to account for the $3,000,000 shortfall so he and another individual, Jeff Krol, set up a "Completion Fund" to raise additional funds to complete production of the YBG trilogy. (*See* Ex. B, Factual Allegations, ¶ 41-42.)

39.     The *Lorenzen* Lawsuit alleges that on August 4, 2023, without notice to CBL or any of the original investors, CWM modified its original loan agreement with YBG Commercial

7

"to enable the Completion Funds…to be recouped by those providing the Completion Funds ahead of Lender [CWM] recouping sums due to it pursuant to the [Loan and Security Agreement]." The *Lorenzen* Lawsuit alleges that upon information and belief, Sanford Schmidt, Schmidt Financial, and Schmidt Advisory were closely involved in the modification of the original loan agreement to facilitate the Completion Fund and put Completion Fund investors in a first position. (*See* Ex. B, Factual Allegations, ¶ 43.)

40.     The *Lorenzen* Lawsuit alleges that because the Completion Fund has priority over the repayment of the original loan, original investors, like CBL, will now only see a return on their investment once the $3 million shortfall is repaid. (*See* Ex. B, Factual Allegations, ¶ 44.)

41.     The *Lorenzen* Lawsuit alleges that only after the Completion Fund was already set up did Sanford Schmidt reach out to investors, including CBL. (*See* Ex. B, Factual Allegations, ¶ 45.)

42.     The Lorenzen Lawsuit alleges that on September 27, 2023, CBL and other Schmidt Advisory investors participated in a conference call hosted by Jeff Krol and Sanford Schmidt regarding the Completion Fund.  During the call, Sanford Schmidt admitted that he knew for a year prior that the YBG trilogy was vastly underfunded and mismanaged, that investor funds had been misappropriated, and that a Bron executive had personally communicated this issue to him. Sanford Schmidt further admitted that he had consulted months earlier with several various law firms that had filed suits against CWM for similar investment schemes. According to the *Lorenzen* Lawsuit, Sanford Schmidt, however, said nothing to investors and instead continued to represent that the project was near completion and investors could expect an exit soon. (*See* Ex. B, Factual Allegations, ¶ 47.)

43.     The *Lorenzen* Lawsuit alleges that in October 2023, CWM and Bron both filed for bankruptcy.  (*See* Ex. B., Factual Allegations ¶ 48.)

44.    The *Lorenzen* Lawsuit alleges that the missing $3,000,000 remains unaccounted for and that Sanford Schmidt has not provided further updates to CBL or Lorenzen on the status of the trilogy. (*See* Ex. B, Factual Allegations, ¶ 50.)

45.    The *Lorenzen* Lawsuit alleges that more than three years have passed since Sanford Schmidt, through Schmidt Advisory and Schmidt Financial, initially raised over $10,000,000 in capital. More than three years have passed since Sanford Schmidt falsely reported to CBL and other investors that the films were "well into production." (*See* Ex. B, Factual Allegations, ¶ 51.)

46.    According to the *Lorenzen* Lawsuit, the films remain unfinished to this day. (*See* Ex. B, Factual Allegations, ¶ 52.)

47.    The *Lorenzen* Lawsuit asserts six counts against the Underlying Defendants: (1) Violation of the Illinois Securities Law of 1953 815 ILCS 5/12(f), (g), and (j); (2) Violation of the Illinois Consumer and Fraud Deceptive Business Practices Act 815 ILCS 505/2; (3) Fraudulent Misrepresentation; (4) Negligent Misrepresentation; (5) Breach of Fiduciary Duty; and (6) Unjust Enrichment. (*See* Ex. B.)

48.    CBL's prayer for relief requests that the court declare the sale of the security void and award CBL the amount CBL paid plus interest, compensatory and punitive damage, and attorneys' fees and costs. (*See* Ex. B, p. 17-18.)

**The *Fowler* Lawsuit**

49.    On March 5, 2024, Diane Fowler filed a Class Action Complaint (the *Fowler* Lawsuit) against Schmidt Advisory ("Schmidt Advisory"), Sanford Schmidt, Jordan Schmidt, and Jason Cloth. (*See* Ex. C).

50.    The *Fowler* Lawsuit concerns a film financing scheme wherein Sanford Schmidt, personally and through his advisory and financial services companies, Schmidt Advisory, served

as the brokers for Jason Cloth, who allegedly defrauded Fowler and other investors. (*See* Ex. C, Nature of the Action, ¶ 4.)

51.     Jason Cloth, as alleged in the *Fowler* Lawsuit, is the owner and control person of CWM. (*See* Ex. C, Facts, ¶ 16, 18.)

52.     CWM is the primary financier of BRON Studios. (*See* Ex. C, Facts, ¶ 19.)

53.     The *Fowler* Lawsuit alleges that Schmidt is one of two intermediaries or brokers that Cloth worked with to raise the bulk of the American investment for several movies and series on behalf of Bron and others. (*See* Ex. C, Facts, ¶ 34-35.)

54.     According to the *Fowler* Lawsuit, upon information and belief, Schmidt received a carried interest in the investments he placed with CWM. ( *See* Ex. C, Facts, ¶ 36.)

