# EXHIBIT B

FILED
2/1/2024 12:03 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024L001179
Calendar, W
26225810

FILED DATE: 2/1/2024 12:03 PM   2024L001179

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

| | |
|---|---|
| CBL INVESTMENTS, LLC, a Delaware limited liability company, | |
| *Plaintiff*, | No. |
| v. | JURY TRIAL DEMANDED |
| SANFORD SCHMIDT; SCHMIDT ADVISORY SERVICES, INC., d/b/a CATALYST WEALTH MANAGMENT, an Illinois corporation; and SCHMIDT FINANCIAL GROUP, LLC, an Illinois limited liability company, | 2024L001179 |
| *Defendants.* | |

## COMPLAINT

Plaintiff, CBL Investments, LLC ("CBL"), through its undersigned counsel, Taft Stettinius & Hollister LLP, for its complaint against Defendants Sanford Schmidt, Schmidt Advisory Services, Inc., d/b/a Catalyst Wealth Management, and Schmidt Financial Group (sometimes collectively "Defendants"), hereby states as follows:

### NATURE OF THE ACTION

1. This action arises from a film financing scheme in which Sanford Schmidt ("Schmidt"), personally and through his advisory and financial services companies, deceived and defrauded investor CBL.

2. CBL agreed to help finance a trilogy of animated films about the British explorer Bear Grylls based on Schmidt's representations that the timeline of the investment would be short, that the films had been carefully vetted, and that CBL's investment would be used solely to fund the trilogy. All of these representations proved to be false.

3. Schmidt's deception did not end once CBL made its investment. Based on Schmidt's repeated assurances that the films were near completion and that an exit was imminent, CBL remained invested in the project.

4. More than three years after CBL's initial investment, the films remain unfinished, and more than $3,000,000 in investor funding has gone missing. Schmidt is unable to account for the massive investor shortfall and has set up a "Completion Fund," closely resembling a Ponzi scheme, to raise yet another round of funding.

5. CBL brings this action for violation of the Illinois Securities Law of 1953 (Count I), violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (Count II); fraudulent and negligent misrepresentation (Counts III and IV); breach of fiduciary duty (Count V), and unjust enrichment (Count VI).

## PARTIES, JURISDICTION, AND VENUE

6. CBL is a Delaware limited liability company with its principal place of business in Miami Beach, Florida.

7. Schmidt is an individual and Illinois citizen. On information and belief, Schmidt resides in Northbrook, Illinois.

8. Schmidt Advisory Services, Inc., d/b/a Catalyst Wealth Management ("Catalyst") is an Illinois corporation with its principal place of business in Northbrook Illinois.

9. Schmidt Financial Group, LLC is an Illinois limited liability company with its principal place of business in Northbrook, Illinois.

10. This Court has subject matter jurisdiction over the controversy pursuant to Article VI, Section 9 of the Illinois Constitution.

FILED DATE: 2/1/2024 12:03 PM    2024L001179

11. This Court has personal jurisdiction over Defendants pursuant to 735 ICLS 5/2-209 because Defendants are located in Illinois, because they transact business in this State, and because the tortious acts alleged herein occurred here.

12. Venue is proper in Cook County, Illinois pursuant to 735 ILCS 5/2-101 because Defendants reside here and the transaction out of which this action arose occurred here.

## FACTUAL ALLEGATIONS

**A.     Schmidt sets up a film financing fund and seeks investors.**

13. Schmidt holds himself out as a Chicago-based investment advisor, wealth manager, and financial planner. He is the president of Catalyst, which describes itself as providing "goals-based independent advice and investment management services." He is also the managing member of Schmidt Financial, which advertises itself as a "boutique financial planning firm" serving the high net worth marketplace.

14. Schmidt holds credentials as a certified financial planner ("CFP"), a Chartered Financial Consultant ("ChFC"), a Chartered Life Underwriter ("CLU"); he also holds FINRA Series 6, 22, 63, and 65 securities registrations. These credentials are displayed on the Schmidt Financial website and in Schmidt's professional email signature. Schmidt's clients, including CBL, place trust and confidence in him based on his professional credentials, knowledge, and expertise.

