# EXHIBIT C

FILED
3/5/2024 12:28 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024CH01610
Calendar, 1
26678234

FILED DATE: 3/5/2024 12:28 PM  2024CH01610

# IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| DIANE FOWLER, individually and on behalf of the class members described below, )<br><br>Plaintiff, )<br><br>v. )<br><br>SCHMIDT ADVISORY SERVICES, INC. d/b/a CATALYST WEALTH MANAGEMENT, SANFORD SCHMIDT ETHAN SCHMIDT, JORDAN SCHMIDT, and JASON CLOTH, )<br><br>Defendants, )<br><br>C2 MOTION PICTURE GROUP, LLC, )<br><br>Respondent in Discovery. ) | No.  2024CH01610 |

## CLASS ACTION COMPLAINT

Plaintiff, DIANE FOWLER, individually and on behalf of class members described below, by and through her undersigned attorneys, LOFTUS & EISENBERG, LTD. and for her Complaint against Defendants, SCHMIDT ADVISORY SERVICES, INC. d/b/a CATALYST WEALTH MANAGEMENT, SANFORD SCHMIDT, JORDAN SCHMIDT, and JASON CLOTH states as follows:

### I.      INTRODUCTION

1.      Jason Cloth is a movie producer and principal of two bankrupt entities. Cloth purported to raise money for specific movie projects but instead commingled all the invested funds and moved money from entity to entity without any regard for what was agreed to with investors. At some point in or about 2021 the scheme turned Ponzi and in 2023 it went bankrupt.

FILED DATE: 3/5/2024 12:28 PM   2024CH01610

2.      Hollywood loves sequels and so do Jason Cloth ("Cloth") and Aaron Gilbert ("Gilbert"). In the late 2010's Cloth's business partner Gilbert benefitted from another film Ponzi Scheme called Crystal Wealth that victimized thousands of Canadian investors. The Crystal Wealth scheme ended with a soft landing for Gilbert and a huge settlement from Crystal Wealth's auditor for not realizing the Ponzi Scheme sooner. Right about when Crystal Wealth was cratering, Creative Wealth Media Fund ("CWMF") came in and took up the mantle with Gilbert and engaged in the same practices with new investors, this time in America.

3.      Since approximately 2021 Cloth does not pay investors on profitable projects, makes lulling payments on unprofitable projects to select investors, and repeatedly misrepresents facts in order to induce investment and keep investors at bay while maintaining his lavish lifestyle.

4.      Ethan Schmidt ("Ethan"), Jordan Schmidt ("Jordan"), Sanford Schmidt ("Sandy" or "Sanford"), and SCHMIDT ADVISORY SERVICES, INC. d/b/a CATALYST WEALTH MANAGEMENT ("SAS")(collectively "Schmidt") served as the brokers for Cloth in America, Schmidt held themselves out as a fiduciary for investors and sold dozens of individuals on the lies told by Cloth raising over $30,000,000 in Cook County.

## II.   **PARTIES**

5.      Plaintiff, Diane Fowler, is, and at all times relevant to this action, has been a citizen of the state of Oklahoma and domiciled in Oklahoma.

6.      Defendant, Sanford Schmidt, is a citizen of Illinois and domiciled in Cook County, Illinois.

7.      Defendant, Jordan Schmidt, is a citizen of Illinois and domiciled in Cook County, Illinois.

8.      Defendant, Ethan Schmidt, is a citizen of Illinois and domiciled in Cook County, Illinois.

9. Defendant, SCHMIDT ADVISORY SERVICES, INC. d/b/a CATALYST WEALTH MANAGEMENT, is an Illinois company whose sole member is Sanford Schmidt.

10. Defendant, Jason Cloth, is a citizen of Canada and domiciled in Florida.

11. Respondent in Discovery, C2 Motion Picture Group, LLC ("C2") is a Delaware Limited Liability Company operated by Cloth and Dave Kaplin.

### III. JURISDICTION AND VENUE

12. Pursuant to 735 ILCS 5/2-209, this Court has personal jurisdiction over Defendants because Defendants committed the tortious acts complained of in Cook County, Illinois.

13. Venue in this county is proper pursuant to 735 ILCS 5/2-101, because the acts and omissions complained of occurred in this county. Defendants purposely availed themselves of jurisdiction in Cook County by contracting with Cook County residents, directing phone, email, and letter correspondence to investors in Cook County, meeting with investors in Cook County and making oral misrepresentations here. CWMF raised over $34,000,000 in Illinois of its $80,000,000 total capital raised.

14. The unregistered securities at issue in this case are not "covered securities" within the meaning of National Securities Market Improvement Act of 1996 (NMSIA), 15 U.S.C. § 77r(b), and accordingly this action is not removable to federal court under the Securities Litigation Uniform Standards Act (SLUSA), 15 U.S.C. § 77p(f)(3), nor is it subject to the procedural requirements of the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u–4(a). The securities were not issued by a nationally registered investment company nor was it designated for trading in a national securities exchange.

15. Schmidt are forum defendants from whom significant relief is sought, greater than two thirds of the Schmidt Class are domiciled in Cook County, and the claims relate to the rights, duties, and obligations relating to or created by or pursuant to a security. 28 U.S.C. § 1332(d)(4)(B); § 1332(d)(9).

FILED DATE: 3/5/2024 12:28 PM 2024CH01610

FILED DATE: 3/5/2024 12:28 PM   2024CH01610

IV.   **FACTS COMMON TO ALL COUNTS**

A.   **Cloth's Fraudulent Scheme**

16.   Cloth is an individual who resides in Florida. Cloth is the owner and control person of Creative Wealth Media Finance Corp. ("Creative Wealth" or "CWMF") and several related entities.

17.   Creative Wealth is a pass through entity with no assets.

18.   On its website, Creative Wealth describes itself as "a prolific film and television financing company that has executive produced over 50 movies, while raising and deploying in excess of $650 million for a portfolio of critical hits, commercial blockbusters and cult favorites."

19.   Creative Wealth is the primary financier for BRON Studios (defined below) since Crystal Wealth was shut down by regulators.

20.   Cloth is the founder of Creative Wealth and serves as its managing director. He is also the co-founder of BRON Creative, as described below, and Cloth owns 15% of BRON Studios at all times relevant.

21.   BRON Studios, Inc. is a corporation incorporated under the laws of the Province of Vancouver, Canada, with its principal place of business in Vancouver, British Columbia.

22.   Except where otherwise noted, BRON Studios USA, Inc. and BRON Studios, Inc. are referred to together herein as "BRON Studios." Bron Studios is controlled by Aaron Gilbert and Jason Cloth.

23.   Cloth was a director of BRON Studios at all times relevant.

24.   Bron and Gilbert were previously involved in another Canadian Ponzi Scheme called "Crystal Wealth" and portentously referred to as "CWMF".

25.   Creative Wealth follows the name and business model of Crystal Wealth that was operated by Clayton Smith.

FILED DATE: 3/5/2024 12:28 PM   2024CH01610

26.     Throughout the late 2010's Smith produced movies alongside Cloth including "The Childhood of a Leader".

27.     As of 2017 Crystal Wealth claimed to have $193 million under management that were for the most part invested in Aaron Gilbert's Media House Capital and used to fund Bron productions. Crystal Wealth operated as a Ponzi Scheme premised on funding big budget film projects.

28.     After an Ontario Securities Commission ("OSC") investigation and insolvency proceeding, Crystal Wealth's principal, Clayton Smith, escaped with a fine that was never paid and Aaron Gilbert and Bron were allowed to continue with their operations and repeat the scam with a new "CWMF" called Creative Wealth.

29.     Ultimately Crystal Wealth's auditor, BDO, bore the brunt of the many unpaid investors and settled for tens of millions of dollars.

30.     Right when Crystal Wealth was cratering in bankruptcy and securities enforcement actions, BRON Studios was making millions with its new partner Creative Wealth on the movie Joker.

31.     C2 Motion Picture Group, LLC ("C2") is a Delaware Limited Liability Company operated by Cloth and Dave Kaplin.

32.     C2 was formed on May 5, 2022, just as Creative Wealth and BRON Studios were defaulting.

33.     C2 picked up where Creative Wealth left off but apparently with new investors.

34.     Cloth raised tens of millions of dollars in the United States for several pictures and series from approximately 2019 through 2023 on behalf of BRON Studios, Crystal Wealth, CWMF, and now C2.

35.     Cloth raised the bulk of the American investment via two intermediaries or brokers, Schmidt and Maraboyina Capital ("Maraboyina") in Texas.

FILED DATE: 3/5/2024 12:28 PM    2024CH01610

36.     Schmidt's compensation from Creative Wealth was not disclosed, but upon information and belief he received a carried interest in the "investments" he placed he placed with Creative Wealth.

37.     Cloth's scheme was complicated, and it appears that it did not matter what project an investor supposedly invested in, and instead, Cloth just paid who he felt he needed to in order to keep his scheme going.

38.     Investors were promised repayment based on the success of specific film projects.

39.     Investors were promised that they would be paid if the project was profitable and accepted the risk that they would not be paid if it was not profitable.

40.     Investors were led to believe that they had a direct interest in the project and the success or failure of the investment only depended on the profits of the project.

41.     Investors were assured that each project was thoroughly analyzed and would be successful.

42.     Contrary to the promises made, Cloth would pay whatever he felt like whenever he felt like regardless of the success or failure of the project invested in.

43.     Upon information and belief, a significant portion of the money invested was consumed by Cloth and his salesmen and never actually invested in film production.

44.     Cloth would invest in movies via various entities, but the repayments made to investors had little relation to what they purportedly invested in.

45.     Cloth would pay out on investments in failed projects when it suited his needs to keep an investor engaged.

46.     Cloth would not pay investors on successful projects when it did not suit his needs to keep that particular investor paying.

47.     At times, investors would be promised payment based on the success of projects they did not even invest in.

FILED DATE: 3/5/2024 12:28 PM   2024CH01610

48. Since forming C2 Cloth has promised Class Members that they will be repaid for investments in Creative Wealth and CWMF from C2.

49. Creative Wealth, CWMF, and BRON Studios had no internal controls, audits, or any structure in place to ensure the invested funds went where they were promised to go. The lack of auditing is the only material difference between Creative Wealth and CWMF.

50. Cloth's scheme of misrepresentations and robbing profitable ventures to make Ponzi payments on others is best illustrated with a handful of specific projects Class Members invested in:

### i. Ghostbusters: Afterlife

51. On or about December 18, 2018, Bron Creative, the joint venture between Bron Studios and Creative Wealth Media, closed a multi-picture, $100 million co-financing deal with Warner Bros. that included investment in Ghostbusters: Afterlife ("Ghostbusters").

52. Ghostbusters was a huge financial success. Its budget was only $75 million and it made $204 million at the box office alone following its release on November 19, 2021.

53. Despite the huge success, investors were not paid.

54. On June 15, 2022, Maraboyina emailed an investor:

"I wanted to give you an update on Ghostbusters. We received the first studio ultimate in January, and then recently received the second one (numbers as of 3/31/2022). Profit is continuing to increase, and the next studio ultimate will come out at the end of June. I have attached the first ultimate and a screenshot of the most recent one is attached below. We will be financing repayment based upon the next ultimate. Full repayment is expected within the next 30-60 days. I appreciate your patience as this project was delayed, but I think you will be very happy with the final return. If you have any questions, please let me know"

55. On August 26, 2022, Maraboyina emailed an investor:

Good afternoon. I hope that you are doing well. We just received an update on the Ghostbusters repayment, and I wanted to keep you in the loop as to timing and when to expect a wire. We are working with BRON and Comerica for the line of credit that will allow us to repay principal, interest, and an initial tranche of profit as quickly as possible.

FILED DATE: 3/5/2024 12:28 PM  2024CH01610

BRON and Sony have signed off on all documents and have send everything to Comerica. They are establishing a separate facility for this one transaction and not putting it through their general line of credit. While beneficial - no cross-collateralization risk for investors and straight forward reporting - it still requires a few more steps to establish than putting the studio ultimates through our existing line. BRON just received a new ultimates report from Sony that will provide for additional funds to be pulled through the facility. They have additionally already received approximately 90% of the value of the tax credits on the film, so future tax credit receipts will not have a material effect on the amount available through the refinancing. **Comerica will provide all the loan documents as well as work with Sony to get any third-party documents sorted. Sony needs to execute an NOA with Comerica confirming the agreement to provide financial information directly to Comerica and several other covenants that are specifically negotiated**. BRON got ahead of this and this document is substantially negotiated at this point. In addition to the loan documents and the Sony agreement, there are several other documents, for example, certificates of insurance from Sony, that we are working on obtaining now to ensure a quick closing. That said, **a realistic timeframe from this point forward is three to four weeks. We are doing everything we can to push Comerica to move faster than this, but I wanted to give you an estimate.**

56.     On September 15, 2022, Maraboyina emailed an investor on behalf of CWMF:

"Ghostbusters repayment is imminent, so we will have that out in the next few business days."

57.     Schmidt made similar promises to his investors in late 2022 about Ghostbusters

paying soon.

58.     On September 21, 2022, Maraboyina emailed another investor on behalf of CWMF:

**We just received an update on the Ghostbusters repayment**, and I wanted to keep you in the loop as to timing and when to expect a wire. **We are working with BRON and Comerica for the line of credit that will allow us to repay principal, interest, and an initial tranche of profit as quickly as possible.**

BRON and Sony have signed off on all documents and have send everything to Comerica. They are establishing a separate facility for this one transaction and not putting it through their general line of credit. While beneficial - no cross-collateralization risk for investors and straight forward reporting - it still requires a few more steps to establish than putting the studio ultimates through our existing line....
Comerica will provide all the loan documents as well as work with Sony to get any third-party documents sorted. Sony needs to execute an NOA with Comerica confirming the agreement to provide financial information directly to Comerica and several other covenants that are specifically negotiated. BRON got ahead of this and this document is substantially negotiated at this point.