55.     Cloth allegedly raised money in the U.S. through Schmidt and another firm. According to the *Fowler* Lawsuit, Schmidt acted as a placement agent by raising money from investors for the purpose of investing in promissory notes and co-investment used to fund Cloth's individual projects (hereinafter, the "Cloth Offering"). (*See* Ex. C, ¶ 118.)

56.     The *Fowler* Lawsuit alleges these promissory notes were later used to fund Series B and Series E notes and later used in Schmidt's own fund, Catalyst Wealth. (*See Id.*)

57.     Schmit allegedly solicited over $30,000,000 in investments for the Cloth Offering, all of which remains outstanding. (*See* Ex. C, ¶ 125.)

58.     According to the *Fowler* Lawsuit, Schmidt was Cloth's salesman and broker raising money throughout the Midwest. (*See* Ex. C, ¶ 126.)

59.     The *Fowler* Lawsuit alleges that Schmidt negligently relied on misrepresentations from Cloth when recommending the investments to Diane Fowler, rather than confirming anything with third parties, looking into Bron or CWM's finances, or Cloth's previous Ponzi scheme. (*See* Ex. C, ¶ 127.)

60.   Schmidt allegedly proceeded to sell Diane Fowler and the proposed class investments in the Cloth Offering by telling lies told by Cloth. (*See* Ex. C, ¶ 129.)

61.   According to the Fowler Lawsuit, Diane Fowler reasonably relied on Schmit's due diligence of the investment and the representations that they were investing in specific projects, rather than "Cloth's personal piggy bank." (*See* Ex. C, ¶ 131.)

62.   The Fowler Lawsuit alleges that the Cloth Offerings were structured as co-investments in various film projects. (*See* Ex. C, ¶ 136.)

63.   It is alleged that Diane Fowler reasonably relied on Sanford Schmidt's representations and due diligence into Cloth because he was an investment advisor, a CFP (Certified Financial Planner), an International Board of Certified Financial Planners, ChFC (Chartered Financial Consultant), CLU (Chartered Life Underwriter), and has FINRA Series 6, 63, 65, & 22 securities registrations. (*See* Ex. C, ¶ 138.)

64.   Because Schmidt sells private placements to retail customers for a commission, the *Fowler* Lawsuit alleges that Schmidt is required to register with the Financial Industry Regulatory Authority ("FINRA"). (*See* Ex. C, ¶ 142.)

65.   The Fowler Lawsuit alleges that Schmidt violated FINRA rules by failing to perform reasonable due diligence on a private placement prior to offering it for sale to its customers, in violation of FINRA Rule 2111.05(a), FINRA Regulatory Notice 10-22, NASD Notice to Members 03-71, and NASD Notice to Members 05-26, 17 C.F.R. § 240.15l-1(b)(1). (*See* Ex. C, ¶ 144.)

66.   The Fowler Lawsuit alleges that Scmidt had a duty to conduct a reasonable investigation in connection with each offering and failed to conduct the proper due diligence, which caused his conduct to fall below the standard of care and thereby breaching his duties owed to Fowler and the potential Class. (*See* Ex. C, ¶ 147-155; 164.)

67. According to the *Fowler* Lawsuit, Diane Fowler invested $1,000,000 in CWM via a Series B Note in January 2023. The investment was part of a $20,000,000 loan to CWM for the production of motion pictures. (*See* Ex. C, ¶ 171;173.)

68. Diane Fowler's investment was allegedly a total loss. (*See* Ex. C, ¶ 177.)

69. The *Fowler* Lawsuit brings a sub-class of potential plaintiffs for "[a]ll persons who invested in the Cloth Offering with Schmidt from January 1, 2020 to December 31, 2020." (*See* Ex. C, ¶ 177.)

70. The *Fowler* Lawsuit asserts the following causes of action against one or all of the Schmidt Defendants: (1) violation of the Illinois Securities Law ("ISL") of 1953, 815 ILCS 5/12(g) against Schmidt; (2) negligent representation against the Schmidt Defendants; and (3) unjust enrichment against the Schmidt Defendants.

## THE MURAFF MATTER

71. By e-mail dated January 26, 2024, Lynda Bennett of Lowenstein Sandler, counsel for the **Insureds,** provided notice of an email from James Muraff to Sanford Schmidt requesting a draft tolling agreement and information about Schmidt's insurance policy so that he could "consider filing a claim." A copy of the January 26, 2024 email is attached here to as Exhibit E .

72. By letter dated January 31, 2023 (the "January 31 Letter"), counsel for Mr. Muraff advised that Schmidt convinced Mr. Muraff to invest $450,000 in the Catalyst Wealth Management Media Fund I, LLC (the "Catalyst Wealth Fund") for the production of creative works which were to be produced by Bron. (A copy of the January 31 Letter is attached hereto as Exhibit F.)

73. Muraff alleged that Schmidt and Schmidt Advisory both breached their duties to Muraff and that he sustained substantial damages as a result. (*See* Ex. F).

## RELEVANT POLICY PROVISIONS

74.     MAIC issued the Policy to Schmidt Advisory for the policy period effective January 30, 2023 to January 30, 2024. (*See* Ex. A).