15. One of the investment funds that Schmidt manages is the Catalyst Wealth Management Media Fund I, LLC (the "Fund"). Catalyst serves as the Fund's sole manager.

16. The Fund's strategic partners are the production company Bron Studios ("Bron") and film financing company Creative Wealth Media Finance Corp. ("CWM"). According to a July 2020 Catalyst pitch deck, the Fund's objective and strategy was to generate "high current income

3

with additional strong ancillary returns on digital animated content being exclusively produced for the global streaming market."

17. As an investment advisor, Schmidt had a fiduciary duty to reasonably investigate Bron and CWM. On information and belief, Schmidt, who has no background in film financing, failed to conduct such due diligence.

18. On May 4, 2020, pursuant to a loan and security agreement, CWM agreed to loan to an entity called YBG Commercial Ltd. ("YBG Commercial") approximately $11,000,000 to fund the production of the Young Bear Grylls ("YBG") animated trilogy, with distribution to be handled by Bron. The Catalyst pitch deck showcased the YBG trilogy as one of the Fund's featured projects.

19. In July of 2020, Schmidt prepared a confidential private placement memorandum ("PPM") concerning the offering for sale of interests in the Fund and began recruiting investors through Catalyst and Schmidt Financial.

**B.    Schmidt secures CBL's investment in the YBG trilogy after falsely promising "capital out" in 12 months, that the project was carefully vetted, and that CBL's investment would be used "exclusively" to fund the YBG trilogy.**

20. In late July or early August of 2020, Schmidt, through Schmidt Financial, approached CBL's sole managing member, Christopher Lorenzen, with an opportunity for CBL to become an investor in the financing of the YBG trilogy. Through Lorenzen, Schmidt presented CBL with the pitch deck, PPM, Fund subscription agreement, "Participation Agreement," and term sheet, as well as an advisory agreement with Catalyst.

21. Both the July 2020 pitch deck and the PPM detailed a careful six-step vetting process for all features that the Fund agreed to finance.

4

22. Schmidt urged CBL to invest $1,000,000 in the Fund and $1,000,00,00 in the YBG project, claiming that the profit estimates showed double returns, and that both investments should provide "capital out" within 12 months, plus merchandising and licensing revenue for years to come.

23. Schmidt claimed that he had to convince CWM to open up another $1,000,000 to make room for CBL to invest in the YBG trilogy. "You would be the last one in," he claimed. He touted the rapid success of another advisory client who had previously invested in CWM. Schmidt claimed that this investor would have invested more in the YBG project were he not tied up in another multimillion investment with Schmidt. On information and belief, these statements were false.

24. Through Schmidt Financial and Catalyst, Schmidt offered CBL the opportunity to purchase an undivided fractional interest in CWM's $11,000,000 loan to YBG Commercial. On August 17, 2020, Lorenzen—on behalf of CBL—entered into the Participation Agreement with CWM, in which it agreed to lend CWM $750,000 through a participation note. According to the term sheet included with the Participation Agreement, proceeds of the loan would be "used exclusively to finance the pre-production, production, post-production and delivery of the [YBG] Project." The term sheet stated that the loan term was 18 months.

25. In entering into the Participation Agreement, CBL relied on Schmidt's representations that CBL would receive "capital out" in 12 months, that each film project was carefully vetted, and that CBL's investment would be used "exclusively" to fund the YBG films. Each of these statements has proven to be untrue.

26. CBL and Lorenzen placed their trust and confidence in Schmidt because of his expertise and qualifications as an investment advisor.

5

27. As a condition of the investment, Schmidt also required Lorenzen to enter into the Catalyst advisory agreement.

28. CBL was just one of many investors who, through Schmidt, Catalyst, and Schmidt Financial, funded CWM's loan to YBG Commercial. In total, the investors that Schmidt assembled contributed more than $10,000,000 of the $11,000,000 loan for the YBG trilogy.