In addition to the loan documents and the Sony agreement, there are several other documents, for example, certificates of insurance from Sony, that we are working on obtaining now to ensure a quick closing.

That said, **a realistic timeframe from this point forward is 5-7 business days**. We are doing everything we can to push Comerica to move faster than this, but I wanted to give you an estimate

59.     On October 4, 2022, Maraboyina emailed an investor on behalf of CWMF:

"I spoke with Arron this morning **and we are waiting on funds from Comerica which will then be transferred to BRON and then to CWM.** We are expending this any day now. I know the delay has been frustrating for everyone; I following up daily with Aaron Gilbert and his team"

60.     On October 28, 2022, a CWMF employee emailed an investor:

"We have a checklist call with Akin (bank's counsel) today but we don't have that far to go to get to a closing on Ghostbusters. Because it's being pulled from our general line of credit, we'll need Union's approval and a few other issues need to be addresses, but the action loan itself is quite advanced and I don't see other issues causing any material delays...."

61.     On February 16, 2023, Cloth emailed Maraboyina: "we are expecting $ right now within days."

62.     On February 19, 2023, Cloth emailed Maraboyina: "26% and it will be in next week."

63.     Cloth told another investor Bron received 33% of the profits.

64.     Class members were never paid the full return on their Ghostbusters investment.

65.     Plainly, Cloth promised more returns than he could satisfy and his salesmen, Schmidt and Maraboyina were oblivious to the inner workings of the scheme they were promoting.

66.     Another investor was repaid less than half his principal invested in Ghostbusters, and payment came from an entity called Shaggy Dog Media that was not disclosed in any investment documents.

67.     In July 2023, Cloth said another large investor was paid on Ghostbusters.

FILED DATE: 3/5/2024 12:28 PM   2024CH01610

FILED DATE: 3/5/2024 12:28 PM   2024CH01610

**ii. Monkey Man**

68.     CWMF and Bron produced the Dev Patel movie, Monkey Man. It was produced at a total expense of $10,500,000 and then sold to Netflix for $34,000,000.

69.     Monkey Man was a huge success.

70.     Cloth claimed that Creative Wealth actually received 25% of Monkey Man's net profits in compensation for a $6,500,000 loan.

71.     Further, Creative Wealth had registered a charge on Kid Unknown Holdings Ltd., the production company for the Monkey Man project, on or about March 30, 2021 and that this charge was satisfied on or about August 6, 2021. In other words, it appears as though Creative Wealth received monies in connection with the Monkey Man project over two years ago, yet has failed to pay anything to investors.

72.     On January 27, 2022, Schmidt repeated Cloth's representation to investors that Monkey Man sold for $33,000,000 with a total profit of over $20,000,000,

73.     On September 7, 2022, Maraboyina emailed an investor:

Netflix has the film and editing is complete. BRON is finalizing everything with Netflix's lawyers, and we expect everything to be completed in the coming weeks. Netflix will be paying BRON starting at the end of the year, but CWM is going to be paying investors in the next month or so with other funds.

74.     Despite the success of Monkey Man, Class Members were not paid on their investment in the project.

**iii. Shadowplay**

75.     On or about March 19, 2020, Class Members invested in financing episodes 101-108 of the series Shadowplay.

76.     Class Members entered into a participation agreements that provided:

Financier shall participate in the Collections and be repaid principal and interest and share in "Adjusted Gross Revenues" derived from exploitation of the Picture,

10

FILED DATE: 3/5/2024 12:28 PM   2024CH01610

on and subject to the terms provided in Schedule "A" to the extent of its Participation.

Lender agrees to pay and otherwise account to Financier on or about fifteen (15) calendar days after Lender's actual receipt of amounts due and payable to Lender pursuant to the Financing Agreements, amounts due and payable to Financier, pursuant to the Client Term Sheet in respect of the Participation, as such amounts are earned and paid by the Borrower to Lender, pursuant to the terms of the Financing Agreements

77.     On July 16, 2020, Cloth entered into term sheet for another loan for the same project with the same terms with Hudson, LP.

78.     On December 9, 2020, Maraboyina emailed an investor:

The production risk isn't an issue for any of your investments. Digital Animation will be sold within a couple of months. Shadowplay repayment is scheduled for February.

79.     On March 4, 2021 a class member texted Maraboyina:

Q: Hey do you have any update on Shadowplay repayment?
A: Will have an update from BRON by end of the day today.

80.     On April 16, 2021, Maraboyina emailed an investor:

Casey, I hope that you are doing well. I wanted to get back to you regarding an update on Shadowplay. The sale to Netflix is being finalized right now but has been delayed several weeks as a result of..."

81.     An investor told Maraboyina that he could invest more as soon as Shadowplay paid off.

82.     On February 2, 2022, the investor's investment in Shadowplay miraculously paid off right in time for him to invest in another CWMF film, National Anthem.

83.     The payoff on Shadowplay had nothing to do with the success of the investment and everything to do with the investor's willingness to rollover the investment into another project.

84.     Cloth stated in affidavit filed on December 16, 2022 in SDNY 1:22-cv-05520:

[Shadowplay] was not successful as Creative Wealth had hoped, and Shadowplay did not generate sufficient gross receipts to pay Hudson. Therefore, no amount is due and owing to Hudson, from Creative Wealth or anyone else" (affidavit exhibit)

11

"repayment of those outstanding amounts was conditioned on Shadowplay's generation of sufficient receipts."

85.     The same terms for the same investment yielded a 20% profit for one investor while another investor received nothing on the same purportedly failed project.

**iv. Gossamer**

86.     Class Members invested in two failed projects Fables and Gossamer.

87.     Both projects were complete failures and nothing was paid.

88.     On June 3, 2022, Oaks invested in Gossamer.

89.     On June 16, 2022, Maraboyina told investors that CWMF renegotiated the deal with Bron and was now getting 40% of the profits on Gossamer.

90.     On January 27, 2023, Cloth communicated to Sandy Schmidt in Illinois:

I've been asked to provide a further update on the initial financial exit from the various film / TV productions financed by all of you. Firstly, and I cant stress this strongly enough, there is zero risk of non repayment. **All the shows, except for Bear Grylls (that deal is being worked on now) are sold and have sold for far in excess of production cost**. I think Ive stated this before, film finance is very much akin to a first lean construction finance loan. Other then the first 10-15% of monies received, we are always the first party to be repaid with interest. Just like construction, the purchaser of the property does not "close" until the project is delivered as substantially complete. That is exactly the same mechanic in film at tv finance. We have multiple, non related productions contained within a fund and a few one off productions that sit exclusive to the media fund. Delivery of all of these shows will occur anywhere from a few months from now to 18-24 months from now. If we waited for delivery and payment from the studios / distributors repayment would be irregular and very choppy. I found over the years that didn't sit well with clients and caused needless angst to clients. **Aaron Gilbert and myself took it upon ourselves to put in place a credit facility which allows us to take deal paper and bring forward the cash value. That value is to exclusively be used to repay clients from the underlying deals. To get to that point all 26 agreements on all 9 shows need to be legally reopened and Comerica inserted as a party to the transaction**. Once new docs are drafted, they must be sent to the legal council of every party connected to each show for review and comment. Once everyone has agreed to all of the new docs they have to go out for wet ink signatures. **Once all the wet ink is back at Comerica, closing is arranged (usually within 48 hours) and funds are transferred to our collection account for distribution to clients. Closing a bank facility for 1 show**

FILED DATE: 3/5/2024 12:28 PM  2024CH01610

**is heavy work, 9 is enormous**. Covid played a role in slowing the lawyers work in Dec and early Jan, but things are rolling along now. I've told Sandy this on numerous occasions that there are probably 100 people working to push all parties to review, comment, sign, and execute documents as soon as possible. I cant push people any harder. They will stop taking my call. We are all at the end here. **I anticipate funds closing very shortly, as a matter of fact I'm being told imminently. The payments being processed now will allow for full exits with all outstanding interest.** Further profit participation will provide investors with returns well above 100%. Future revenues will include; merchandise, gaming, publishing, music, digital strategies (nft). You all will make money for years to come from these shows. For further comfort (and please do not share any of this info with anyone outside our group), I am going to give out the purchase details for each show. For clarification though, I must admit that I don't have all of the waterfalls yet (those are being prepared) so I cant quite calculate the exact quantum of profit owed to us per project. Also please remember that we are only one of many parties entitled to profit participation.

**Monkey Man**
 10,500,000cost
Netflix  33,000,000 purchase price

**Hailey and the Hero Heart**
2,775,000 (CW Loan)
Warner Brothers (Cartoon Network)  3,650,000 (only for North America)
The rest of the world is being sold now

**Bubbles Hotel**
5,500,000 (CW Loan)
Warner Brothers (Cartoon Network)   8,700,000 purchase price

**Fables**
10,500,000 cost
Netflix (North America) Paramount + (Rest of World)
17,000,000 purchase price

**Gossamer**
10,800,000 cost
Netflix (North America) Paramount + (Rest of World)
18,700,000 purchase price

**Robin Hood**
 In production

Bear Grylls Corporate have agreed to post a corporate guarantee of our loan. That guarantee is being financed with our Comerica line as well. Clients will reveive

FILED DATE: 3/5/2024 12:28 PM  2024CH01610

their investment plus outstanding interest. A distribution deal is being worked on now, and I should have further details shortly to share with you.

As always, I don't take it lightly that you have all entrusted me with your hard earned money. We are always very careful to select shows that we identify as those with the greatest return potential that can survive in all market conditions. I know you will all be happy and impressed with the total return performance of these first few shows.

91. Cloth told Schmidt Gossamer was already sold but didn't pay investors anything for their investment in it.

92. Cloth's favorite lie to deploy when in a bind is that a Comerica line of credit will soon come save the day and neither Schmidt nor Maraboyina bothered to confirm there was actually a line of credit or that it would be used to pay investors.

**v. Young Bear Grylls**

93. On May 4, 2020, pursuant to a loan and security agreement, CWMF agreed to loan to an entity called YBG Commercial Ltd. ("YBG Commercial") approximately $11,000,000 to fund the production of the Young Bear Grylls ("YBG") animated trilogy, with distribution to be handled by Bron. The Catalyst pitch deck showcased the YBG trilogy as one of the Fund's featured projects.

94. Class members relied on Schmidt's representations they would receive "capital out" in 12 months, that each film project was carefully vetted, and the investment would be used "exclusively" to fund the YBG films.

95. On December 30, 2020, only a few months after class members entered into the participation agreement, Schmidt told investors that the "three Bear Grylls animated movies are well into production with 2 out of 3 complete," and that a bidding was imminent. Once the film was sold, Schmidt claimed, investors would be taken out of the investment within just 45 days.

96. In the first quarter of 2021, Creative Wealth released a newsletter advising that the production on Fables, Gossamer, Bubble's Hotel, and Hailey & the Hero Heart was completed, and

FILED DATE: 3/5/2024 12:28 PM   2024CH01610

negotiations were ongoing for the sale of each of these projects to major streamers and/or TV Networks. Negotiations for the sale of Young Bear Grylls were also reportedly ongoing at this point.

97. On June 9, 2021, Schmidt again emailed investors advising them that production was "underway" and that there were ongoing "sales discussions" regarding distribution rights. "The films will be distributed worldwide in 196 countries," Schmidt claimed, with North American distribution via major streaming services such as Apple, Amazon, Netflix, and HBO Max.

98. On May 10, 2022, Schmidt emailed investors, claiming that the YBG films were still "out for sale," this time at the Cannes Film Festival. Schmidt advised them that he hoped the Fund's exit would occur at the end of the month. "Your investment in not at risk of loss of principal," he reassured. "Unfortunately, it is just taking longer than expected. We are very close."

99. On July 20, 2022, Schmidt reported that the "films were recently completed," and that streaming services including Netflix were vying for distribution.

100. Months passed without an update. Then, on September 1, 2022, Schmidt emailed investors, including CBL, a projected financial outlook for the YBG franchise, which promised an incredible "80 million of potential revenue"—more than six times the trilogy's initial production budget. Schmidt said he was still determining an exit strategy for investors. He acknowledged that the timing of the investors' exit had been "misrepresented," but that as soon as Bron sold the films, their capital would be returned. "I strongly believe this will be an excellent investment," he stated. "Just taking longer than we had hoped. Thank you for your patience."

101. On February 15, 2023, Schmidt emailed investors, with another update on the YBG trilogy and financial projections from Bron. "We expect YBG to be monetized this year," Schmidt assured, stating he would know more the following month. According to the email, the first film

FILED DATE: 3/5/2024 12:28 PM   2024CH01610

was "completed," and the second film was in "Post," and the films would be shopped around to global buyers that month.

102.    In reality the project was never completed. YBG made no money and the project remains in limbo.

**B. Bron Bankruptcy**

103.    On July 10, 2023, Cloth spoke to a group of investors in Illinois about the Bron bankruptcy.  Sandy Schmidt acted as master of ceremonies for this Zoom meeting and recorded the meeting.

104.    Remarkably, Cloth attributed all the failures and investment losses to Bron despite the fact that he was an owner and director of Bron.

105.    Cloth said the cause of the bankruptcy was "it's financial mismanagement" and that "we haven't worked with Bron in a about a year and a half."

106.    He claimed CWMF had nothing to do with it and no liability because "we are a flow through entity."

107.    Cloth claimed, "we know that there is value in other investments Bron made" and that C2 agreed to pledge its share to a bank for a line of credit to repay the Bron and CW investors.

108.    Just like he did years earlier, Cloth claimed Comerica would come to the rescue and "credit facility will be in place within 90 days" and "we [C2] will pull revenue forward to pay off those notes".

109.    Cloth boldly claimed that CW and Bron investors would be paid soon based on the success of C2's investment in Mission Impossible.