75.     Subject to all terms, conditions, limitations, exclusions and endorsements, the Policy provides Investment Adviser Professional Liability Insurance coverage and Professional Liability Insurance coverage only with a $2,000,000 each **loss** limit of liability and a $2,000,000 aggregate limit of liability, subject to a $100,000 each **loss** retention.

76.     **Defense costs** and **loss** reduce both the limit of liability and retention.

77.     Coverage under the Policy is subject to a December 31, 2020 "Prior  Knowledge Date."

78.     The Insuring Agreements in SECTION I – COVERAGE provide, in relevant part, that the Insurer, relying on the statements in the **application**, agrees with the Named Entity as follows:

> Coverage is provided under the following Insuring Agreement(s) only if a Limit of Liability for such Insuring Agreement(s) is shown in the Declarations.
>
> **1.  Investment Adviser Professional Liability Insurance**
>
> The Insurer will pay, on behalf of an **insured adviser** or its **insured persons**, **loss** which they become legally obligated to pay as a result of a **claim** first made against them and reported during the Policy Period or Extended Reporting Period, if applicable.
>
> **2.  Professional Liability Insurance**
>
> The Insurer will pay, on behalf of an **accounting firm**, **life and health insurance agency** or **professional service provider** or their **insured persons**, **loss** which they become legally obligated to pay as a result of a **claim** first made against them and reported during the Policy Period or Extended Reporting Period, if applicable.

79. SECTION II – DEFINITIONS, B. of the Policy defines **broker** to have the "meaning assigned to that term by the Securities Exchange Act of 1934, as amended, but **broker** does not include a person who is a **registered representative**."

80. SECTION II – DEFINITIONS, E. of the Policy defines **claim**, in relevant part, to mean:

> 2. A civil proceeding commenced by the service of a complaint or similar pleading;
>
> \*       \*       \*
>
> 7. Any written request to toll or waive any statute of limitations commenced by the receipt of such request;
>
> \*       \*       \*

made upon an **insured** for a **wrongful act**.

81. SECTION II – DEFINITIONS, F. of the Policy defines **dealer** as "the meaning assigned to that term by the Securities Exchange Act of 1934, as amended, but dealer does not mean a person who is a **registered representative.**"

82. SECTION II – DEFINITIONS, G. of the Policy defines **defense cost(s)** to mean:

> reasonable and necessary fees, costs, charges, and expenses incurred in the investigation, defense or appeal of any **claim** and the costs of appeal, attachment or similar bonds (but does not include applying for or furnishing such bond).
>
> **Defense costs** do not include fees, salaries, regular or overtime wages, overhead, benefits or extradition expenses.

83. SECTION II – DEFINITIONS, P. of the Policy defines **insured(s)** to mean the "Named Entity, **insured entity(ies)** and the **insured person(s)**."

84. SECTION II – DEFINITIONS, Q. of the Policy defines **insured adviser(s)** to mean "the Named Entity that is a registered 'investment adviser' as defined in the Investment Advisers Act of 1940, and its amendments, and which renders **investment advisory services** to others."

85.     SECTION II – DEFINITIONS, R. of the Policy defines **insured entity(ies)** to mean "the **accounting firm(s)**, **insured adviser**(s), **life and health insurance agency**(ies) or **professional service provider(s)**."

86.     SECTION II – DEFINITIONS, S. of the Policy defines **insured executive(s)** to mean "any person who has been, now is or becomes a duly elected or appointed partner, director, officer, chief compliance officer, managing member, manager or trustee of an **insured entity**."

87.     SECTION II – DEFINITIONS, T. of the Policy defines **insured person(s)**, in relevant part, to mean:

1. The **insured executives**;
2. The chief compliance officer;
3. Any person who has been, now is or will become an employee of an **insured entity**, but solely while providing **accounting services**, **investment advisory services**, **life and health services** or **professional services** on behalf of such **insured entity[.]**

88.     SECTION II – DEFINITIONS, W. of the Policy defines **life and health insurance agency** to mean "any entity specifically listed on the Schedule of Insurance Agencies endorsement to this Policy that renders **life and health services**, but only while such entity is acting on behalf of the Named Entity.

89.     SECTION II – DEFINITIONS, X. of the Policy defines **life and health services** to mean any **life insurance agent** duties performed or required to be performed in the regular course of business for a fee, commission, other monetary consideration, **pro bono** or other remuneration which inures to the benefit of the **life insurance agent**.

90.     SECTION II – DEFINITIONS, Y. of the Policy defines **life insurance agent** to mean:

an individual licensed, as required by any applicable Federal law and the law of the state where any part of the transaction occurs, to sell life, health, disability, fixed annuities, long term care or

accidental death and dismemberment insurance, including activities as a licensed life insurance consultant. **Life insurance agent** does not include anyone selling **non-traditional life insurance products** or anyone while acting as a general agent or in any similar capacity for a life insurance company.

91.     SECTION II – DEFINITIONS, Z. of the Policy, as amended by the Illinois Amendatory Endorsement, form MPL 1484-IL 05 19, defines loss to mean "the amount that an **insured** becomes legally obligated to pay on account of any **claim**, including but not limited to, damages, judgments, settlements and **defense costs**."