**C. Time and again, Schmidt falsely assures investors that the YBG trilogy is on track and their principal is not at risk.**

29. After securing funding for CWM's loan to YBG Commercial, Schmidt repeatedly made misrepresentations to CBL about the status of the films, the prospects for distribution, and the timeline for investors' exit. Given his close relationship to and involvement with the Fund's strategic partners CWM and Bron, Schmidt knew or reasonably should have known these statements were false. Schmidt sent these communications to Catalyst investors from his Schmidt Financial email address.

30. On December 30, 2020, only a few months after CBL entered into the participation agreement, Schmidt falsely claimed to CBL and other investors that the "three Bear Grylls animated movies are well into production with 2 out of 3 complete," and that a bidding was imminent. Once the film was sold, Schmidt claimed, investors would be taken out of the investment within just 45 days.

31. Schmidt knew or reasonably should have known that the films could not yet have been completed, as CWM had only just secured financing—provided by Schmidt's own clients—for its loan to YBG Commercial.

32. On June 9, 2021, Schmidt again emailed investors, including CBL, advising them that production was "underway" and that there were ongoing "sales discussions" regarding distribution rights. "The films will be distributed worldwide in 196 countries," Schmidt claimed,

6

with North American distribution via major streaming services such as Apple, Amazon, Netflix, and HBO Max.

33. Around this same time, lawsuits against Catalyst's strategic partners CWM and Bron began to percolate in the courts based on their failure to repay other investor loans. For example, on October 6, 2021, Hudson Private LP filed suit against CWM, its CEO Jason Cloth, and Bron, alleging that CWM misrepresented that their investments would be used "exclusively to finance the production and delivery of certain film and television productions." *See Hudson Private LP v. Bron Studios USA, Creative Wealth Media Finance Corp. et al.* No. 21-cv-8259 (S.D.N.Y.), Dkt. 1. Given Catalyst's strategic partnership with CWM and Bron, Schmidt knew or reasonably should have known about these lawsuits and the underlying misappropriation of investor funds, yet he said nothing about this issue to investors.

34. On October 20, 2021, CWM provided funding to YBG Commercial for the last time. CWM did not provide any further funds to YBG Commercial after this date. Given Catalyst's strategic partnership with CWM, Schmidt knew or reasonably should have known about this serious breach of the underlying loan agreement, but again he said nothing to investors. It would be another year before Schmidt indicated that the timing of investors' exit had been misrepresented and admitted he knew the films were underfunded, and almost another two years before he would acknowledge that a massive $3,000,000 shortfall was keeping the films far from completion.

35. On May 10, 2022, Schmidt emailed investors, including CBL, claiming that the YBG films were still "out for sale," this time at the Cannes Film Festival. Schmidt advised them that he hoped the Fund's exit would occur at the end of the month. "Your investment in not at risk of loss of principal," he reassured. "Unfortunately, it is just taking longer than expected. We are very close."

7

36. On July 20, 2022, Schmidt reported that the "films were recently completed," and that streaming services including Netflix were vying for distribution. He promised that in an upcoming conference call with CWM's CEO Jason Cloth, he would update investors on their exit from the investment.

37. Months passed without an update. Then, on September 1, 2022, Schmidt emailed investors, including CBL, a projected financial outlook for the YBG franchise, which promised an incredible "80 million of potential revenue"—more than six times the trilogy's initial production budget. Schmidt said he was still determining an exit strategy for investors. He acknowledged that the timing of the investors' exit had been "misrepresented," but that as soon as Bron sold the films, their capital would be returned. "I strongly believe this will be an excellent investment," he stated. "Just taking longer than we had hoped. Thank you for your patience."

38. At this time, where CWM's payments to YBG to fund the production had dried up almost a year ago, other investors were targeting CWM for similar investment schemes, and Schmidt acknowledged that he had misrepresented the timing for investors' exit, Schmidt knew or reasonably should have known that investors funds' were at risk and the YBG films were nowhere near completion. He did nothing to further investigate or apprise investors' of these issues.