110.    Cloth claimed in July 2023 that was a 100% likelihood that he would repay the notes to the Illinois within 110 days of July 10, 2023.

111.    The Comerica line of credit was made up. Just like before.

FILED DATE: 3/5/2024 12:28 PM   2024CH01610

112.    Mission Impossible, while a huge production was not profitable, and paramount lost $40,000,000 on the production.

113.    C2 is not listed on IMBD as a producer of Mission Impossible.

**C. CWMF  Bankruptcy**

114.    On or about November 28, 2023 CWMF filed a petition for voluntary bankruptcy in Ontario, Canada.

115.    The bankruptcy was just three months after Cloth put all the blame on Bron and Gilbert and promised that CWMF would clean things up and they would be repaid.

116.    CWMF claims to have over $80,000,000 in total liabilities of which $34,000,000 is owed to Illinois investors.

117.    Cloth has gone quiet and recently gave up his defense of a related fraud case in the Southern District of Florida.

**D. Schmidt's Participation in the Scheme**

118.    Cloth raised money in the United States via two principal firms who acted as placement agents selling notes for investment, including Schmidt, most of whom raised funds from friends, family, and other downstream investors for the purpose of investing in promissory notes and co-investment agreements used to fund individual projects offered by Cloth and promissory notes to fund CMWF including Series B and Series E notes and later in Schmidt's own fund, Catalyst Wealth that aggregated investment for CMWF.  (hereinafter "Cloth Offering").

119.    Schmidt is family business that has a solid reputation that enabled the sale to dozens of investors with no knowledge of the film business and plenty of funds available for investment.

120.    Cloth could not have tapped into Chicago-area wealth without Schmidt.

121.    Cloth needed Schmidt after burning bridges with Canadian pension funds in the Crystal Wealth scam.

FILED DATE: 3/5/2024 12:28 PM   2024CH01610

122. Cloth's scheme was a house of cards and an iota of due diligence by the middleman earning paid to sell the investment would have demonstrated this investment was not safe for anyone.

123. Schmidt relied on personal relationships and word-of-mouth referrals to obtain investors.

124. Schmidt typically solicited investors in person, over the telephone, and via email for the Cloth Offering.

125. Schmidt solicited over $30,000,000 in investment for the Cloth Offering of which approximately $30,000,000 remains outstanding.

126. Schmidt was Cloth's salesmen and broker raising money for Cloth throughout the Midwest.

127. Schmidt negligently relied on only representations from Cloth when recommending the investment to Plaintiff rather than confirming anything with third parties or looking into Bron or CWMF's finances or the principal's previous Ponzi scheme.

128. During this time, Cloth made representations and provided purported contracts, emails, and other information to Schmidt, which Schmidt negligently believed to be true and accurate without investigating the obvious holes in the story that was far too good to be true.

129. Schmidt proceed to sell Plaintiff and the Class investment in the Cloth Offering by regurgitating the lies told by Cloth.

130. Schmidt acted as the gatekeeper of information from Cloth.

131. Plaintiff reasonably relied on Schmidt's due diligence on the investment and representations that they were actually investing in specific projects rather than Cloth's personal piggy bank.

FILED DATE: 3/5/2024 12:28 PM   2024CH01610

132.    Rather than relying on any substantive investigation of its own, Schmidt relied on the fact that Cloth kept paying as sufficient evidence that the apparent Ponzi Scheme was legitimate.

133.    Schmidt was taken hook line and sinker by Cloth and did not bother to do his own independent due diligence when promoting the Ponzi Scheme.

134.    Schmidt kept his head in the sand so long as the lulling payments kept coming in from Cloth then parroted Cloth's absurd lies when payments did not come as promised.

135.    Now Schmidt is trying to keep investors at bay by promising a miracle in the Canadian bankruptcy. The same tool employed by the last iteration of this Ponzi scheme, Crystal Wealth.

### E.  Schmidt's Duty to Plaintiff and the Class

136.    The Cloth Offerings were structured as co-investment in various film projects.

137.    For all intents and purposes, Schmidt was acting as a placement agent or broker for Cloth and paid to make the sales.

138.    Plaintiff reasonably relied on Sandy Schmidt's representations and due diligence into Cloth because he was an investment advisor, a CFP (Certified Financial Planner),a International Board of Certified Financial Planners, ChFC (Chartered Financial Consultant), CLU (Chartered Life Underwriter), and has FINRA Series 6, 63, 65, & 22 securities registration.

139.    Jordan was the primary point of contact with Plaintiff and was previously acquainted with her son. Jordan is a registered Broker and passed a FINRA Series 63 Examination.

140.    Ethan claims he created the Catalyst Wealth division of SAS:

FILED DATE: 3/5/2024 12:28 PM   2024CH01610



141.    Ethan is a registered Broker and Investment Advisor that passed his Series 66 and Series 7 Examinations.

142.    Brokers such as Schmidt who sell private placements to retail customers for a commission, such as Schmidt, are required to register with the Financial Industry Regulatory Authority ("FINRA").

143.    FINRA regulates broker/dealer firms like Schmidt and their registered representatives (*i.e.*, stockbrokers), and promulgates rules and regulations that brokerage firms and their registered representatives must adhere to.

144.    A placement agent, or at least a party acting in that role such as Schmidt, is required to perform reasonable due diligence on a private placement prior to offering it for sale to its customers pursuant to FINRA Rule 2111.05(a), FINRA Regulatory Notice 10-22, NASD Notice to Members 03-71, and NASD Notice to Members 05-26, 17 C.F.R. § 240.15l-1(b)(1).

FILED DATE: 3/5/2024 12:28 PM   2024CH01610

145.    SEC Regulation Best Interest ("Reg BI") provides Schmidt as a placement agent owed the following duties to Plaintiff and the Class:

 (ii) Care obligation. The broker, dealer, or natural person who is an associated person of a broker or dealer, in making the recommendation, exercises reasonable diligence, care, and skill to:

(A) Understand the potential risks, rewards, and costs associated with the recommendation, and have **a reasonable basis to believe that the recommendation could be in the best interest of at least some retail customers**;

(B) **Have a reasonable basis to believe that the recommendation is in the best interest of a particular retail customer based on that retail customer's investment profile and the potential risks**, rewards, and costs associated with the recommendation and does not place the financial or other interest of the broker, dealer, or such natural person ahead of the interest of the retail customer;

(C) Have a reasonable basis to believe that a series of recommended transactions, even if in the retail customer's best interest when viewed in isolation, is not excessive and is in the retail customer's best interest when taken together in light of the retail customer's investment profile and does not place the financial or other interest of the broker, dealer, **or such natural person** making the series of recommendations ahead of the interest of the retail customer.

(17 C.F.R. § 240.15l-1(b)(1).)

146.    In order to ensure that it has fulfilled its responsibilities, FINRA requires that a broker-dealer in a Regulation D offering must, at a minimum, conduct a reasonable investigation concerning:

a.    the issuer and its management;

b.    the business prospects of the issuer;

c.    the assets held by or to be acquired by the issuer;

d.    the claims being made; and

e.    the intended use of proceeds of the offering.

147.    Schmidt had a duty to conduct a reasonable investigation in connection with each offering, notwithstanding that a subsequent offering may be for the same issuer.

21

FILED DATE: 3/5/2024 12:28 PM 2024CH01610

148.    FINRA has also provided detailed guidance on how a broker-dealer such as Schmidt was acting with the Cloth Offering may ensure an adequate investigation has taken place into the issuer and its management, the issuer's business prospects, and the issuer's assets.

149.    As set forth in FINRA Regulatory Notice 10-22 and securities industry standards, a reasonable investigation of Cloth and its history by Schmidt would have included:

a.    Examining historical financial statements of Cloth, with particular focus, if available, on financial statements that have been audited by an independent certified public accountant and auditor letters to management;

b.    Looking for any trends indicated by Cloth's financial statements;

c.    Contacting customers and suppliers regarding their dealings with Cloth;

d.    Reviewing Cloth's contracts, leases, and financing arrangements;

e.    Inquiring about Cloth's past securities offerings and the degree of their success; and

f.    Inquiring about the length of time that Cloth had been in business and whether the focus of its business was expected to change.

150.    This was not done here. The full extent of the investigation was reliance on information supplied by the apparent Ponzi Schemer. There was zero independent investigation done by Schmidt.

151.    As set forth in FINRA Regulatory Notice 10-22 and securities industry standards, a reasonable investigation of Cloth's business prospects by Schmidt should include:

a.    Inquiring about the viability and value of any movies funded by Cloth;

b.    Inquiring about the industry in which Cloth operates, and the competitive position of Cloth; and

FILED DATE: 3/5/2024 12:28 PM   2024CH01610

c. Requesting any business plan, business model or other description of the business intentions of Cloth and its management and their expectations for the business, and analyzing management's assumptions upon which any business forecast is based. A broker/dealer should test models with information from representative assets to validate projected returns, break-even points, and similar information provided to investors.

152. This was not done here. Instead, it is apparent that Cloth oversubscribed each investment and operated a Ponzi Scheme with the excess investment.

153. Minimal investigation would have confirmed that the investments were oversubscribed and investors were getting paid with new investments rather than proceeds of the movies they supposedly invested in.

154. As set forth in FINRA Regulatory Notice 10-22 and securities industry standards, a reasonable investigation of Cloth's assets and facilities should include:

a. Carefully examining any reports by third-party experts that may raise red flags;

b. Obtaining an expert opinion from auditors and financial experts and others as necessary to form a basis for determining the suitability of the investment prior to recommending the security to investors;

c. Inquiring about previous or potential regulatory or disciplinary problems of the issuer;

d. Obtaining a credit check of Cloth;

e. Making reasonable inquiries concerning the issuer's management. Maraboyina should have inquired about such issues as the expertise of

FILED DATE: 3/5/2024 12:28 PM   2024CH01610

management for the issuer's business and the extent to which management has changed or is expected to change;

f.      Inquiring about the forms and amount of management compensation, who determines the compensation and the extent to which the forms of compensation could present serious conflicts of interest. A party acting as a broker-dealer might make similar inquiries concerning the qualifications and integrity of any board of directors or similar body of the issue; and

g.      Inquiring about the length of time that the issuer has been in business and whether the focus of its business is expected to change.

155.    Schmidt failed to do this third party confirmation of this supposedly nine-figure operation.

156.    A broker-dealer that offers securities, including those offered under Regulation D, must meet the suitability requirements of FINRA Rule 2111. This means that the broker-dealer must have a reasonable basis to believe that a recommendation to purchase, sell or exchange a security is suitable for the customer.

157.    FINRA Rule 2111.05(a) is the source of a broker-dealer's obligation to perform a reasonable investigation of the issuer and offered securities before offering securities in a Regulation D for sale to its clients.

158.    Reasonable-basis suitability requires that a broker-dealer (1) perform reasonable diligence to understand the potential risks and rewards associated with a recommended security or strategy and (2) determine whether the recommendation is suitable for at least some investors based on that understanding. A broker-dealer can violate reasonable-basis suitability under either prong of the test.

FILED DATE: 3/5/2024 12:28 PM   2024CH01610

159.    Schmidt could not rely blindly upon the issuer for information concerning a company, nor may it rely on the information provided by the issuer in lieu of conducting its own reasonable investigation.

160.    While broker-dealers like Schmidt are not expected to have the same knowledge as an issuer or its management, firms are required to exercise a high degree of care in investigating and independently verifying an issuer's representations and claims. The fact that a broker-dealer's customers may be sophisticated and knowledgeable does not obviate this duty to investigate.

161.    Of course, under these circumstances, Schmidt was in a position to know more about Cloth, understand its business, its finances, and its outlook better than just a mere broker-dealer since it was acting as its placement agent or investment banker raising capital exclusively for Cloth.

162.    As the de facto placement agent and investment banker for Cloth, Schmidt was in a unique position compared to another broker-dealer that was merely part of the investment banking syndicate.

163.    In the course of a reasonable investigation, a broker-dealer must note any information that it encounters that could be considered a "red flag" that would alert a prudent person to conduct further inquiry. A broker-dealer's reasonable investigation responsibilities obligate it to follow up on any red flags that it encounters during its inquiry as well as to investigate any substantial adverse information about the issuer. When presented with red flags, the broker-dealer must do more than "blindly rely" upon representations by the issuer's management or the disclosure in an offering document.

164.    As described below, unfortunately for the Plaintiffs and the Class, Schmidt failed to conduct proper due diligence, which caused Defendant's conduct to fall below the standard of care thereby breaching the duties that it owed the Plaintiffs and the Class.

25

FILED DATE: 3/5/2024 12:28 PM   2024CH01610

**F. Cloth Defaults**

165.    The cascade of defaults and lawsuits started in 2019 (years prior to Plaintiff's investment) and culminated in two bankruptcy filings last year.

166.    In or about September 2022 the Ontario Securities Commission interviewed several individuals involved in the scheme.

167.    On or about July 19, 2023, Bron filed for bankruptcy protection in Vancouver and a Creative Wealth entity offered to provide Debtor in Possession financing. The attempt to manipulate the bankruptcy system failed.

168.    On or about October 27, 2023, CWMF filed for bankruptcy protection in Ontario.

169.    The whole adventure is a total loss with whatever value there was apparently transferred to C2.

170.    Upon information and belief, Cloth, via C2 put more than $100M into four Paramount movies in the between August 2022 and August 2023 including: *Mission: Impossible — Dead Reckoning Part One*, *Transformers: Rise Of The Beasts*, *Dungeons & Dragons: Honour Among Thieves* and *Babylon*.

**G. Plaintiff's' Investments Placed by Schmidt**

171.    In January 2023 Plaintiff invested $1,000,000 in CWMF via a Series B Note. (Note Attached hereto as Exhibit "A" and incorporated herein)

172.    Plaintiff invested $1,000,000 long after it should have been clear to Schmidt that they were dealing with a crook after multiple defaults and significant litigation, and just six months before the Bron bankruptcy.