> **Loss** does not include:
>
> 1.  Payments for pre-judgment and post-judgment interest as described in Paragraph C. below in the amendment to Section IV – Limits of Liability and Retentions;
>
> *     *     *
>
> 4.  Any amount not insurable under the law pursuant to which this Policy is construed;
>
> *     *     *
>
> 7.  Punitive, exemplary or multiplied damages, except that if a suit is brought against the **insured** with respect to a claim for acts or alleged acts falling within coverage hereof, seeking both compensatory and punitive or exemplary damages, then the insurer will afford a defense to such action without liability for such punitive or exemplary damages.

92.     SECTION II – DEFINITIONS, FF. of the Policy defines **professional service(s)** to mean "services rendered for or advice given to others by an **insured** for a fee, remuneration, **pro bono** or other consideration in an **insured's** business and explicitly listed on the Schedule Of Professional Service Providers endorsement or other endorsement to this Policy."

93.     SECTION II – DEFINITIONS, GG. of the Policy defines **professional service provider** to mean "any individual or entity specifically listed on the Schedule Of Professional Service Providers endorsement or other endorsement to this Policy that renders **professional services**, but only while such individual or entity is acting on behalf of the Named Entity."

94.     SECTION II – DEFINITIONS, HH. of the Policy defines **registered representative** to mean a person who:

1.  Is registered with the Financial Industry Regulatory Authority (FINRA) or its successor as a registered representative of a broker or dealer pursuant to the provisions of the Securities Exchange Act of 1934; and

2.  Is in the business of buying and selling securities for the account of others, including but not limited to, direct participation products such as limited partnerships, shares in mutual funds, unit investment trusts and variable annuities

    **Registered representative** does not include any person while acting in the capacity of a principal of a **broker** or **dealer**, including but not limited to a General Securities Principal or Limited Principal General Securities Sales Supervisor.

95.     SECTION II – DEFINITIONS, JJ. of the Policy defines s**ecurity** to mean the following:

1.  The Securities Exchange Act of 1934;

2.  The Securities Act of 1933;

3.  The Investment Advisers Act of 1940 as amended; or

4.  Any rules issued by the Securities Exchange Commission pursuant to any of these acts.

    **Securities** means the plural of **security** as defined herein.

\*       \*       \*

96.     SECTION II – DEFINITIONS, PP. of the Policy defines **wrongful act** to mean the following:

1.  With respect to Insuring Agreement 1. Investment Adviser Professional Liability Insurance, any actual or alleged error, misstatement, misleading statement, negligent act or omission, or neglect or breach of duty by any **insured adviser** or its **insured persons**, solely in their capacities as such, in rendering or failing to render **investment advisory services**;

2.  With respect to Insuring Agreement 2. Professional Liability Insurance, any actual or alleged error, misstatement, misleading

statement, negligent act or omission, or neglect or breach of duty by any…

        \*       \*      \*

b. **Life and health insurance agency** or its **insured persons**, solely in their capacities as such, in rendering or failing to render **life and health services**; or

c. **Professional service provider** or its **insured persons**, solely in their capacities as such, in rendering or failing to render **professional services**…

        \*       \*      \*

97.    SECTION III – EXCLUSIONS, J. provides, in relevant part, that the Policy provides no coverage for any **loss** in connection with any **claim** alleging, arising out of, based upon, or attributable to any:

1. Activities of any **insured** as an underwriter, **broker** or **dealer**, or mortgage **broker** (as those terms are defined in the Investment Company Act of 1940, the Securities Act of 1933, or the Securities Exchange Act of 1934, including their amendments) in **securities**;

2. Purchase or sale of **securities** or insurance products for which an **insured** received commission or other remuneration or where an **insured** had a 5% or more equity interest in the issuer of such **securities**[.]

98.    SECTION III – EXCLUSIONS, R. provides, in relevant part, that the Policy provides no coverage for any **loss** in connection with any **claim** alleging, arising out of, based upon, or attributable to:

Any **claim** involving the amount of, return of, disgorgement of or reimbursement of fees, commissions or other sums paid to an **insured** for **accounting services**, **investment advisory services**, **life and health services** or **professional services** rendered by an **insured**; provided, however, that this exclusion will not apply to **defense costs**.

99.    SECTION IV – LIMITS OF LIABILITY AND RETENTIONS, A. of the Policy provides in relevant part:

**A.   Limits Of Liability**

        \*       \*      \*

3. **Interrelated Wrongful Acts**

All **claims** for the same **wrongful act** or **interrelated wrongful acts** will be considered a single **claim** and will be deemed to have been made when the earliest **claim** was first made, or when the earliest **claim** is treated as having been made in accordance with Section VI –Notice, whichever is earliest, whether before or during the Policy Period.

**Defense costs** are part of, not in addition to, the applicable Limit Of Liability. Such **defense costs** will reduce the applicable Limit Of Liability and will be applied against the Retention. The Insurer will have no obligation to pay any **loss** or to defend or continue to defend any **claim** or to pay **defense costs** after the applicable Limits Of Liability have been exhausted by payment of **loss** or **defense costs**.