39. Instead, despite his knowledge that investors' funds were in danger and the YBG trilogy was underfunded and incomplete, Schmidt continued to represent that investors' funds were in good hands and the films largely completed in order to keep his clients locked into the project.

40. For example, on February 15, 2023, Schmidt emailed investors, including CBL, with another update on the YBG trilogy and financial projections from Bron. "We expect YBG to be monetized this year," Schmidt assured, stating he would know more the following month.

8

According to the email, the first film was "completed," and the second film was in "Post," and the films would be shopped around to global buyers that month.

**D.  In reality, the YBG trilogy was never fully funded.**

41. As it turns out, the YBG films were never fully funded, as CWM only provided to YBG Commercial $7,550,000, leaving a shortfall of approximately $3,000,000. Contrary to Schmidt's misrepresentations, two of the three films still remain unfinished. On information and belief, there was never any bidding war or competition among distributors for the mostly incomplete films. There are no plans for distribution at this time, much less lucrative merchandising and licensing opportunities.

**E.  Schmidt attempts to recover the $3,000,000 shortfall by soliciting additional investment for a "Completion Fund," to the disadvantage of CBL and other original investors.**

42. In or around July of 2023, and unable to account for the $3,000,000 shortfall, Schmidt and an individual named Jeff Krol set up a "Completion Fund" to raise additional funds to complete production of the YBG trilogy.

43. On August 4, 2023, without notice to CBL or any of the other original investors, CWM modified its original loan agreement with YBG Commercial "to enable the Completion Funds . . . to be recouped by those providing the Completion Funds ahead of Lender [CWM] recouping sums due to it pursuant to the [Loan and Security Agreement]." On information and belief, Schmidt, Schmidt Financial, and Catalyst were closely involved in the modification of the original loan agreement to facilitate the Completion Fund and put Completion Fund investors in a first position.

9

44. Because the Completion Fund has priority over the repayment of the original loan, original investors like CBL will now only see a return on their investment once the $3,000,000 shortfall is repaid.

45. Only after the Completion Fund was already set up did Schmidt reach out to investors including CBL. On August 8, 2023, he reported that he had been working "very hard nonstop for the last three months in order to create a fair workable solution for the investors to not only get our investment back but also have a profitable return."

46. On August 22, 2023, Schmidt emailed CBL regarding the Completion Fund, stating everyone was still "all very bullish" on the global opportunity for the YBG films and their monetization, and inviting him to join a conference call regarding the Completion Fund.

47. On September 27, 2023, CBL and other Catalyst investors participated in a conference call hosted by Krol and Schmidt regarding the Completion Fund. During the call, Schmidt admitted that he knew *for a year prior* that the YBG trilogy was vastly underfunded and mismanaged and that investor funds had been misappropriated, and that a Bron executive had personally communicated this issue to him. Schmidt further admitted that he had consulted months ago with several of the various law firms that had filed suit against CWM for similar investment schemes. Schmidt, however, said nothing to investors and instead continued to represent that the project was near completion and investors could expect an exit soon.

48. In an email dated October 3, 2023, Schmidt acknowledged to CBL that CWM was a "bad apple" and that he never could have imagined he would be "investing with a con man." That same month, CWM and Bron both filed for bankruptcy.

49. The Completion Fund subsequently entered into an agreement with YBG Commercial to fund the last two YBG films.

10

50. The missing $3,000,000 remains unaccounted for. Schmidt has not provided further updates to CBL or Lorenzen on the status of the trilogy.

51. More than three years have passed since Schmidt, through Catalyst and Schmidt Financial, initially raised over $10,000,000 in capital. And more than three years have passed since Schmidt falsely reported to CBL and other investors that the films were "well into production."