173.    The investment was part of a $20,000,000 loan to CWMF for the production of motion pictures. *See* (Pitch Deck Attached hereto as Exhibit "B")

174.    Jordan facilitated the transaction for Schmidt and Fowler.

175.    The Series B Note promised 12% interest paid monthly.

FILED DATE: 3/5/2024 12:28 PM   2024CH01610

176.    Schmidt's compensation was never disclosed.

177.    Plaintiff's investment was a total loss.

178.    Plaintiff demanded rescissions of her investment pursuant to Illinois Securities Law.

**V.       CLASS ALLEGATIONS**

179.    Plaintiff states claims on behalf of a class of similarly situated investors in CWMF for negligent misrepresentation against Schmidt and fraudulent misrepresentation against Cloth which led the Class to lose money entrusted with Defendants totaling over $80,000,000 dollars.

180.    Plaintiff brings this case as a class action on behalf of the classes of persons, defined as follows:

**Cloth Class**

All persons who invested in the Cloth Offering from January 1, 2020 to December 31, 2023.

**Schmidt Sub-Class**

All persons who invested in the Cloth Offering with Schmidt from January 1, 2020 to December 31, 2023.

Excluded from the proposed Class and subclass are Defendants, their respective officers, directors, and employees, affiliates, legal representatives, heirs, successors, or assignees. Plaintiff reserves the right to amend the Class definition as necessary.

181.    The members of the putative classes are so numerous that joinder of all members is impracticable.

182.    Questions of fact and law as to all putative class members predominate over any questions affecting any individual member of the putative class, including, but not limited to:

   a)   Whether Defendant, Schmidt, owed an extra-contractual duty of ordinary care to Class Members;

   b)   Whether Defendant, Schmidt, breached its duty of ordinary care to Class Members;

FILED DATE: 3/5/2024 12:28 PM    2024CH01610

c) Whether Defendant, Schmidt, negligently misrepresented the facts of their investing in the Cloth Offering to Class Members;

d) Whether Defendant, Schmidt, was unjustly enriched;

e) Whether Defendant, Cloth violated the Illinois Securities Law;

f) Whether Defendant, Cloth fraudulently induced Class members to invest; and

g) Whether Defendant, Cloth was unjustly enriched.

183. Plaintiff's claims are typical of the claims of the Class because Defendants' breaches of their respective duties (or aiding and abetting thereof) affected Plaintiff and the Class uniformly and in precisely the same manner.

184. Plaintiff will fairly and adequately represent and protect the interests of the putative class. Plaintiff has retained experienced class action counsel. The interest of Plaintiff is coincident with and not antagonistic to the interests of the Class.

185. The questions of law and fact common to the members of the putative class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

186. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joiner of all putative class members is impracticable. Moreover, because the damages suffered by individual members of the putative class may be relatively small, the expense and burden of individual litigation makes it impossible for the members of the putative class to redress the wrongs done to them individually.

187. The putative class is readily definable and prosecution of the action as a class action will eliminate the possibility of repetitious litigation. There will be no difficulty in the management of this action as a class action.

FILED DATE: 3/5/2024 12:28 PM   2024CH01610

## IV. <u>CLAIMS</u>

### <u>COUNT I</u>
### Fraudulent Misrepresentation
### *Cloth Class v. Jason Cloth*

188.    Plaintiff on behalf of the Class, restates and realleges paragraphs 1 through 187 as though fully set forth herein as paragraph 188.

189.    Cloth directly and via his sales agents Schmidt and Maraboyina conveyed the following misrepresentations and omissions in order to induce investment in the Cloth Offering and lull investors to continue investing:

a)    Cloth omitted that he was soliciting more funds than actually required for the projects CWMF funded;

b)    Cloth omitted that funds invested were being used to pay off old investors in failed projects;

c)    Cloth represented that invested funds were being applied to specific projects;

d)    Cloth represented that the projects funds were applied to were profitable or soon would realize a profit;

e)    Cloth represented that projects sold and the only reason for delay was setting up a credit facility with Comerica Bank;

f)    Cloth omitted that commissions and fees were being paid to undisclosed individuals and entities;

g)    Cloth represented that specific projects were profitable when in fact they lost money;

h)    Cloth was a producer on projects he did not in fact produce;

i)    Cloth omitted that the profits realized on successful projects were being used to pay investors on failed projects rather than returned to investors in successful projects;

29

FILED DATE: 3/5/2024 12:28 PM  2024CH01610

j)      Cloth omitted investment in specific projects was being commingled with other projects; and

k)      Cloth omitted CMWF was just a flow through entity with no assets.

190.   Cloth knew that he told investors false statements of fact and omitted material facts with a duty to disclose them.

191.   Plaintiff and the Class reasonably relied on Cloth's fraudulent representations and omissions and invested tens of millions of dollars based on the false promises.

192.   As a direct and proximate result of Cloth's fraudulent representations and omissions, Cloth is liable to Plaintiff and the Class for all of the investment losses that they suffered in the Cloth Offering.

**COUNT II**
**Violation of 815 ILCS 5/12(i)**
***Class v. Jason Cloth***

193.   Plaintiff on behalf of the Class, restates and realleges paragraphs 1 through 187 as though fully set forth herein as paragraph 193.

194.   At all times relevant, there existed in the State of Illinois, a statute entitled the Illinois Securities Law of 1953, 815 ILCS 5/1 *et seq.* ("ISL").

195.   Interests in CWMF that are the subject of this Complaint are "securities" as defined in Section 2.1 of the ISL whether sold as promissory notes for a term greater than six months in specific projects, promissory notes greater than six months for investment in slates of projects (Series E Notes, Series B Notes, or membership units in Catalyst Wealth).

196.   Pursuant to Section 12 of the ISL, 815 ILCS 5/12, it is unlawful for any person to employ any device, scheme or artifice to defraud in connection with the sale or purchase of any security, directly or indirectly.

FILED DATE: 3/5/2024 12:28 PM   2024CH01610

197.   On or about from approximately January 2019 to June 2023 Cloth did offer, as that term is defined in Section 2.5a of the ISL, an investment in the Cloth Offering to Plaintiff and the Class by a solicitation by its principal Jason Cloth conveyed via his agents/brokers Maraboyina and Schmidt and directly to the Class.

198.   Cloth issued numerous statements and other papers or documents touting the value of the investments and how the invested funds would be utilized.

199.   Cloth's representations to the Class to invest in CWMF was performed in the course and scope of his employment as agent, control person, and owner of CWMF.

200.   This solicitation contained materially false and untrue statements including misrepresentations of the value of the projects backing the notes and units and how the funds would be utilized.

201.   Cloth's solicitation to invest in the Cloth Offering omitted to state the following material facts that were required to make the statement contained in the solicitation not misleading:

a)   That Cloth was soliciting more funds than actually required for the projects CWMF funded;

b)   That funds invested were being used to pay off old investors in failed projects;

c)   That commissions and fees were being paid to undisclosed individuals and entities;

d)   That specific projects were profitable when in fact they lost money;

e)   That Cloth was a producer on projects he did not in fact produce;

f)   That the profits realized on successful projects were being used to pay investors on failed projects rather than returned to investors in successful projects;

g)   That investment in specific projects was being commingled with other projects;

h)   That CMWF was just a flow through entity with no assets;

i)   That Cloth laboring under numerous conflicting interests;

FILED DATE: 3/5/2024 12:28 PM   2024CH01610

j)      That fees were paid to undisclosed entities controlled by Cloth; and

k)      Other material facts detailed herein.

202.    Plaintiff was justified in relying on Cloth's representations when they accepted the investment advice to invest in the Cloth Offering because Cloth possessed superior knowledge and skill.

203.    As a result of the reliance on Cloth's misrepresentations and omissions, the Class has suffered financial losses totaling at least $80,000,000.

204.    Pursuant to Section 13 of the ISL, 815, ILCS 5/13(A), the Class has purchasers of securities, may rescind any securities transaction effected in violation of Section 12 of the ISL.

205.    Section 13 of the ISL, 815 ILCS 5/13, imposed joint and several liability upon the issuer, controlling person, and dealer; and each dealer or salesperson who participated or aided in any way in making the sale.

### COUNT III
### Violation of 815 ILCS 5/12(g)
### *Schmidt Class v. Schmidt*

206.    Plaintiff on behalf of the Schmidt Class, restates and realleges paragraphs 1 through 187 as though fully set forth herein as paragraph 206.

207.    At all times relevant, there existed in the State of Illinois, a statute entitled the Illinois Securities Law of 1953, 815 ILCS 5/1 *et seq.* ("ISL").

208.    Interests in CWMF that are the subject of this Complaint are "securities" as defined in Section 2.1 of the ISL whether sold as promissory notes for a term greater than six months in specific projects, promissory notes greater than six months for investment in slates of projects (Series E Notes, Series B Notes, or membership units in Catalyst Wealth).

209.    Pursuant to Section 12 of the ISL, 815 ILCS 5/12, it is unlawful for any person to obtain money or property through the sale of securities by means of any untrue statement of a

FILED DATE: 3/5/2024 12:28 PM    2024CH01610

material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

210. On or about from approximately January 2019 to June 2023 Schmidt did offer, as that term is defined in Section 2.5a of the ISL, an investment in the Cloth Offering.

211. Sandy, Ethan, and Jordan were each control persons of SAS at all relevant times and directly participated in soliciting investors via text, email, and Zoom meetings.

212. Schmidt issued numerous statements and other papers or documents touting the value of the investments and how the invested funds would be utilized.

213. This solicitation contained materially false and untrue statements including misrepresentations of the value of the projects backing the notes and units and how the funds would be utilized.

214. Schmidt's solicitation to invest in the Cloth Offering omitted to state the following material facts that were required to make the statement contained in the solicitation not misleading:

a) That Cloth was soliciting more funds than actually required for the projects CWMF funded;

b) That funds invested were being used to pay off old investors in failed projects;

c) That commissions and fees were being paid to undisclosed individuals and entities;

d) That specific projects were profitable when in fact they lost money;

e) That Cloth was a producer on projects he did not in fact produce;

f) That the profits realized on successful projects were being used to pay investors on failed projects rather than returned to investors in successful projects;

g) That investment in specific projects was being commingled with other projects;

h) That CMWF was just a flow through entity with no assets;

i) That Cloth laboring under numerous conflicting interests;

33

FILED DATE: 3/5/2024 12:28 PM   2024CH01610

j)      That fees were paid to undisclosed entities controlled by Cloth; and

k)      Other material facts detailed herein.

215.    Plaintiff was justified in relying on Schmidt's representations when they accepted the investment advice to invest in the Cloth Offering because Schmidt were trained and licensed brokers who possessed superior knowledge and skill.

216.    As a result of the reliance on Schmidt's negligent misrepresentations and omissions, the Class has suffered financial losses totaling at least $30,000,000.

217.    Pursuant to Section 13 of the ISL, 815, ILCS 5/13(A), the Class has purchasers of securities, may rescind any securities transaction effected in violation of Section 12 of the ISL.

218.    Section 13 of the ISL, 815 ILCS 5/13, imposed joint and several liability upon the issuer, controlling person, and dealer; and each dealer or salesperson who participated or aided in any way in making the sale.

### COUNT IV
**Negligent Misrepresentation**
***Schmidt Sub Class v. Schmidt Defendants***

219.    Plaintiffs on behalf the Schmidt Sub Class, restates and realleges paragraphs 1 through 187 as though fully set forth herein as paragraph 219.

220.    To establish the applicable standard of care under the circumstances, the Court may examine professional standards of conduct in the industry. In this case, the applicable standards of conduct for Schmidt are the rules promulgated by FINRA, which each of the Schmidt Defendants were members of.

221.    Those who undertake any work or calling for which a special skill is required such as a broker-dealer have a duty not only to exercise reasonable care in what they do, but also to possess a standard minimum of special knowledge and ability.

222.    Schmidt owed Plaintiff and the Class a duty to act as a reasonably prudent broker-dealer would do under the same or similar circumstances. The duties set forth herein arise from

FILED DATE: 3/5/2024 12:28 PM   2024CH01610

the regulations, customs and usage of the brokerage trade, including rules promulgated by FINRA. These duties and obligations flow to Plaintiff and the Class members as a result of the client relationship between Cloth, the Plaintiff, and the Class.

223.    As set forth above, Schmidt breached their legal duty to provide accurate information to Plaintiff and the Class as prospective purchasers of investments in the Cloth Offering by omitting material facts, and such material facts were necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

224.    By reason of the aforesaid, Schmidt are guilty of negligent misrepresentation and omission in connection with the offer and sale of investments in Cloth Offerings.

225.    At all times relevant to this action, Schmidt had knowledge of, or reasonable grounds to believe the existence of facts by reason of which their liability under this Count is alleged to exist, and with this knowledge, Schmidt made material omissions of fact with respect to the offer and sale of the Cloth Offering in each of its forms.

226.    As described above, Defendant negligently breached its duties to Plaintiff and the members of the Class.

227.    Had a reasonably prudent broker-dealer under the same or similar circumstances conducted adequate due diligence on CWMF to understand the risks and rewards of the Cloth Offerings, it would have concluded that the risks in investing in CWMF far outweighed any potential reward, and it would not have approved of the Cloth Offerings for sale to any of their clients.

228.    By approving of the sale of the Cloth Offerings to its clients, notwithstanding the numerous red flags identified herein, Schmidt demonstrated that it failed to understand the risks and rewards of the Cloth Offerings, or consciously ignored the risks presented by these red flags in order to ensure it maximized its placement agent fees and commissions.