B. **Retention**

1. The Insurer will pay only that portion of any **loss** which is in excess of the applicable Retention for each Insuring Agreement shown in the Declarations, up to the applicable Limit Of Liability shown in the Declarations. A Retention will apply to each and every **claim**, and such Retention will be borne by the **insureds** uninsured and at their own risk.

2. No Retention will apply to **loss** incurred by an **insured executive** if such **loss** cannot be indemnified by the Named Entity or **insured entity** because the Named Entity or **insured entity** is not permitted or required to indemnify, or is not financially able to indemnify by reason of **financial impairment**. The Insurer's liability for all other covered **loss** will apply only to that part of **loss** on account of each **claim** which is excess of the applicable Retention shown in the Declarations.

3. If different parts of a single **claim** are subject to different Retentions, the applicable Retention will be applied separately to each part of the **claim**. The sum of the Retentions will not exceed the largest applicable Retention.

\* \* \*

100. The Life Product Sales Coverage – Named Individuals Endorsement (the "Life Product Sales Endorsement"), form MPL 1224 07 17, in the Policy provides, in relevant part:

**SCHEDULE**

| Named Individuals | Pending And Prior Proceeding Date For Purchase Or Sale Of Insurance As A Life Insurance Agent | Pending And Prior Proceeding Date For Registered Investment Adviser Services | Termination Date |
|---|---|---|---|
| Sanford Schmidt | 03/01/1985 | 12/02/1993 | |
| Ethan Michael Schmidt | 08/30/2019 | 08/22/2019 | |

  A. Each of the Named Individuals shown in the Schedule of this endorsement is a covered **insured** and subject to the exclusion in Paragraph **B.** of this endorsement.

  B. Section III – Exclusions is amended by the following:

    1. The following exclusion is added:

    This Policy provides no coverage for any **loss** in connection with any **claim** alleging, arising out of, based upon, or attributable to:

    The purchase or sale of **securities** or investments as a **registered representative** or insurance products as a **life insurance agent**; however, this exclusion will not apply to the Named Individuals shown in the Schedule of this endorsement, solely with respect to **wrongful acts** in the rendering of or failure to render **professional services**…

*  *  *

    2. As a **registered investment adviser** only when rendered on behalf of or under contract with the Named Entity and provided a Pending And Prior Proceeding Date For Registered Investment Adviser Services is shown in the Schedule of this endorsement;

*  *  *

    2. With respect to coverage provided by this endorsement, exclusion J.2. does not apply.

*  *  *

  101. The Specified Person, Organization, Investment Vehicle, Service or Activity Exclusion (the "Specified Organization Exclusion"), form MPL 1323 05 19, which states:

This endorsement modifies insurance provided under the following:

INVESTMENT ADVISER, PROFESSIONAL SERVICES AND DIRECTORS AND OFFICERS LIABILITY INSURANCE POLICY

The following is added to Section III – Exclusions:

This Policy provides no coverage for any **loss** in connection with any **claim** alleging, arising out of, based upon, or attributable to:

Any of the Specified Person(s), Organization(s), Investment Vehicle(s), Services(s) Or Activity(ies) described in the Schedule of this endorsement, including the purchase, sale, servicing or management of, advice relative to, or recommendation to purchase, sell, or hold any investment interest in the described Investment Vehicle(s), Services(s) or Activity(ies).

102.    The Schedule for the Specified Organization Exclusion includes, in relevant part:

Based upon arising from or in consequence of the Catalyst Wealth Management Media Fund I, LLC TLG Advisors, Inc.

\*       \*       \*

## COVERAGE CORRESPONDENCE

103.    By e-mail dated November 13, 2023, Schmidt Advisory provided MAIC with notice of CWM's intention to file for bankruptcy in the District of Ontario, Toronto Division.

104.    MAIC accepted the November 13, 2023 e-mail as a notice of circumstances pursuant to Section VI – Notice B. of the Policy (the "Notice Provision"), which provides:

If, during the **Policy Period**, an **insured** becomes aware of any circumstances which may reasonably be expected to give rise to a **claim** being made against an **insured** and gives written notice to the Insurer of the circumstances, the anticipated allegations of the **wrongful act** and the reasons for anticipating such a **claim**, with full particulars as to dates, persons and entities involved, then any **claim** subsequently made against the **insured** and reported to the Insurer for any **wrongful act** or **interrelated wrongful acts** will be deemed to have been made at the time such notice was received by the Insurer under this provision.

105.    By letter dated January 22, 2024, counsel for Schmidt Advisory, Lynda Bennett of Lowenstein provided notice of demand letters from Christopher Lorenzen (the "Lorenzen Demand") and Diane Fowler (the "Fowler Demand"), both of whom requested tolling agreements

in connection with their allegations that Schmidt made misrepresentations regarding investments in CWM and its various film projects. (A copy of the January 22, 2024 letter is attached hereto as Exhibit G.)

106. The Lorenzen Demand and the Fowler Demand are both **Claims** as that term is defined in the Policy.

107. By e-mail dated February 2, 2024, Ms. Bennett provided notice of the *Lorenzen* Lawsuit (collectively with the Lorenzen Demand, the "Lorenzen Matter"). (A copy of the February 2, 2024 e-mail is attached hereto as Exhibit H).