52. On information and belief, the films remain unfinished to this day.

## COUNT I
## Violation of the Illinois Securities Law of 1953
## 815 ILCS 5/12(f), (g), and (j)

53. CBL incorporates by reference the foregoing paragraphs as if fully set forth herein.

54. Section 12(f) of the Illinois Securities Law of 1953 ("ISL") makes it unlawful to "engage in any transaction, practice or course of business in connection with the sale or purchase of securities which works or tends to work a fraud or deceit upon the purchaser or seller thereof." 815 ILCS 5/12(f).

55. Section 12(g) of the ISL makes it unlawful to "obtain money or property through the sale of securities by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 815 ILCS 5/12(g).

56. In offering CBL the opportunity to purchase an interest in CWM's loan to YBG Commercial, Schmidt engaged in the sale of an unregistered security.

57. In violation of Sections 12(f) and 12(g), Schmidt, personally and through Catalyst and Schmidt Financial, engaged in various practices that tended to work a fraud or deceit upon CBL and made false statements of facts to CBL in connection with the sale of the security. These deceitful practices and misrepresentations included telling CBL that he had to convince CWM to

11

"open up" an additional investment opportunity for CBL; that CBL could expect "capital out" within 12 months; that each CWM film project was carefully vetted; and that CBL's investment would be used "exclusively" to fund the YBG trilogy.

58. CBL reasonably relied on Schmidt's deceptive acts and misrepresentations in electing to purchase the security.

59. As a direct and proximate of Schmidt's deceptive acts and misrepresentations, CBL was damaged, losing its initial investment of $750,000.

60. Section 12(j) of the ISL makes it unlawful, when acting as an investment advisor, directly or indirectly: "(1) To employ any device, scheme or artifice to defraud any client or prospective client; (2) To engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client; or (3) To engage in any act, practice, or course of business which is fraudulent, deceptive or manipulative." 815 ILCS 5/12(j).

61. Schmidt is a professionally qualified investment advisor and holds himself out as such through Catalyst and Schmidt Financial.

62. In violation of Section 12(j), Schmidt, as an investment advisor, engaged in various practices that tended to work a fraud or deceit upon CBL and made fraudulent misrepresentations to CBL in connection with the sale of the security and afterward. These deceptive practices and misrepresentations include those set forth in Paragraph 54. In addition, as an investment advisor, Schmidt continually misrepresented the status, profitability, and investor exit timeline for the YBG trilogy. Further, Schmidt failed to inform CBL that CWM was hit with multiple lawsuits in 2021 based on its failure to pay investors and had stopped providing any funding to YBG Commercial by October of 2021. Even though Schmidt knew that the YBG trilogy was vastly underfunded and mismanaged, he falsely claimed that investors' funds were not at risk and that the films were

12

largely completed. In addition, Schmidt did not inform CBL of the $3,000,000 shortfall until after setting up the Completion Fund, which disadvantaged CBL and other original investors.

63. CBL reasonably relied on Schmidt's deceptive acts and misrepresentations in electing to purchase the security and in remaining invested in the YBG trilogy.

64. As a direct and proximate of Schmidt's deceptive acts and misrepresentations as an investment advisor, CBL was damaged, losing its initial investment of $750,000.

65. Pursuant to Section 13 of the ISL, every sale of a security made in violation of the ISL is voidable at the election of the purchaser, and each issuer, controlling person, underwriter, dealer, or other person on behalf of whom the sale was made, as well as any person who participated or aided in making the sale, shall be jointly and severally liable "for the full amount paid, together with interest from the date of payment for the securities sold." 815 ILCS 5/13.