FILED DATE: 3/5/2024 12:28 PM   2024CH01610

229.     Schmidt knew or should have known that Plaintiff and the Class would place their trust and confidence in Schmidt that it had a reasonable-basis to conclude that CMWF was suitable for at least some investors, and that it had conducted adequate due diligence to understand the risks and rewards of the Cloth Offering.

230.     Schmidt knew or should have known that it was reasonably foreseeable that Plaintiff and the Class would act in reliance on Schmidt's approval to sell the Cloth Offering.

231.     Plaintiff and the Class acted in reliance on Schmidt's approval to offer to sell the Cloth offerings.

232.     But for Schmidt's approval to sell the Cloth Offerings, Plaintiff or the Class members would not have even been presented the opportunity to participate in the Cloth Offerings.

233.     As a direct and proximate result of Schmidt's negligence, Schmidt is liable to Plaintiff and the Class for all of the investment losses that they suffered in the Cloth Offering.

**<u>COUNT V</u>**
**Unjust Enrichment**
***Cloth Class v. Cloth***

234.     Plaintiff on behalf the Class, restates and realleges paragraphs 1 through 187, as though fully set forth herein as paragraph 234.

235.     Cloth received and retained a benefit from Plaintiffs and the Class and inequity has resulted.

236.     Cloth benefitted from the sale of investment in the Cloth Offering based on his fraudulent representations and his sales agents negligent representations.

237.     Thus, all Class Members conferred a benefit on Cloth.

238.     It is inequitable for Cloth to retain these benefits.

239.     Plaintiffs and the Class were not aware of the true facts about the investment and did not benefit from Defendant's conduct.

240.     Cloth knowingly accepted the benefits of his unjust conduct.

FILED DATE: 3/5/2024 12:28 PM   2024CH01610

241.     As a result of Schmidt's conduct, the amount of his unjust enrichment should be disgorged in an amount according to proof.

**<u>COUNT VI</u>**
**Unjust Enrichment**
***Schmidt Sub Class v. Schmidt Defendants***

242.     Plaintiff on behalf the Class, restates and realleges paragraphs 1 through 187, as though fully set forth herein as paragraph 242.

243.     Schmidt received and retained a benefit from Plaintiffs and the Class and inequity has resulted.

244.     Schmidt benefitted from the sale of investment in the Cloth Offering based on Cloth's fraudulent representations and their own negligent representations.

245.     Thus, all Class Members conferred a benefit on Schmidt.

246.     It is inequitable for Schmidt to retain these benefits.

247.     Plaintiffs and the Class were not aware of the true facts about the investment, and did not benefit from Defendant's conduct.

248.     Schmidt knowingly accepted the benefits of their unjust conduct.

249.     As a result of Schmidt's conduct, the amount of his unjust enrichment should be disgorged in an amount according to proof.

FILED DATE: 3/5/2024 12:28 PM  2024CH01610

## COUNT VII
### Respondent in Discovery
### *C2*

250.    Plaintiffs, restates and realleges paragraphs 1 through 188, as though fully set forth herein as paragraph 250.

251.    C2 has information essential to the determination of who should properly be named as additional defendants in this action.

252.    Cloth told Class Members they would be paid from projects produced by C2

253.    735 ILCS 5/2-402 provides in pertinent part:

> "The plaintiff in any civil action may designate as respondents in discovery in his or her pleading those individuals or other entities, other than the named defendants, believed by the plaintiff to have information essential to the determination of who should properly be named as additional defendants in the action.
>
> Persons or entities so named as respondents in discovery shall be required to respond to discovery by the plaintiff in the same manner as are defendants and may, on motion of the plaintiff, be added as defendants if the evidence discloses the existence of probable cause for such action.
>
> A person or entity named a respondent in discovery may upon his or her own motion be made a defendant in the action, in which case the provisions of this Section are no longer applicable to that person."

254.    Plaintiff respectfully requests that the Court order Respondent in Discovery C2 to answer the attached summons for discovery.

FILED DATE: 3/5/2024 12:28 PM    2024CH01610

WHEREFORE, Plaintiff on behalf of the Class prays for judgment against Defendants as follows:

a)     Finding that this action satisfies the prerequisites for maintenance as a class action as set forth in 735 ILCS 5/2-801, and certifying the proposed Class as defined herein;

b)     Designating Plaintiff as representative of the proposed Class, and Alexander N. Loftus, Esq. as Lead Counsel;

c)     Attorneys' Fees;

d)     All actual and compensatory damages caused by Defendants breach including loss of interest and reasonable costs in excess of $80,000,000;

e)     Punitive Damages against Jason Cloth in excess of $100,000,000; and

f)     Any and all further relief that this Court deems just and appropriate.

Respectfully Submitted,

*Alexander Loftus*

One of Plaintiff's Attorneys

Alexander Loftus, Esq.
Ross Good, Esq.
LOFTUS & EISENBERG, LTD.
161 N. Clark Suite 1600
Chicago, Illinois 60601
p: 312.899.6625
alex@loftusandeisenberg.com
ross@loftusandeisenberg.com

Firm No: 64600

Dated: March 5, 2024

FILED DATE: 3/5/2024 12:28 PM  2024CH01610

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION**

| | | |
|---|---|---|
| DIANE FOWLER, individually and on behalf of the class members described below, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. |
| SCHMIDT ADVISORY SERVICES, INC. d/b/a CATALYST WEALTH MANAGEMENT, SANFORD SCHMIDT ETHAN SCHMIDT, JORDAN SCHMIDT, and JASON CLOTH, | ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| C2 MOTION PICTURE GROUP, LLC, | ) ) | |
| Respondent in Discovery. | ) | |

# EXHIBIT "A"

FILED DATE: 3/5/2024 12:28 PM   2024CH01610

### CREATIVE WEALTH MEDIA FINANCE CORP.
### SECURED SERIES B LOAN COMMITMENT AGREEMENT – COVER PAGE

TO:         **CREATIVE WEALTH MEDIA FINANCE CORP. (the "Corporation")**

The undersigned (hereinafter referred to as the "**Lender**") hereby agrees to provide a loan (the "**Loan**") to the Corporation in the amount set forth below upon and subject to the terms and conditions set forth in this Secured Loan Commitment Agreement and the attached "Terms and Conditions of the Secured Loan" document, including, without limitation, the representations, warranties, and covenants set forth in the applicable schedules attached hereto (collectively the "**Loan Documents**" or this "**Loan Agreement**" or this "**Agreement**").   The Lender further agrees that the Corporation may rely upon the Lender's representations, warranties, and covenants contained in the Loan Documents.  **In addition to this face page, the Lender must also complete all of the applicable schedules attached hereto.**

### LOAN AND LENDER INFORMATION

**Please print all information (other than signatures), as applicable, in the space provided below.**

| | |
|---|---|
| Diane Fowler Revocable Trust<br>(Name of Lender - Please Print)<br><br>By: _Diane Fowler_<br>   (Authorized Signature)<br><br>Owner<br>(Official Capacity or Title)<br><br><br>_____<br>(Please print name of individual whose signature appears above if different than the name of the Lender printed above.)<br><br>P.O. Box 795<br>(Address)<br><br>Blair, OK 73526<br>(Address Cont.)<br><br>███████████<br>(Telephone Number)<br><br>_____<br>(Fax Number)<br><br>fowlerdiane3030@yahoo.com<br>(Email Address) | **Amount of Loan Commitment:**<br><br>$1,000,000.00<br><br><br>**Subsequent Loan Commitment:**<br><br><br><br>**If the Lender is signing as agent / trustee / fiduciary for a principal, complete the following and ensure that the applicable Exhibit(s) are completed on behalf of such principal.**<br><br>_____<br>(Name of Principal)<br><br>_____<br>(Principal's Address)<br><br>_____<br>(Principal's Address Cont.)<br><br>_____<br>(Telephone Number)<br><br>_____<br>(Fax Number)<br><br>_____<br>(Email Address) |

FILED DATE: 3/5/2024 12:28 PM   2024CH01610

**Register the Loan as Set Forth Below:**

Diane Fowler, Reweable TRust
(Name)

_____
(Account Reference, if Applicable)

P.O. Box 795
(Address)

Blair, OK 73526
(Address Cont.)

_____
SOCIAL INSURANCE NUMBER

**Deliver the Loan as Set Forth Below:**
☑ Same as Registered Address
   (otherwise complete below)

_____
(Company Name)

_____
(Account Reference, if Applicable)

_____
(Contact Name)

_____
(Address)

_____
(Address Cont.)

## TO BE COMPLETED BY THE CORPORATION ONLY

The Corporation accepts the Loan on the terms and conditions of this Agreement for the following amount:

_____

Date: _____

**CREATIVE WEALTH MEDIA FINANCE CORP.**

Per: _____
     Authorized Signing Officer

_____
Official Capacity or Title

_____
Signature

TOTAL NOTE FACILITY: _____

-2-

FILED DATE: 3/5/2024 12:28 PM   2024CH01610

**DATED at Toronto** as of this _____ day of_____, 2023

**Lender:**                                                **CREATIVE WEALTH MEDIA FINANCE CORP.**

Per:_____       Per:_____

Signature: *Diane Fowler*           Signature:_____

**Account Holders Wire Transfer Instructions For Interest Payments**

Beneficiary: Diane Fowler
Address: P.O. Box 795 Blair, OK 73526



DocuSign Envelope ID: 8F38FEDE-6FF3-4A45-9B26-0AA9CCCDE1CC

**TERMS AND CONDITIONS OF THE SERIES B SECURED LOAN**

**SECTION 1     Terms of the Loan - Security**

A.     The Loan shall form part of the "Series B" loan in the aggregate amount of up to $20,000,000.00 USD as set forth in Schedule "A" attached hereto, the terms and conditions of which are set forth in the term sheet (the "**Term Sheet**") attached hereto as Schedule "A". The Loan shall rank in *pari passu* with other Series B loans accepted by the Corporation. The Loan, and any and all Subsequent Loans (as defined below), if any, shall be secured by the assets of the Corporation pursuant to a security agreement (the "**Security Agreement**", attached hereto as Schedule "D"). The Lender hereby acknowledges and agrees that this Agreement forms an inter-lender agreement providing that each Series B loan will be registered under the PPSA pursuant to the security provided by the attached Security Agreement, and shall rank *pari passu* as against one another.

B.     The Lender acknowledges that the Corporation has entered into term sheet agreements with the borrower (collectively, the "**Borrower**") (collectively, the "**Picture Term Sheet**") in respect of motion pictures.

C.     Pursuant to the terms of the Picture Term Sheets (together with any amendments, supplements, extensions and renewals thereof, and any related agreements, security agreements, documents and instruments), the Corporation has extended and/or will extend from time to time loans, advances, equity investments and other financial accommodations to the Borrowers upon certain collateral security including the present and future accounts of the Borrowers.

D.     Lender agrees to advance the Loan to the Corporation, upon the terms and conditions set forth herein, in order for the Corporation to fulfil its financing obligations in respect of the Pictures in accordance with the terms set forth in the Picture Term Sheets.

**SECTION 2     Interest**

A.     **Interest:** The principal amount of the Loan remaining from time to time unpaid and outstanding shall bear interest from the date of Closing to and including the date of repayment in full, both before and after default, demand, maturity, and judgement at the rate and payable as set forth in the Term Sheet. Interest shall not be less than a minimum of 5% of the total principle invested.

**SECTION 3     Maturity**

The principal amount of the Loan shall become due and payable in full on that date that is indicated in Schedule A.

**SECTION 4     Subsequent Loans**

Each subsequent loan (each a "**Subsequent Loan**") provided by the Lender will be subject to the same terms and conditions and security provided for herein. All Subsequent Loans will be added to the outstanding amount of the Loan and evidenced by a contract note reflecting the specific term of such Subsequent Loan.

**SECTION 5     Closing**

Closing ("**Closing**") shall occur on the date that the Lender provides the amount of the Loan to the Corporation by way of certified cheque, bank draft or wire transfer or such other method of payment acceptable to the Corporation, or such other date and time as may be determined by the Corporation.

FILED DATE: 3/5/2024 12:28 PM   2024CH01610

DocuSign Envelope ID: 8F38FEDE-6FF3-4A45-9B26-0AA9CCCDE1CC

FILED DATE: 3/5/2024 12:28 PM   2024CH01610

## SECTION 6   Conditions of Closing

The Lender, on its own behalf or on the behalf of the Disclosed Beneficial Lender, if applicable, acknowledges that the acceptance of the Loan as contemplated by this Agreement is subject to, among other things, the following conditions being fulfilled or performed on or before Closing, which conditions are for the exclusive benefit of the Corporation and may be waived, in whole or in part, by the Corporation in its sole discretion:

(a)   The Lender agreeing to execute and deliver to the Corporation all reports, undertakings or other documents required under Applicable Securities Laws in connection with this Loan;

(b)   The representations and warranties of the Lender having been true and correct as of the date of this Agreement and being true and correct at Closing; and

(c)   All documentation relating to the offer of this Loan in form and substance satisfactory to the Corporation.

## SECTION 7   Acknowledgments of the Lender

The Lender, on its own behalf or on the behalf of the Disclosed Beneficial Lender, if applicable, acknowledges that:

(a)   **A LOAN ADVANCED TO THE CORPORATION PURSUANT TO THE TERMS AND CONDITIONS AND SECURED BY THE SECURITY AGREEMENT ATTACHED IS NOT WITHOUT RISK AND THE LENDER (AND ANY DISCLOSED BENEFICIAL LENDER) MAY LOSE HIS, HER OR ITS ENTIRE LOAN;**

(b)   The Corporation may complete additional financings or borrowings in the future in order to develop the business of the Corporation and fund its ongoing development, and such future financings may affect the Lender's rights hereunder but there is no assurance that such financing will be available, on reasonable terms or at all, and if not available, the Corporation may be unable to fund its ongoing development;

(c)   The Corporation has the right to accept or reject the Lender's Loan in whole or in part.  If the commitment is rejected in whole or in part, all or a portion of the Loan amount, as the case may be, will be promptly delivered to the Lender, without interest.