108. The **Insureds** provided notice of the *Fowler* Lawsuit (collectively with the Fowler Demand, the "Fowler Matter").

109. The **Insureds** sought coverage for the Lorenzen Matter under the Policy.

110. The **Insureds** sought coverage for the Fowler Matter under the Policy.

111. By e-mail dated January 26, 2024, Ms. Bennett provided notice of an e-mail from James Muraff to Sanford Schmidt requesting a draft tolling agreement and information about Schmidt's insurance policy so that he could "consider filing a claim." (See Exhibit E).

112. The Muraff Matter is a **Claim** as that term is defined in the Policy.

113. The **Insureds** sought coverage for the Muraff Matter under the Policy.

114. By letter dated May 2, 2024, MAIC issued a letter addressing coverage for the Noticed Matters under the Policy (the "Declination Letter"). (A copy of the May 2, 2024 letter is attached hereto as Exhibit I).

115. In the Declination Letter, MAIC advised that, pursuant to Section VI – Notice, B., because each of the Noticed Matters arises out of the **Insured's** misrepresentations regarding investments in CWM, each is deemed to have been made on November 13, 2023 when the notice of circumstances was provided. (*See*, Ex. I).

116.     MAIC also advised that the Noticed Matters constitute a single **Claim** pursuant to Section IV.A.3. (the "Interrelated Wrongful Acts Provision"), which provides:

> "[a]ll **claims** for the same **wrongful acts** or **interrelated wrongful acts**[4] will be considered a single **claim** and will be deemed to have been made when the earliest **claim** was first made, or when the earliest **claim** is treated as having been made in accordance with Section VI – Notice, whichever is earliest, whether before or during the Policy Period."

(*See*, Ex. I).

117.     In the Declination Letter, MAIC declined coverage for the Noticed Matters pursuant to Exclusion J.2. (the "Sale of Securities Exclusion"), which excludes coverage for an **Loss** in connection with any **Claim** alleging, arising out of, based upon, or attributable to any "[p]urchase or sale of **Securities** or insurance products for which an **Insured** received commission or other remuneration[.]" (*See*, Ex. I).

118.     MAIC also declined coverage for the Muraff Matter pursuant to the Specified Person, Organization, Service Or Activity Exclusion Endorsement (the "Specified Organization Exclusion Endorsement"), which excludes coverage for any "**Loss** in connection with any **Claim** alleging, arising out of, based upon, or attributable to . . . [a]ny of the Specified Person(s), Organization(s), Investment Vehicle(s), Service(s), or Activitie(s) described in the Schedule of this endorsement, including the purchase, sale, servicing or management of, advice relative to, or recommendation to purchase, sell, or hold any investment interest in the described Investment Vehicle(s), Services(s) or Activity(ies)."  (*See*, Ex. I).

---

[4] **Interrelated Wrongful Acts** is defined in the Policy to mean "**wrongful acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes, including, but not limited to a Pyramid Scheme or Ponzi Scheme."   **Wrongful Act** is defined, in relevant part, to mean "any actual or alleged error, misstatement, misleading statement, negligent act or omission, or neglect or breach of duty by any insured adviser or its insured persons, solely in their capacities as such, in rendering or failing to render investment advisory services."

119.     MAIC also declined coverage for Schmidt Financial on the grounds that the Policy provides limited coverage to Schmidt Financial under Insuring Agreement 2. as a **life and health insurance agency**.  MAIC concluded that because that coverage is not implicated here, there is no coverage for Schmidt Financial, nor anyone acting on behalf of Schmidt Financial, in connection the Noticed Matters. (*See*, Ex. I).

120.     By letter dated June 3, 2024, Kenneth Anspach, new coverage counsel for the **Insureds**, responded to the Declination Letter, disagreeing with MAIC's position and again requesting coverage for the Noticed Matters under the Policy.  (A copy of the June 3, 2024 letter is attached hereto as Exhibit J).

121.     By letter dated August 9, 2024, MAIC responded to Mr. Anspach's June 3, 2024 letter, reiterating its denial of coverage for the Noticed Matters.  (A copy of the August 9, 2024 letter is attached hereto as Exhibit K).

122.     MAIC also denied coverage pursuant to Exclusion J.1., which excludes coverage, in relevant part, for "[a]ny . . . [a]ctivities of any **insured** as an underwriter, **broker** or **dealer**, or mortgage **broker** (as those terms are defined in the Investment Company Act of 1940, the Securities Act of 1933, or the Securities Exchange Act of 1934, including their amendments) in **securities**."

## COUNT I— DECLARATORY JUDGMENT
## (Exclusion J.2 – the Sale of Securities Exclusion)

123.     MAIC incorporates Paragraphs 1 through 125 above as though fully set forth herein.

124.     Pursuant to the Sale of Securities Exclusion, the Policy provides no coverage for:

> any **loss** in connection with any **claim** alleging, arising out of, based upon, or attributable to: … [a]ny Purchase or sale of **securities** or insurance products for which an **insured** received commission or other remuneration or where an **insured** had a 5% or more equity interest in the issuer of such **securities**.