## COUNT II
**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act**
**815 ILCS 505/2**

66. CBL incorporates by reference the foregoing paragraphs as if fully set forth herein.

67. Schmidt, personally and through Catalyst and Schmidt Financial, has committed various deceptive acts in violation of the Illinois Consumer Fraud and Deceptive Trade Practices Act ("ICFA"), including making misrepresentations to induce CBL to invest and remain invested in the YBG trilogy. These misrepresentations included telling CBL that he had to convince CWM to "open up" an additional investment opportunity for CBL; that CBL could expect "capital out" within 12 months; that each CWM film project was carefully vetted; and that CBL's investment would be used "exclusively" to fund the YBG trilogy. Further, Schmidt failed to inform CBL that CWM was hit with multiple lawsuits in 2021 based on its failure to pay investors and had stopped providing any funding to YBG Commercial by October of 2021. Even though Schmidt knew that

13

the YBG trilogy was vastly underfunded and mismanaged, he falsely claimed that investors' funds were not at risk and that the films were largely completed. In addition, Schmidt did not inform CBL of the $3,000,000 shortfall until after setting up the Completion Fund, which disadvantaged CBL and other original investors.

68. Schmidt intended for CBL to rely on these deceptive acts and CBL did rely on them.

69. Schmidt's deceptions occurred during the course of trade or commerce.

70. As a direct and proximate of Schmidt's deceptions, CBL was damaged, losing its initial investment of $750,000.

71. In addition to the deceptive acts set forth above, Schmidt has also engaged in unfair practices in violation ICFA, including failing to conduct due diligence at the outset of the YBG project and after the project was funded.

72. Schmidt's conduct constitutes an unfair practice under ICFA in that offends public policy, is oppressive, and causes substantial injury to consumers.

## COUNT III
## Fraudulent Misrepresentation

73. CBL incorporates by reference the foregoing paragraphs as if fully set forth herein.

74. Schmidt, personally and through Catalyst and Schmidt Financial, made fraudulent misrepresentations to CBL in order to induce CBL to invest and remain invested in the YBG trilogy, including that he had to convince CWM to "open up" an additional investment opportunity for CBL; that CBL could expect "capital out" within 12 months; that each CWM film project was carefully vetted; and that CBL's investment would be used "exclusively" to fund the YBG trilogy; that investors' funds were not at risk; and that the films were largely completed. In addition to these false statements, Schmidt continually misrepresented the status, profitability, and investor

14

exit timeline for the YBG trilogy and hid from investors his knowledge that the films were vastly underfunded and mismanaged. Further, Schmidt did not inform CBL of the $3,000,000 shortfall until after setting up the Completion Fund, which disadvantaged CBL and other original investors.

75. Schmidt knew or should have known that the representations were false when he made them and intended CBL to rely on the false representations.

76. CBL reasonably relied on Schmidt's misrepresentations, investing $750,000 and remaining invested in the project based upon Schmidt's false assurances that the project was on track and CBL's principal was not at risk.

77. As a direct and proximate result of Schmidt's misrepresentations, CBL was damaged, losing its initial investment of $750,000.

78. Schmidt's conduct was willful and intentional, and as a result, CBL is entitled to punitive damages.

## COUNT IV
### Negligent Misrepresentation

79. CBL incorporates by reference the foregoing paragraphs as if fully set forth herein.

80. Schmidt, personally and through Catalyst and Schmidt Financial, made negligent misrepresentations to CBL in order to induce CBL to invest and remain invested in the YBG trilogy, including that he had to convince CWM to "open up" an additional investment opportunity for CBL; that CBL could expect "capital out" within 12 months; that each CWM film project was carefully vetted; and that CBL's investment would be used "exclusively" to fund the YBG trilogy; that investors' funds were not at risk; and that the films were largely completed. In addition to these false statements, Schmidt continually misrepresented the status, profitability, and investor exit timeline for the YBG trilogy and hid from investors his knowledge that the films were vastly

15

underfunded and mismanaged. Further, Schmidt did not inform CBL of the $3,000,000 shortfall until after setting up the Completion Fund, which disadvantaged CBL and other original investors.

81. Schmidt was negligent in ascertaining the truth of the representations when he made them and intended CBL to rely on the negligent representations.

82. CBL reasonably relied on Schmidt's misrepresentations, investing $750,000 and remaining invested in the YBG trilogy based upon Schmidt's false assurances that the project was on track and CBL's principal was not at risk.

83. As a direct and proximate result of Schmidt's misrepresentations, CBL was damaged, losing its initial investment of $750,000.