## SECTION 8   Representations and Warranties of the Lender

The Lender, on its own behalf or on the behalf of the Disclosed Beneficial Lender, if applicable, represents and warrants as follows to the Corporation at the date of this Agreement and at Closing and acknowledges and confirms that the Corporation is relying on such representations and warranties in connection with the Loan:

(a)   **THE LENDER HAS KNOWLEDGE IN FINANCIAL AND BUSINESS AFFAIRS, IS CAPABLE OF EVALUATING THE MERITS AND RISKS OF THIS LOAN TO THE CORPORATION, AND IS ABLE TO BEAR THE ECONOMIC RISK OF SUCH LOAN EVEN IF THE ENTIRE LOAN AMOUNT IS LOST;**

(b)   This loan has not been made through, or as a result of, and is not being accompanied by, (i) a general solicitation, (ii) any advertisement including articles, notices or other communications published in any newspaper, magazine or similar media or broadcast over radio or television, or (iii) any seminar or meeting whose attendees have been invited by general solicitation or general advertising;

(c)   None of the funds that the Lender is committing to lend to the corporation are to the knowledge of the Lender, proceeds obtained or derived, directly or indirectly, as a result of illegal activities;

DocuSign Envelope ID: 8F38FEDE-6FF3-4A45-9B26-0AA9CCCDE1CC

FILED DATE: 3/5/2024 12:28 PM   2024CH01610

(d)     If the Lender is an individual, he or she is of legal age and is legally competent to execute, deliver and perform his or her obligations under this Agreement.  If the Lender is not an individual, (i) it has the legal capacity and competence to execute, deliver and perform its obligations under this Agreement; and (ii) the execution and delivery of and performance by the Lender of this Agreement have been authorized by all necessary corporate or other action on the part of the Lender;

(e)     If the Lender is committing on its own behalf, this Agreement has been duly executed and delivered by the Lender, and constitutes a legal, valid and binding agreement of the Lender enforceable against him, her or it in accordance with its terms;

(f)     If the Lender is acting for a Disclosed Beneficial Lender, the Lender is duly authorized to execute and deliver this Agreement and all other documentation in connection with the commitment on behalf of the Disclosed Beneficial Lender.  This Agreement has been duly authorized, executed and delivered by or on behalf of such Disclosed Beneficial Lender and constitutes a legal, valid and binding agreement of such Disclosed Beneficial Lender enforceable against him, her or it in accordance with its terms;

(g)     The execution and delivery of and performance by the Lender (and any Disclosed Beneficial Lender) of this Agreement do not and will not (or would not with the giving of notice, the lapse of time or the happening of any other event of condition) result in a breach or violation of or a conflict with, or allow any other person to exercise any rights under any of the terms or provisions of the Lender's (and any such Disclosed Beneficial Lender's) constating documents or by-laws, if applicable, or any other contract, agreement, instrument, undertaking or covenant to which the Lender (and any Disclosed Beneficial Lender) is a party or by which it is bound; and

(h)     The Lender (and the Disclosed Beneficial Lender) has obtained such legal and tax advice as it considers appropriate in connection with the Loan and the execution, delivery and performance by it of this Agreement and the transactions contemplated by this Agreement.  The Lender (and the Disclosed Beneficial Lender) is not relying on the Corporation, its affiliates or counsel to any of them in this regard.

(i)     The Lender is an "accredited investor" within the meaning of National Instrument 45-106 and agrees to execute the Accredited Investor Status Certificate attached hereto at Schedule "E".

(j)     Lender has received, or has been given the reasonable opportunity to receive, independent legal advice in respect of this Agreement.

**SECTION 9     Covenants of the Lender**

The Lender (and any Disclosed Beneficial Lender) will execute, deliver, file and otherwise assist the Corporation in filing any reports, undertakings and other documents required in connection with the Loan.

**SECTION 10     Representations and Warranties of the Corporation**

The Corporation represents and warrants as follows to the Lender at the date of this Agreement and at Closing and acknowledges and confirms that the Lender is relying upon such representations and warranties in connection with the Loan:

a)     The Corporation is duly incorporated, organized, validly existing and in good standing under the laws of the Province of Ontario.  The Corporation is duly qualified and in good standing in all jurisdictions where the failure to so qualify would have a material adverse effect on the business or condition, financial or otherwise of the Corporation;

DocuSign Envelope ID: 8F38FEDE-6FF3-4A45-9B26-0AA9CCCDE1CC

b) The Borrower has full corporate right, power and authority to enter into this Agreement. The Borrower has full corporate power and authority to own, operate and carry on its business as now conducted;

c) Neither the execution and delivery of this Agreement or the documents related hereto nor the consummation of this loan transaction nor compliance with the terms, conditions and provisions hereof or thereof will conflict with or result in a breach of any of the terms, conditions or provisions of the charter documents or bylaws of the Corporation, any law, rule or regulation having the force of law; any contractual restriction binding on or affecting the Corporation; or any writ, judgment, injunction, determination or award which is binding on the Corporation; or result in, or require the imposition of any lien upon or with respect to the properties now owned or hereafter acquired by the Corporation, under any contractual provision binding on or affecting the Corporation;

d) The execution and delivery of this Agreement and the consummation by the Corporation of the transactions herein contemplated have been duly authorized by all necessary corporate action of the Corporation, and no authorization, consent, approval, licence or exemption under any applicable law, rule or regulation having the force of law, and no registration, qualification, designation, declaration or filing with any official body, is or was necessary therefor;

e) This Agreement, and the documents related hereto have been duly executed and delivered by the Corporation and constitute legal, valid and binding obligations of the Corporation enforceable against it in accordance with the terms, subject to the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and the effect of general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law);

f) The Corporation is not in default in any material respect under any material indenture, mortgage, deed of trust, agreement or other instrument to which it is a party or by which it or any of its property may be bound; and

g) The Corporation owns all of the properties and assets that it purports to own.  All agreements by which the Corporation holds an interest in a property or asset are in good standing in all material respects according to their terms.

The Corporation agrees that the Lender is entitled to the benefit of all representations, warranties and covenants of the Corporation.  The representations, warranties and covenants of the Corporation contained in this Agreement, together with such changes as are necessary in order to reflect that they are being made by the Corporation to the Lender

## SECTION 11   Covenants of the Borrower

During the Term of the Loan the Corporation Shall:

(a) ensure that all amounts that may rank in priority to the security are paid in full and on time;

(b) report any material adverse change in the business of the Corporation to the lender immediately following the occurrence; and

(c) immediately pay over to the Lender the full amount owing under the terms of this Agreement received by the Corporation upon any sale of the shares in the Corporation.

DocuSign Envelope ID: 8F38FEDE-6FF3-4A45-9B26-0AA9CCCDE1CC

FILED DATE: 3/5/2024 12:28 PM    2024CH01610

## SECTION 12   Survival

The representations, warranties, acknowledgements and covenants contained in this Agreement and any certificate or document delivered pursuant to or in connection with this Agreement will survive Closing and continue in full force and effect for a period of **two years**.

## SECTION 13   Beneficial Lenders

Whether or not explicitly stated in this Agreement, any acknowledgement, representation, warranty, covenant or agreement made by the Lender in this Agreement, including the schedules will be treated as if made by the Disclosed Beneficial Lender, if any.

## SECTION 14   Schedules

The following Schedules are incorporated into and form an integral part of this Agreement, and any reference to this Agreement includes the Schedules:

| | |
|---|---|
| Schedule "A" | Term Sheet for the Loan |
| Schedule "B" | Payment Information |
| Schedule "C" | General Security Agreement |

## SECTION 15   Interpretation

Any reference in this Agreement to gender includes all genders.  Words importing the singular number only include the plural and vice versa. The division of this Agreement into Sections and other subdivisions and the insertion of headings are for convenient reference only and do not affect the Agreement's interpretation. All references in this Agreement to dollars or to "$" are to the currency of the **United States of America**, unless otherwise specifically indicated. In this Agreement (i) the words "including", "includes" and "include" mean "including (or includes or include) without limitation", (ii) the words "the aggregate of", "the total of", "the sum of", or a phrase of similar meaning means "the aggregate (or total or sum), without duplication, of".

## SECTION 16   Assignment

This Agreement becomes effective when executed by all of the parties to it.  After that time, it will be binding upon and enure to the benefit of the parties and their respective successors, heirs, executors, administrators and legal representatives.   This Agreement is not transferable or assignable by any party to it.

## SECTION 17   Entire Agreement

This Agreement constitutes the entire agreement between the parties with respect to the transactions contemplated by it and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties.   There are no representations, warranties, covenants, conditions or other agreements, express or implied, collateral, statutory or otherwise, between the parties in connection with the subject matter of this Agreement, except as specifically set forth in this Agreement.  The parties have not relied and are not relying on any other information, discussion or understanding in entering into and completing the transactions contemplated by this Agreement.

## SECTION 18   Time of Essence

Time is of the essence in this Agreement.

## SECTION 19   Governing Law

This Agreement will be governed by, interpreted and enforced in accordance with the laws of the Province of Ontario **and the federal laws of Canada applicable therein**.  The Lender, (and any Disclosed Beneficial Lender), irrevocably attorns and submits to the non-exclusive jurisdiction of the courts of the Province of

DocuSign Envelope ID: 8F38FEDE-6FF3-4A45-9B26-0AA9CCCDE1CC

Ontario with respect to any matters arising out of this Agreement and waives objection to the venue of any proceeding in such court or that such court provides an inconvenient forum.

**SECTION 20   Language of Documents**

It is the express wish of the parties to this Agreement that this Agreement and all related documents be drafted in English.  Les parties aux présentes conviennent et exigent que cette convention ainsi que tous les documents s'y rattachant soient rédigés en langue Anglais.

**SECTION 21   Execution by Facsimile and Counterparts**

This Agreement including the schedules may be executed in any number of counterparts (including counterparts by facsimile) and all such counterparts taken together will be deemed to constitute one and the same document.

**[SIGNATURE PAGE TO FOLLOW]**

DocuSign Envelope ID: 8F38FEDE-6FF3-4A45-9B26-0AA9CCCDE1CC

FILED DATE: 3/5/2024 12:28 PM   2024CH01610

**SCHEDULE "A"**

Maturity extended to December 31 2023

**TERM SHEET**
**CREATIVE WEALTH MEDIA FINANCE CORP.**
**SECURED LOAN**
**SERIES "B"**

| | |
|---|---|
| **Borrower:** | Creative Wealth Media Finance Corp. (the "**Borrower**") |
| **Lender:** | As written on the Cover Sheet of this Loan Agreement |
| **Total Raise:** | Up To $20,000,000.00 USD |
| **Use of Funds:** | To provide the Borrower with capital to support secured Film Financing |
| **Interest Rate:** | 12% annualized interest, paid monthly to Maturity Date |
| **Maturity:** | December 31, 2022 (the "**Maturity Date**") |
| **Interest Payments:** | Interest will be paid monthly |
| **Repayment of Loan:** | The Borrower shall repay the entire Loan on that date that is the Maturity Date. |
| **Closing Date:** | Continuous |
| **Subsequent Loans:** | Each subsequent loan provided by the Lender will be subject to the same terms and conditions and security provided for herein. All Subsequent Loans will be added to the outstanding amount of the Loan and evidenced by a contract note reflecting the specific term of such Subsequent Loan. |

-10-

FILED DATE: 3/5/2024 12:28 PM   2024CH01610

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

| | | |
|---|---|---|
| DIANE FOWLER, individually and on behalf of the class members described below, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. |
| SCHMIDT ADVISORY SERVICES, INC. d/b/a CATALYST WEALTH MANAGEMENT, SANFORD SCHMIDT ETHAN SCHMIDT, JORDAN SCHMIDT, and JASON CLOTH, | ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| C2 MOTION PICTURE GROUP, LLC, | ) ) | |
| Respondent in Discovery. | ) | |

# EXHIBIT "B"

FILED DATE: 3/5/2024 12:28 PM   2024CH01610



# Catalyst Wealth Management Media Fund I*

*See "Important Information at the end of this presentation

FILED DATE: 3/5/2024 12:28 PM 2024CH01610

# Contents

▼ Media Opportunity

▼ Terms & Objectives

▼ Key Data

▼ Managing Partners

▼ Past, Present, & Future Content

▼ Public Spotlight

▼ Industry Overview

▼ Project Evaluation Process

▼ Fund I

▼ Projects

▼ Team Bios



2

FILED DATE: 3/5/2024 12:28 PM  2024CH01610

# Media Opportunity

▼ An investment in an access fund co-managed with Creative Wealth Media finance company. Creative Wealth Media manages over $750 million of capital for theatrical, television, and digital animation productions. The fund offers a unique diversified investment opportunity to participate in the sale and ongoing revenues generated from the opportunistic environment of four digital children's animation productions.

3

# Terms & Objectives

- ▼ Investment Objective - Catalyst Wealth is sponsoring a closed ended investment fund for a limited number of qualified investors. The objective of the fund is to generate a high level of current returns and appreciation from loans for studio and independently produced motion pictures, television, and animated production.

- ▼ Investment strategy - providing investors with attractive short / medium term project lending at high yields. The objective of the fund is to generate high current income with additional strong ancillary returns on digital animated content being exclusively produced for the global streaming market.