24

125. The term **security** is defined in the Policy to have the meaning assigned to that term by the following:

      i. The Securities Exchange Act of 1934;

      ii. The Securities Act of 1933;

      iii. The Investment Advisors Act of 1940 as amended; or

      iv. Any Rules issued by the Securities Exchange Commission pursuant to any of these acts[.]

126. The Securities Act of 1933 defines "security", in relevant part, as a "note" or an "investment contract."

127. The investments at issue in the Noticed Matters are **securities** as that term is defined in the Policy.

128. Because the Policy precludes coverage for any **loss** in connection with any **claim** alleging, arising out of, based upon, or attributable to any Purchase or sale of **securities**, MAIC has no duty to defend, indemnify, and/or reimburse the Defendants for **loss** incurred in connection with the Noticed Matters.

## COUNT II — DECLARATORY JUDGMENT
### (Exclusion J.1.)

129. MAIC incorporates Paragraphs 1 through 131 above as though fully set forth herein.

130. Pursuant to Exclusion J.1., the Policy provides no coverage for:

Activities of any **insured** as an underwriter, **broker** or **dealer**, or mortgage **broker** (as those terms are defined in the Investment Company Act of 1940, the Securities Act of 1933, or the Securities Exchange Act of 1934, including their amendments) in **securities**;

131. The term **broker** is defined in the Policy to have "the meaning assigned to that term by the Securities Exchange Act of 1934, as amended, but **broker** does not include a person who is a **registered representative**."

132. The Securities Act of 1934 defines the term "broker" to mean, in relevant part, "any person engaged in the business of effectuating transactions in securities for the account of others."

25

133. The **insureds** are brokers as that term is defined in the Policy.

134. The term **security** is defined in the Policy to have the meaning assigned to that term by the following:

    a. The Securities Exchange Act of 1934;

    b. The Securities Act of 1933;

    c. The Investment Advisors Act of 1940 as amended; or

    d. Any Rules issued by the Securities Exchange Commission pursuant to any of these acts[.]

135. The Securities Act of 1933 defines "security", in relevant part, as a "note" or an "investment contract."

136. The investments at issue in the Noticed Matters are **securities** as that term is defined in the Policy.

137. Because the Policy precludes coverage for activities of any **insured** as a **broker** (as that is defined in the Securities Act of 1934) in **securities**, MAIC has no duty to defend, indemnify, and/or reimburse the Defendants for **loss** incurred in connection with the Noticed Matters.

## COUNT III— DECLARATORY JUDGMENT
### (Specified Organization Exclusion Endorsement)

138. MAIC incorporates Paragraphs 1 through 140 above as though fully set forth herein.

139. The Specified Organization Exclusion Endorsement modifies Section III – Exclusions of the Policy and provides:

> This Policy provides no coverage for any **loss** in connection with any **claim** alleging, arising out of, based upon, or attributable to:
>
> Any of the Specified Person(s), Organization(s), Investment Vehicle(s), Services(s) Or Activity(ies) described in the Schedule of this endorsement, including the purchase, sale, servicing or management of, advice relative to, or recommendation to purchase, sell, or hold any investment interest in the described Investment Vehicle(s), Services(s) or Activity(ies).

140.    The Schedule to the Endorsement lists the Catalyst Wealth Fund as a specified person, organization, service or activity.

141.    Muraff invested directly in the Catalyst Wealth Fund.

142.    Because the Muraff Matter alleges, arises out of, is based upon, or is attributable to the purchase, sale, servicing or management of, advice relative to, or recommendation to purchase, sell, or hold any investment interest in the Catalyst Wealth Fund, MAIC has no duty to defend, indemnify, and/or reimburse the Defendants for **loss** incurred in connection with the Muraff Matter.

**COUNT IV— DECLARATORY JUDGMENT**
**(Schmidt Financial)**

143.    Pursuant to the definition of **insured**, the Policy provides limited coverage to Schmidt Financial under Insuring Agreement 2. as a **life and health insurance agency**.

144.    Insuring Agreement 2. **Professional Liability Insurance** provides:

> The Insurer will pay, on behalf of an **accounting firm**, **life and health insurance agency** or **professional service provider** or their **insured persons**, **loss** which they become legally obligated to pay as a result of a **claim** first made against them and reported during the Policy Period or Extended Reporting Period, if applicable.

145.    **Claim** is defined, in relevant part, to mean "1. [a]ny demand for monetary damages in a legal action . . . or "7. any written request to toll or waive any statute of limitations commenced by the receipt of such request . . . made upon an **insured** for a **wrongful act**."

146.    With respect to Insuring Agreement 2., **wrongful act** means "any actual or alleged error, misstatement, misleading statement, negligent act or omission, or neglect or breach of duty by any . . . b. **life and health insurance agency** or its **insured persons,** solely in their capacities as such, in rendering or failing to render **life and health services**.

147.    **Life and health services** is defined in the Policy to mean "any **life insurance agent** duties performed or required to be performed in the regular course of business for a fee,

commission, other monetary consideration, **pro bono** or other remuneration which inures to the benefit of the **life insurance agent**."