## COUNT V
## Breach of Fiduciary Duty

84. CBL incorporates by reference the foregoing paragraphs as if fully set forth herein.

85. As an investment advisor, wealth manager, and financial planner, Schmidt had a fiduciary duty to his clients, including CBL, who placed trust and confidence in Schmidt.

86. Schmidt breached his fiduciary duty by, among other things, making false and/or negligent misrepresentations to CBL at the time of its investment in the YBG trilogy and after, including claiming that CBL's investment was not at risk when he knew or reasonably should have known that it was and claiming the films were completed when he knew or reasonably should have known they were not. In addition, Schmidt breached his fiduciary duty by failing to inform CBL of the litigation against CWM and CWM's failure to fund the YBG trilogy as early as October of 2021, failing to inform CBL that he was aware the films were vastly underfunded and mismanaged, failing to inform CBL of the $3,000,000 shortfall until after the Completion Fund was created, and then subordinating CBL's interests to those of Completion Fund investors. In addition, Schmidt failed to conduct due diligence at the outset of the YBG project and after the project was funded.

16

87. As a direct and proximate result of Schmidt's breach of his fiduciary duties, CBL was damaged, losing its initial investment of $750,000.

## COUNT VI
## Unjust Enrichment

88. CBL incorporates by reference the foregoing paragraphs as if fully set forth herein.

89. In securing CBL's investment in the YBG trilogy, Schmidt misrepresented that CBL could expect "capital out" within 12 months; that each CWM film project was carefully vetted; and that CBL's investment would be used "exclusively" to fund the YBG trilogy. In addition to these false statements, Schmidt continually misrepresented the status, profitability, and investor exit timeline for the YBG trilogy and omitted critical information regarding Catalyst's strategic partners CWM and Bron.

90. CBL relied on Schmidt's promises in investing and remaining invested in the YBG trilogy pursuant to the Participation Agreement.

91. Schmidt unjustly profited from and retained compensation as a result of CBL's investment, which was not used to fund the YBG trilogy as promised.

92. Schmidt's retention of these benefits violates fundamental principles of justice, equity, and good conscience.

## JURY DEMAND

Plaintiff CBL demands a trial by jury on all claims so triable.

WHEREFORE, Plaintiff CBL Investments, LLC respectfully requests that this Court: (a) enter judgment in its favor and against Defendants Sanford Schmidt, Catalyst Advisory Services, Inc., d/b/a Catalyst Wealth Management, and Schmidt Financial Group; (b) declare the sale of the security void under Section 13 of the Illinois Securities Law of 1953 and award CBL the full amount paid for the security with interest; (c) award CBL all compensatory and punitive damages

FILED DATE: 2/1/2024 12:03 PM 2024L001179

to which it is entitled, plus interest, in an amount to be determined at trial; (d) award CBL reasonable attorneys' fees and costs to the extent allowed by law; and (e) grant any other and further relief as this Court deems equitable and just.

Dated: February 1, 2024　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　　CBL INVESTMENTS, LLC

　　　　　　　　　　　　　　　　　　　　　By: */s/ William J. Serritella*　　　　
　　　　　　　　　　　　　　　　　　　　　　　　*One of Its Attorneys*

　　　　　　　　　　　　　　　　　　　　　William J. Serritella, Jr.
　　　　　　　　　　　　　　　　　　　　　wserritella@taftlaw.com
　　　　　　　　　　　　　　　　　　　　　Elizabeth A. Winkowski
　　　　　　　　　　　　　　　　　　　　　ewinkowski@taftlaw.com
　　　　　　　　　　　　　　　　　　　　　TAFT STETTINIUS & HOLLISTER LLP
　　　　　　　　　　　　　　　　　　　　　111 East Wacker Drive, Suite 2600
　　　　　　　　　　　　　　　　　　　　　Chicago, Illinois 60601
　　　　　　　　　　　　　　　　　　　　　(312) 527-4000
　　　　　　　　　　　　　　　　　　　　　Firm ID No. 29143