- ▼ Fund size: $20 MM

- ▼ # of Projects: 4

- ▼ Term: approximately 12-18 months

- ▼ Manager Co-Investment**: $1 MM

- ▼ Preferred Return: 8% + 25% profit participation of fund projects

- ▼ Projected Annual Return: 18%+ net of fees

- ▼ Fees: 2 & 20



4

FILED DATE: 3/5/2024 12:28 PM  2024CH01610

# Key Data

- ▼ Four children's digital animation productions
- ▼ A-list Hollywood talent
- ▼ Aggregate co-finance investment $28,000,900
- ▼ Investment structured as debt with 25% equity participation
- ▼ Featured productions
  - ▼ Fables
  - ▼ Gossamer
  - ▼ Hailey & the Hero Hearts
  - ▼ Bubbles Hotel



5

FILED DATE: 3/5/2024 12:28 PM   2024CH01610

# Key Data Cont.
## Bron Animation Slate Figures

| Series | Total CW / Bron Loan | CW / Bron Cost to Date | Latest Whisper estimate | Est Sale Date | Projected Net Merchandise and Licensing estimates | | |
|--------|---------------------|------------------------|--------------------------|---------------|-------------------|-------------------|-------------------|
| | | | | | Yr 1 M&L | Yr 2 M&L | Yr 3 M&L |
| Fables | $ 9,042,192.00 | $ 5,500,000.00 | $ 18,500,000.00 | August 2021 | $ 462,500.00 | $ 3,230,000.00 | $ 3,634,000.00 |
| Gossamer | $ 11,404,296.00 | $ 1,500,000.00 | $ 21,000,000.00 | August 2021 | $ - | $ - | $ - |
| Bubbles | $ 5,897,431.00 | $ 2,450,000.00 | $ 11,000,000.00 | August 2021 | $ 2,000,000.00 | $ 10,500,000.00 | $ 23,560,000.00 |
| HHH | $ 2,556,188.00 | $ 1,100,000.00 | $ 6,000,000.00 | August 2021 | $ 1,825,000.00 | $ 10,000,000.00 | $ 24,175,000.00 |
| Total | $ 28,900,107.00 | $ 10,550,000.00 | $ 56,500,000.00 | | $ 4,287,500.00 | $ 23,730,000.00 | $ 51,369,000.00 |

6

FILED DATE: 3/5/2024 12:28 PM   2024CH01610

# Managing Partners*



- Driving force in studio and independent production.
- Produced and/or financed motion pictured alongside Warner Bros., Sony, MGM, Paramount, A24, Universal, and Lionsgate.
- Bron Digital is a state-of-the art virtual production and service company

- Specializes in financing solutions for studio and distributors of film entertainment
- 50 years of combined media, entertainment, and investment experience
- More than $750 million in financing for approx. 60 motion pictures since 2010





7

FILED DATE: 3/5/2024 12:28 PM   2024CH01610

# Past, Present, & Future Content

- ▼ Bron Studio overview of past and future
  - ▼ https://www.dropbox.com/s/5ue6s7bk0ulpat8/BRON%20REEL%2001%2320.mp4?dl=0
- Bron Animation
  - ▼ https://www.dropbox.com/s/ji7vv4gre191pui/BRON%20Digital%20Sizzle%20Reel%20 06-15-20.mp4?dl=0
- Hailey & the Hero Hearts
  - ▼ https://www.dropbox.com/s/wjn7fl1dx83nrvy/HHH_Opening.mp4?dl=0
- Fables
  - ▼ https://vimeo.com/476100015 (password: pM7wW8hL8r)

8

FILED DATE: 3/5/2024 12:28 PM  2024CH01610

# Public Spotlight

## Bloomberg

### Markets

# Financier for 'Joker' Has Made Movies Into Ultimate Yield Play

By Natalie Wong

September 8, 2019, 7:00 AM CDT Updated on September 9, 2019, 4:00 AM CDT

- Former Canadian banker one of biggest independent backers
- Cloth says his business is most 'alternative of alternatives'



Source: Warner Bros.

...ficer Cloth manages risk in his film-financing business just like he did as an investment banker, continuing deals with one big question in mind: "How do I not get screwed?"

That means staying focused on business and not getting bedazzled by the glitz and glamor of Hollywood.

# Netflix Animated Movie 'The Willoughbys' Clocks 37.6 Million Viewers in First Month, Streamer Says (EXCLUSIVE)

By Matt Donnelly V

Netflix's animated movie "The Willoughbys" was watched by 37.6 million households in its first month on the platform, the company said Friday.

Directed by Kris Pearn, it's the second original film from the streamer's animation division that aims to provide the kind of family content it has been offering from competitors for years.



Netflix

---



## CG / Canaccord Genuity
Capital Markets

### Around the Corner
Emerging companies and industries to watch

Arandom Goisgosthge | Analyst | Canaccord Genuity Corp. (Canada) | agoisgosthge@cgf.com | 1.416.869.7293
Matthew Lee | Associate Analyst | Canaccord Genuity Corp. (Canada) | meelse@cgf.com | 1.416.687.5463

## Canaccord Equity Research
10 June 2019

## Periodical

# BRON Studios: A rising Canadian powerhouse in content production

We are introducing a new publication, **Around the Corner**, which highlights what we believe are some of the most exciting emergent private companies in Canada, as well as industry themes and trends which are yet to be fully represented in the public markets.

Around the Corner will span a broad spectrum of sectors covered by the Canaccord Genuity Research team, including Technology, Media, Telecom, Financial Services, Consumer, Real Estate and Healthcare. It aims to:

1. **Offer insight** into, and a broader perspective on, early industry trends within our research coverage. In many cases, significant elements of these trends first emanate from private companies;

2. **Educate** investors who are interested in private companies that are making a mark in their respective sectors;

3. **Identify** companies that may enter the public markets in the future, either through an IPO process or M&A.

**BRON Studios is featured in our inaugural publication.** BRON is an emerging content production (Film/TV/Animation) company that has risen in prominence in recent years due to its high-quality Motion Picture slate, including highly acclaimed titles like Heroes (Dennis Washington), Iona (Davis), The Birth of a Nation and Roman J. Israel, Esq. Its recent spotlight deal with Warner Bros. expanded its slate to include titles like Clint Eastwood's The Mule and the upcoming Joker (from the Batman franchise). Building on its success in film, BRON has expanded into television and more recently has set up its own venture capital arm aimed at investing in high-quality producers and production-related technologies and services.

Around the Corner highlights what we
believe are some of the most exciting
emergent private companies in
Canada, and/or industry themes and
trends which are yet to be fully
represented in the public markets.

FILED DATE: 3/5/2024 12:28 PM   2024CH01610

# Industry Overview



10

FILED DATE: 3/5/2024 12:28 PM  2024CH01610

# Industry Overview

▼ Offsetting the slowdown in U.S box office revenue is the projected growth in VOD (video-on-demand).

▼ Netflix, Amazon Prime, Apple, HBO, and Hulu revenue expected to grow at 11.3% CAGR with total revenue increasing to US$14 billion in 2021.

▼ In order to create filmed entertainment capital is required.

▼ Major Hollywood studios use outside financing to help diversify their investment across a greater number of projects, but still remain control and ownership of product.

11

FILED DATE: 3/5/2024 12:28 PM 2024CH01610

# The Streaming Platforms

▼ Technology giants are jumping into the content marketplace, following the huge success of Netflix.

▼ There is a flood of money coming into the feature film and episodic content space.

**Forbes**    Netflix's Content Budget Is Updated To $13B For 2018

**CNBC**    Apple signs up Oprah Winfrey in $1bn programming push

**The Guardian**    Disney's new Netflix rival will be called Disney+ and launch late 2019

**Los Angeles Times**    HBO to get bigger programming budget, says WarnerMedia head John Stankey

**The Hollywood Reporter**    NBCUniversal Preps Streaming Service, Reorganizes Executive Team

12



FILED DATE: 3/5/2024 12:28 PM  2024CH01610

# Television

▼ There are more buyers than ever, looking for all sorts of content. With over 60 buyers in the US alone, the demand for content has never been stronger.



13

FILED DATE: 3/5/2024 12:28 PM 2024CH01610

# Creative Wealth Media Project Evaluation Process

- There are six steps in the CWM review process for each project

- Preliminary Review
- Due Diligence Review
- Film Committee Review
- CAP Executive Review
- Fund Review
- Closing Process

14



FILED DATE: 3/5/2024 12:28 PM   2024CH01610

# Preliminary Review

▼ This is an initial, high-level review by CWM Corporate Business Affairs, Finance and the Film Committee Chair. This initial review requires the creation of an Intake Form by the designated Project Manager:

▼ Cast & Key Crew (Producer, Director, Writer, Cast)
▼ Synopsis / Log Line
▼ Genre
▼ Sales Agent (Foreign & Domestic) & track record
▼ Budget
▼ Production Schedule
▼ CAP Requested Amount
▼ Preliminary Finance Plan
▼ Sales Agent Estimates
▼ Proposed back-end
▼ Type of loan
▼ Closing Timeline / available fund cash flow according to projected start date.

15



FILED DATE: 3/5/2024 12:28 PM 2024CH01610

# Due Diligence Review

▼ If recommended by the Film Committee Chair, the CWM Project Manager then prepares the Document Brief which serves to assess the viability of the project and if the proposed investment conforms to Fund requirements/parameters throughout the due diligence review process. The elements being analyzed include, but are not limited to, the following

▼ Business Affairs: Chain of Title, Sales Agent's (foreign and domestic) material terms & conditions, Cast & Crew attachment & agreements, incorporation documents, Recoupment Schedule & related financiers, and other relevant documents

▼ Finance: Collateral analysis based on sales estimates, Finance plan, Budget, Production Schedule, Cash flows, and other relevant documents

▼ Creative: Script review / coverage created, cast attachments, director and other relevant documents and creative elements

16

FILED DATE: 3/5/2024 12:28 PM   2024CH01610

# Film Committee Review

- The CWM Film Committee will review the project's Document Brief to determine whether the project is viable and suitable for the Fund based on the information provided. If further information is required, the Film Committee will work with the Project Manager to further clarify as needed



17

FILED DATE: 3/5/2024 12:28 PM   2024CH01610

# CAP Executive Review

▼ If approved by the Film Committee, CWM's VPs of Business Affairs & Finance will review the Document Brief from a corporate perspective, and the President will have final corporate approval before recommending to the Fund

18



FILED DATE: 3/5/2024 12:28 PM 2024CH01610

# Fund Review

▼ The CWM President will then take the Document Brief to the Fund / Investment Committee for final Fund approval, at which time, if approved, the closing process will commence. CAP's Executive Team and the Film Committee will be available to answer any questions the Fund may have at this stage prior to making an approval decision

19



FILED DATE: 3/5/2024 12:28 PM  2024CH01610

# Closing Process

- Once approved by the CWM Fund / Investment Committee, the project will progress to closing. Some of the key closing documents are as follows:

  - Equity Financing Agreement
  - Tax Credit Opinion
  - Completion Bond Agreement
  - UCC Financing Statement
  - Copyright Mortgage
  - Inter-Party Agreement (if applicable)
  - Inter-Creditor Agreement (if applicable)
  - Subordination Agreement (if applicable)
  - Collection Account Agreement and/or Waterfall Agreement
  - Legal and Chain of Title Opinion
  - Laboratory Pledgeholder Agreements

20

FILED DATE: 3/5/2024 12:28 PM   2024CH01610



# Projects in Fund I

21

FILED DATE: 3/5/2024 12:28 PM  2024CH01610



22

FILED DATE: 3/5/2024 12:28 PM   2024CH01610



# THE REASON

Fables is a collection of the timeless stories we've told for centuries, repurposed in a fresh and exciting way. These are the stories from which we ourselves have learned life's important lessons. *Slow and steady wins the race. A kindness is never wasted. Liars are not believed even when they speak the truth.*

23

FILED DATE: 3/5/2024 12:28 PM   2024CH01610



# THE STORIES

All the Fables chosen for our series are from the public domain, but we've attempted to add new life into traditional tales, expanding on the original stories with further humor and character. We will use the most notable fables: The Tortoise & The Hare, The Lion & The Mouse, The Boy Who Cried Wolf.

24

FILED DATE: 3/5/2024 12:28 PM 2024CH01610

# TARGETED TALENT



**ANGELINA JOLIE**
Actress: Those Who Wish Me Dead, Girl Interrupted, Salt, Maleficent
Brand Partnerships: St. John, Shiseido, Guerlain, Louis Vuitton



**JENNIFER GARNER**
Actress: Dallas Buyers Club, Juno, 13 Going On 30
@8.8M ❤1.5M
Brand Partnerships: Frigidaire, Neutrogena



**JULIANNE MOORE**
Actress: Still Alice, The Hours, Far From Heaven
@1.6M ❤847K
Brand Partnerships: L'Oreal

**CHARLIZE THERON**
Producer/Actress: Bombshell, Tully, Monster, Mad Max Fury Road
@6.7M ❤5.5M ❤733K
Brand Partnerships: Dior, Tiffany and Co., Bvlgari, Raymond Weil



**JENNIFER HUDSON**
Actress: Respect, Monster, Dreamgirls, Sex In The City
@2.9M ❤7.6M ❤3.9M
Brand Partnerships: Weight Watchers

 

**MICHELLE OBAMA**
Producer
@37.7M ❤17M ❤44.6M
Brand Partnerships: Healthier America

**GABRIELLE UNION**
Actress: The Birth Of A Nation, Think Like A Man, Bring It On
@15.7M ❤1.4M ❤4.3M
Brand Partnerships: Miu Miu, Invicta Watches, Neutrogena, Sensationail



**JENNIFER LOPEZ**
Actress: Hustlers, Selena, Maid In Manhattan
@117.2M ❤43M ❤44.9M
Brand Partnerships: Versace, L'Oreal, Venus, Tommy Hilfiger, Fiat, Giuseppe Zanotti, Coach



**SALMA HAYEK**
Actress: Beatriz At Dinner, Frida, From Dusk Till Dawn
@14.5M ❤904K ❤412K
Brand Partnerships: Revlon, Avon, Chopard, Lincoln Cars, Cartier, UNICEF



**HALLE BERRY**
Actress: Monster's Ball, Die Another Day, Catwoman
@6M ❤683K ❤264.2K
Brand Partnerships: Apple Music, Revlon



**JESSICA BIEL**
Actress: The Illusionist, Valentine's Day, Total Recall
@8.7M ❤1.6M ❤919K
Brand Partnerships: Gaiam, Revlon



**VIOLA DAVIS**
Actress: Fences, The Help, Widows
@4.5M ❤1.3M ❤1.2M
Brand Partnerships: L'Oreal

FILED DATE: 3/5/2024 12:28 PM   2024CH01610



FILED DATE: 3/5/2024 12:28 PM 2024CH01610



GOSSAMER | BRON DIGITAL

27

# THE BOOK

Written by two-time Newberry Winner Lois Lowry (The Giver Quartet, Number the Stars), Gossamer takes children and adults alike on a journey of the mind's imagination. In Gossamer, Lowery touches upon such themes such as: loneliness, forgiveness, trust and hope.