148.     **Life insurance agent** is defined in the policy to mean:

> An individual licensed, as required by any applicable Federal law and the law of the state where any part of the transaction occurs, to sell life, health, disability, fixed annuities, long term care or accidental death and dismemberment insurance, including activities as a licensed life insurance consultant. **Life insurance agent** does not include anyone selling **non-traditional life insurance products** or anyone while acting as a general agent or in any similar capacity for a life insurance company.

149.     The investments at issue in the Noticed Matters were not **life and health services** and therefore MAIC has no duty to defend, indemnify, and/or reimburse Schmidt Financial for **loss** incurred in connection with the Noticed Matters.

<u>**COUNT V — DECLARATORY JUDGMENT**</u>
<u>**(Prior Knowledge Exclusion)**</u>

150.     MAIC incorporates Paragraphs 1 through 152 above as though fully set forth herein.

151.     The MAIC Policy's Exclusion – Prior Knowledge Endorsement modifies Section III - Exclusions of the Policy and provides:

> This Policy provides no coverage for any **loss** in connection with any **claim** alleging, arising out of, based upon, or attributable to:
>
> Any **wrongful act**[5] or **interrelated wrongful acts** related to the Insuring Agreement(s) shown in the Schedule of this endorsement and occurring prior to the applicable Date shown in the Schedule of

---

[5] **Wrongful Act** is defined, in pertinent part, as:
1. With respect to Insuring Agreement **1.**, any actual or alleged error, misstatement, misleading statement, negligent act or omission, or neglect or breach of duty by any **insured adviser** or its **insured persons**, solely in their capacities as such, in rendering or failing to render **investment advisory services**;
2. With respect to Insuring Agreement **2.**, any actual or alleged error, misstatement, misleading statement, negligent act or omission, or neglect or breach of duty by any…

    c. **Professional service provider** or its **insured persons**, solely in their capacities as such, in rendering or failing to render **professional services**…

this endorsement which any **insured** knew or could reasonably have foreseen that such **wrongful act** or **interrelated wrongful acts** could lead to a **claim** under this Policy.

For the purpose of this exclusion, all actual or alleged **interrelated wrongful acts** will be deemed to have taken place on the date on which the earliest of such actual or alleged **wrongful acts** took place.

152.    The Schedule of this Endorsement lists December 31, 2020 as the Prior Knowledge Date for both the Investment Adviser Professional Liability and Professional Liability Coverage Part.

153.    The *Lorenzen* Lawsuit alleges that on December 30, 2020, Schmidt falsely claimed to CGL and others that two of the three films were complete.

154.    On this date, Schmidt also allegedly claimed that "a bidding" was imminent.

155.    Because the Lorenzen Lawsuit alleges Schmidt's statements occurred on December 30, 2020, one day prior to the Prior Knowledge Date, MAIC has no duty to defend, indemnify, and/or reimburse the Defendants for Loss incurred in connection with the *Lorenzen* Lawsuit.

## <u>COUNT VI— DECLARATORY JUDGMENT</u>
### <u>(Exclusion R)</u>

156.    MAIC incorporates Paragraphs 1 through 158 above as though fully set forth herein.

157.    Exclusion R. excludes, in relevant part, coverage for any **loss** in connection with any **claim** alleging, arising out of, based upon, or attributable to:

Any **claim** involving the amount, return, disgorgement or reimbursement of fees, commissions or other sums paid to an **insured** for **investment advisory services** . . . rendered by an **insured;** provided, however, that this exclusion will not apply to **defense costs**.

158.    The *Lorenzen* Lawsuits alleges that Sanford Schmidt unjustly profited from and retained compensation as a result of CBL's investment.

159. Because the *Lorenzen* Lawsuit alleges the return, disgorgement, or reimbursement of fees, commissions, or other sums paid to an Insured for investment advisory services and/or professional services rendered by Schmidt, MAIC has no duty to defend, indemnify, and/or reimburse the Defendants for **loss** incurred in connection with the *Lorenzen* Lawsuit.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Markel American Insurance Company, respectfully requests that judgment be entered in its favor and against the defendants as follows:

A. A declaration that MAIC owes no duty to defend and no duty to indemnify with regard to the Noticed Matters;

B. An award of costs of this suit to MAIC; and

C. An award of such other and further relief as this Court deems just.

Respectfully Submitted,

MARKEL AMERICAN INSURANCE COMPANY

By:/s/  *Daniel R. Formeller*
Daniel R. Formeller
Sarah Hertz Maisel
Simone E. Haugen
Tressler LLP
233 South Wacker Drive – 61st Floor
Chicago, Illinois 60606-6399
(312) 768-2281
Dformeller@tresslerllp.com
SMaisel@tresslerllp.com
SHaugen@tresslerllp.com
*Attorneys for Plaintiff Markel American Insurance Company*

Michael Delhagen (pro hac vice to be filed)
Jennifer Zaluski (pro hac vice to be filed)
Tressler LLP
One Penn Plaza, Suite 4701
New York, NY 10119
*Attorneys for Plaintiff Markel American Insurance Company*

4895-4197-7532, v. 2