One of her more daring novels, this is the first time the critically acclaimed book will be adapted to the screen. The novel has elements of both family and realism, which will allow for a visual, inviting and inventive world to play across the screen.

BRON recently premiered its animated feature The Willoughby on NETFLIX, based on the book by Lois Lowry.

FILED DATE: 3/5/2024 12:28 PM 2024CH01610

# CASTING UNDERWAY



**Hunter Schafer**
*Euphoria*

*as LIL*



**Awkwafina**
*Oceans 8, Crazy Rich Asians, The Farewell*

*as*



**James Corden**
*Trolls, Peter Rabbit, Into The Woods*

*as BERTRAND*



**RuPaul**
*The Simpsons, Show Dogs, BoJack Horseman*

*as MO*

GOSSAMER | BRON DIGITAL



28

07

FILED DATE: 3/5/2024 12:28 PM 2024CH01610



* Confidential Information of Epic Story Media Inc. No representation or warranty is made by Epic Story Media Inc., its members or managers, with respect to any information contained herein. Under no circumstances does this presentation constitute an offer to sell or a solicitation of offer to purchase any security of Epic Story Media Inc. Any such offer or solicitation shall be made solely pursuant to legal documents in final form.

FILED DATE: 3/5/2024 12:28 PM 2024CH01610

# OVERVIEW

- Created by **Narae Ha** ("Rainbow Ruby")

- Bubble's Hotel is a magical **resort** where every guest can explore their unique passion with the help of a **bubbly** hotelier extraordinaire who's always there to **save the day!**

- Bubble and her staff welcome new guests to their room and help them live out their fantastical adventure!

- Target: **Girls, 4-8 years old**

- In production: **52 episodes x 11 minutes** (9 min + 2 min)

Having **trouble?** Send a **Bubble!** Our plucky heroine and her two best friends are on hand to take care of anything a guest needs!

**EPIC STORY MEDIA**

Confidential information of EPIC STORY MEDIA INC. - May not be reproduced without written permission

30

FILED DATE: 3/5/2024 12:28 PM  2024CH01610

# WHAT'S BH ALL ABOUT?

**EPIC STORY MEDIA**

- Bubble's mission is to **help her guests** discover and become the **ultimate version** of **who they really want to be**
- Bubble always **discovers a little part of herself** in the process
- Bubble's Hotel makes **energetic innocence** the **new fun attitude** for girls of all ages!

Think *Hello Kitty* meets *K-Pop*

without the snark!

A **NEW ATTITUDE** FOR GIRLS!





Confidential Information of EPIC STORY MEDIA INC. - May not be reproduced without written permission

31

FILED DATE: 3/5/2024 12:28 PM  2024CH01610



FILED DATE: 3/5/2024 12:28 PM 2024CH01610

# The Creator



## Kevin Mowrer
MOWRERMETA-STORY

Kevin is an experienced and proven creator with a rich breadth of experience and a deep passion for creating stories for kids and all family that are mission driven.

He's a **Gemini** and **2-time Emmy Award Winning** show creator and also the holder of multiple play patents.

He founded **Hasbro's** entertainment division, putting Hasbro on the path to content success while running Hasbro's worldwide R&D group.

Kevin also founded **MowrerMeta-Story** and is broadly known as the franchise story-doctor for the kids and all family entertainment business with clients that include: *Dreamworks Animation, Universal, DC Comics, Warner Games, Mattel, LEGO, Breyer and many more!*

Kevin is also the founder and Co-CEO of *HUGE!* Play premium direct-to-consumer toys.

*"Beyond a good and nurturing community and home life, I believe that stories are the greatest and most lasting impact we can have on the future of our children and the future our children will shape for us all. As creators we need to be inspired by the rapidly evolving ideas, community and possibilities of our world and bring that inspiration to our children in inventive ways that reach into the moments they are living in and give them the tools to explore themselves and become better human beings shaping a better world."*

33



FILED DATE: 3/5/2024 12:28 PM 2024CH01610



EPIC STORY MEDIA

What Hailey's All About

Learning how to deal with your BIG EMOTIONS!

Target: 4-8
52 episodes x 11 min

34

FILED DATE: 3/5/2024 12:28 PM   2024CH01610

# Jason Cloth
## Founder and CEO, Creative Wealth Media

▼ Jason M. Cloth is the founder and CEO of Creative Wealth Media, one of the most prolific production and financing entities in the film and television industry, with a slate that currently includes Apple's TV+ Tom Hank's WWII film GREYHOUND; Apple's new TV series starring Reese Witherspoon and Jennifer Aniston as THE MORNING SHOW co-hosts; and the upcoming film release CANDYMAN (MGM Studios), to name a few.

▼ Cloth founded Creative Wealth Media Group of Companies in 1992 and partnered with a Toronto based Merchant Bank to provide financing on more than 40 film and television productions.

▼ Cloth is also a Director of BRON Media Corp. Cloth joined BRON Studios in September 2014 in a key strategic financial and investor management role. He has executive produced more than 77 feature films with producer BRON Studios, along the way raising excess of $750 million for the film industry.

▼ Additional film credits for Cloth include the acclaimed Denzel Washing led film FENCES (Paramount); Joaquin Phoenix led JOKER (Warner Bros); Charlize Theron led BOMBSHELL (Lionsgate) and ADDAMS FAMILY (MGM Studios); THE GOOD LIAR (Warner Bros); QUEEN & SLIM (Universal)

▼ Cloth began his career in 1988 as a Fixed Income Economist for CIBC/Wood Gundy and hold a graduate degree in Economics.



35

FILED DATE: 3/5/2024 12:28 PM  2024CH01610

# Sandy Schmidt, CFP®, ChFC®, CLU®
## Managing Partner

▼ As the Founder and Chairman of Schmidt Financial Group and Catalyst Wealth Management, Sandy has been advising affluent families and their team of core advisors on intelligent solutions to protect, transfer, leverage and integrate their wealth for over 38 years. Sandy believes that the wisdom and knowledge acquired developing unique financial and estate plans for the ultra-wealthy over three decades benefit the individuals and families whom he serves.

▼ As part of the planning process, review and analysis of clients existing investments became an integral part of the advisory and planning process. By understanding various asset classes over the years, Sandy learned firsthand the importance of diversification and risk mitigation within the investment process. As part of the overall planning process, Catalyst Wealth incorporates the ability to help clients invest, diversify, integrate and monitor their investable assets.

▼ Sandy earned his BS in Accounting from the University of Illinois at Chicago. He has also earned the financial credentials of CFP (Certified Financial Planner), International Board of Certified Financial Planners, ChFC (Chartered Financial Consultant), CLU (Chartered Life Underwriter), and has FINRA Series 6, 63, 65, & 22 securities registration.



36

FILED DATE: 3/5/2024 12:28 PM 2024CH01610

# Ethan Schmidt, CFP®, CRPC®
Partner

▼ Ethan Schmidt assists individuals in designing a winning financial game plan to achieve personal goals. He joined Catalyst after spending several years at Merrill offering personalized unbiased advice to individuals and families to improve their financial situation. Ethan was recognized as a top advisor in the country.

▼ As Partner, he takes pride in building long lasting relationships and implementing goal achieving strategies. In addition, he has a unique ability to integrate all the financial elements to design a complete portfolio

▼ Ethan is a Certified Financial Planner™ (CFP®), Chartered Retirement Planning Counselor (CRPC®), licensed insurance advisor and holds securities Series 7 and Series 66 securities registrations with FINRA.



37

FILED DATE: 3/5/2024 12:28 PM 2024CH01610

# Important Information

This presentation ("**Presentation**") is neither an offer to sell nor a solicitation of an offer to buy any security, nor is it an offer of any sort of investment advice. An offer may only be made via a written offering document ("**Memorandum**") provided by Catalyst Wealth Management Media Fund I, LLC (the "**Fund**") that offers limited liability company interests in the Fund (the "**Interests**"). Schmidt Advisory Services, Inc., d/b/a Catalyst Wealth Management ("**Catalyst**") will provide the Memorandum only to qualified and accredited investors. Prior to investing, you are encouraged to request additional information about the Fund. This Presentation should be read in conjunction with the Memorandum, and this Presentation is not intended to be relied upon as the basis for an investment decision, and is not, and should not, be assumed to be complete.

While many of the thoughts expressed in this Presentation are stated in a factual manner, the discussion reflects only Catalyst's beliefs about the markets in which the Fund will invest when following its investment strategies as are described herein. The Memorandum's description of the Fund's investment strategy herein are in summary form, and is qualified in its entirety by the Memorandum. The Presentation are subject to change. The descriptions of the Fund's investment strategy involve subjective elements, and Catalyst's views evolve over time. There is no assurance that investment objectives will be achieved. An investment in the Fund involve substantial risks, some of which are disclosed in the Memorandum. The contents of this Presentation are qualified in their entirety by the Memorandum, and the Fund's Limited Liability Company Agreement ("**Operating Agreement**"), as they may be amended or supplemented from time to time. Only by carefully reviewing and considering those factors and the rest of the Fund's offering documents (including the Fund's independent investigations) can an investor determine whether such risks, as well as the Catalyst's experience and compensation, conflicts of interest and other information contained therein are acceptable to the investor. The Fund does not undertake any obligation to revise or update any statement in this Presentation for any reason.

Catalyst and its affiliates will have complete control over the Fund's operations and the management of its assets. There are significant restrictions on the transferability of the Interests, there will be no market for Interests and no person should invest with the expectation of monetizing an Interest. Capital invested in the Fund is subject to significant restrictions on transfer and may not be redeemed. The Fund's fees and expenses, which would include compensation of Catalyst, may outweigh the Fund's gains, if any.

**Fund Differs from Catalyst Accounts:** Capital invested in the Fund should not be considered an investment that is similar to a separate account with Catalyst. There are material differences between the investment strategies, risks, liquidity and fee structure between the Fund and any separate account held with Catalyst. Prospective investors who are currently or who become direct clients of Catalyst should carefully review the Memorandum and in particular the acknowledgment such persons must execute to understand the differences between the Fund's strategies and risks and those of a separate account with Catalyst.

**Creative & BRON:** As discussed in the Memorandum under "*Summary of the Investment Program—Investment Sourcing*," Creative Wealth Media Finance ("**Creative**") and its affiliate, BRON Studios and BRON Animation ("**BRON**"), have informally agreed to assist Catalyst in selecting the Fund's investments. Neither BRON nor Creative have any binding obligation to offer any projects to the Fund or assist Catalyst in its sourcing of the Fund's investments.

This Presentation should not be construed as investment or other advice—it is presented for information purposes only and is not intended to be either a specific offer by any person to provide any financial service or product. Purchasers of Interests will only be members of the Fund, and will have no equity in, or any standing or other recourse against, Catalyst.

The Fund currently intends to commence operations in August 2020 and has no performance or operating history. Past performance of the Fund, Creative, BRON or their respective personnel is not indicative of future Fund results.

**Forward-Looking Statements:** Certain information in this Presentation constitutes forward-looking statements, opinions or beliefs. Due to various risks and uncertainties, actual events or results or the actual performance of the Fund may differ materially from such forward-looking statements, opinions or beliefs. In addition, new risks may arise from time to time. Accordingly, such statements should be evaluated with the understanding of their inherent uncertainty.

**Third Party Sources:** Certain information in this Presentation, such as the project review process by BRON / Creative, has been obtained from third party sources and, although believed to be reliable, has not been independently verified and its accuracy or completeness cannot be guaranteed. No representation is made with respect to the accuracy, completeness or timeliness of this Presentation, and any recipient agrees that none of the Fund, Catalyst nor their respective affiliates, partners, employees, officers, directors, agents or representatives will have any liability for any misstatement or omission of fact or any opinion expressed herein.

**Confidentiality:** Catalyst reserves all copyright and intellectual property rights to the content, information and data within this Presentation. The contents in this Presentation are protected by copyright and no part or parts hereof may be modified, distributed, published, broadcasted, used for creating derivative works or used in any other way for commercial or public purposes without the prior written consent of Catalyst. The recipient agrees to keep the contents of this Presentation confidential and use it solely to evaluate whether further investigation of the Fund is warranted.

The recipient should consider that all investments carry risk and the Fund's proposed strategies may experience losses.

## End Notes

(1) As discussed in the Memorandum under "*Summary of the Investment Program—Investment Sourcing*," Creative and BRON have informally agreed to assist Catalyst in selecting the Fund's investments. Neither BRON nor Creative have any binding obligation to offer any projects to the Fund or assist Catalyst in its sourcing of the Fund's investments.

(2) As discussed in the Memorandum, the Manager or its principals may fulfill this co-investment via the contribution to the Fund of existing investments, at cost. See "*Conflicts of Interest*" in the Memorandum.

FILED DATE: 3/5/2024 12:28 PM   2024CH01610

# Thank You!

Sanford Schmidt

Sandy@schmidtfinancial.com

773-774-2600

Ethan Schmidt

Ethan@schmidtfinancial.com

847-313-5005



39