# EXHIBIT G



**Lynda A. Bennett**
Partner

One Lowenstein Drive
Roseland, New Jersey 07068

**T**: (973) 597-6338
**F**: (973) 597-6339
**E**: lbennett@lowenstein.com

January 22, 2024

V<small>IA</small> E<small>MAIL</small> & C<small>ERTIFIED</small> M<small>AIL</small>

Mr. Leonard B. Cooper
Markel Claims
P.O. Box 2009
Glen Allen, VA 23058-2009
Leonard.Cooper@Markel.com

Re:     **Named Insured:     Schmidt Advisory Services, Inc.**
        **Policy No.:         PL86085C**
        **Claim No.:          FA400829**

### NOTICE OF CLAIM

Dear Mr. Cooper:

This law firm serves as coverage counsel to Schmidt Advisory Services, Inc. ("Schmidt"), your Insured[1] under Professional Liability Policy No. PL86085C ("Policy") that Markel American Insurance Company ("Markel") sold to Schmidt, providing coverage for Claims asserted during a policy period of January 30, 2023 to January 30, 2024.

We write to place Markel on written notice of the enclosed Claim pursuant to Section VI – Notice, of the Policy.[2]  We address this letter to you as we understand you have been assigned to the Claim.

### Facts

On December 7, 2023, Schmidt received a letter from counsel for Christopher Lorenzen, an investor in a syndicated loan to the Creative Wealth Media Finance Corp. ("Creative Wealth Media") to provide funding for a feature film trilogy -- the *Young Bear Grylls*.  Mr. Lorenzen purchased $750,000 of syndicated loan notes (the "Bear Grylls Notes") and alleges that Schmidt – which had given advice to Mr. Lorenzen and other Schmidt investors with respect to the Bear Grylls Notes – made misrepresentations to investors and recommended further investment in the

---

[1] All capitalized terms in this letter, which are not otherwise defined, shall have the meaning ascribed to them in the Policy.

[2] This written notice serves to supplement the prior oral communications that you have had with Schmidt's principal, Sandy Schmidt, regarding this matter.

---

NEW YORK      PALO ALTO      NEW JERSEY      UTAH      WASHINGTON, D.C.              Lowenstein Sandler LLP

Mr. Leonard B. Cooper                                                          January 22, 2024
Markel Claims
Page 2

trilogy project against investors' interest.[3]  Mr. Lorenzen also alleged that Schmidt breached its fiduciary duty in connection with investment advice regarding the Bear Grylls Notes.  The letter stated that Mr. Lorenzen was evaluating pursuing legal action against Schmidt.  On January 18, 2024, counsel for Mr. Lorenzen sent Schmidt an email requesting a tolling agreement; defense counsel for Schmidt provided a draft tolling agreement in response.  A copy of Mr. Lorenzen's letter and email, and Schmidt's draft tolling agreement, are enclosed.  (See **Exhibits A**, **B**, and **C**, respectively).

On January 12, 2024, Schmidt received a letter from counsel for Diane Fowler alleging that Schmidt had negligently performed professional services on behalf of Ms. Fowler with regards to investment in Creative Wealth Media.[4]  Specifically, Ms. Fowler invested $1,000,000 into the Series B loan notes ("Series B Notes") with Creative Wealth Media.  Counsel for Ms. Fowler requested disclosure of any potentially applicable insurance policies that may apply to the referenced claims.  On January 18, 2024, counsel for Ms. Fowler sent Schmidt an email requesting a tolling agreement.  A copy of Ms. Fowler's letter and email are enclosed.  (See **Exhibits D** and **E**, respectively).

Schmidt recommended and secured approximately 45 additional investors in the Bear Grylls Notes and advised an additional 391 investors with respect to investments in Creative Wealth Media, including but not limited to Series B Notes, Series D Notes, Series E Notes, Series F Notes, and Series H Notes.  Therefore, it is possible that additional investors may make similar allegations, assert facts, or pursue legal causes of action arising from their investment in the Bear Grylls Notes, the Series B Notes, or any other instruments related to Creative Wealth Media.  Schmidt specifically reserves all of its rights regarding any potential allegations of Wrongful Acts that arise out of or are related to Creative Wealth Media investments.

## Analysis

Upon receipt of Mr. Lorenzen's demand letter, Schmidt provided immediate notice of this Claim to Markel.  Markel responded by email dated January 9, 2024 advising that the demand letter did not qualify as a Claim, and that coverage would be unavailable for the Bear Grylls Notes in any event based on Exclusion J.2 which excludes "coverage for any loss in connection with any Claim alleging, arising out of, based upon, or attributable to" the "purchase or sale of securities[5] or

---

[3] Schmidt vigorously disputes, and is defending against, the allegations of the Claim, and denies any wrongdoing whatsoever.

[4] Schmidt also denies the allegations made by Diane Fowler and reserves the right to vigorously defend itself against such allegations.

[5] Security or Securities is defined by the Policy as having the same meaning as defined in the Securities Exchange Act of 1934, the Securities Act of 1933, the Investment Adviser Act of 1940 as amended, or pursuant to rules issued by the Securities Exchange Commission.



Mr. Leonard B. Cooper                                            January 22, 2024
Markel Claims
Page 3

insurance products for which an Insured received commission or other remuneration." (Policy § III J.2).

There is no merit to either coverage position advanced by Markel. Furthermore, Markel's "defense obligation is triggered when the insured tenders the defense of an action against it which is **_potentially_** within the policy coverage." Solo Cup Co. v. Fed. Ins. Co., 619 F.2d 1178, 1183 (7th Cir. 1980) (emphasis added).

### a. Claim

Both Mr. Lorenzen and Ms. Fowler have made to Schmidt a "written request to toll" the "statute of limitations" for a Wrongful Act, and thus a Claim has been made pursuant to Section II – Definitions E.7 of the Policy.

The allegations made by Mr. Lorenzen and Ms. Fowler – and any future allegation involving the Bear Grylls Notes, Series B Notes, or other investment associated with Creative Wealth Media – constitute Interrelated Wrongful Acts because the alleged Wrongful Acts "have as a common nexus" a "series of causally connected facts, circumstances, situations, events, transactions" and "causes" – specifically, Schmidt's Professional Services and Investment Advisory Services provided in connection with investment in the Media Fund. (Policy § II U).

### b. Wrongful Act

Regarding Investment Adviser Professional Liability Insurance, Wrongful Act means any "alleged error, misstatement, misleading statement, negligent act or omission, or neglect or breach of duty . . . in rendering or failing to render investment advisory services." (Policy § II PP.1). Investment Advisory Services means "financial planning services, or financial, economic or investment advice regarding investments or investment management services . . . for or on behalf of a customer . . . for a fee, commission, other monetary consideration, . . . or other remuneration." (Policy § II V).

Regarding Professional Liability Insurance, Wrongful Act means any "alleged error, misstatement, misleading statement, negligent act or omission, or neglect or breach of duty by any . . . Professional service provider . . . in rendering or failing to render professional services." (Policy § II PP.2). Professional Services means "services rendered for or given to others . . . for a fee, remuneration . . . or other consideration in an insured's business and explicitly listed on the Schedule Of Professional Service Providers endorsement." (Policy § II FF). Schmidt is explicitly listed on the Schedule Of Professional Service Providers. (Policy § Schedule of Life and Health Insurance Agencies).

Mr. Lorenzen alleges a "breach of duty" regarding Schmidt's advice to invest in the Bear Grylls Notes. Ms. Fowler alleges "negligence" regarding Schmidt's investment advice with respect to the Creative Wealth Media Fund. Both allegations concern Schmidt's "alleged negligent act or omission, or neglect or breach of duty . . . in rendering . . . investment advisory services." (Policy



Mr. Leonard B. Cooper                                                                January 22, 2024
Markel Claims
Page 4

§ II PP.1).  Furthermore, both Mr. Lorenzen and Ms. Fowler allege a "negligent act or omission, or neglect or breach of duty" by a "Professional service provider" in rendering "professional services" for which Schmidt charged a "fee, remuneration," or some "other consideration." (Policy §§ II FF, II PP.2, Schedule of Life and Health Insurance Agencies).

**c.  No Exclusion Applies**

Markel attempts to invoke Exclusion J.2 to bar coverage for the Bear Grylls Notes, taking the position that the notes are "securities . . . for which an Insured received commission or other remuneration" ("Exclusion J.2").[6]  However, the exclusion does not apply to the Bear Grylls Notes (or the Series B Notes) as a matter of fact or law.

The Supreme Court in <u>Reves</u> articulated the 4-factor "family resemblance" test to determine whether debt instruments are "securities" under the federal securities laws; the test asks (1) the motivations behind the instruments, (2) the instruments' distribution, (3) the expectations of the investing public, and (4) whether there is a relevant regulatory scheme other than the Securities Act at play.  <u>Reves v. Ernst & Young</u>, 494 U.S. 56, 66-67 (1990).  Very recently, the 2nd Circuit affirmed a decision holding that syndicated loan notes – such as the Bear Grylls Notes – are **not** "securities" as defined by applicable regulatory law under the family resemblance test.  <u>Kirschner v. JP Morgan Chase Bank, N.A.</u>, 79 F.4th 290, 307 (2d Cir. 2023).  The facts associated with the Bear Grylls Notes are even ***more*** favorable to support a finding that the Bear Grylls Notes are **not** "securities" as compared to the notes in <u>Kirschner</u> because the Bear Grylls Notes have an extremely limited distribution, lack a secondary market entirely, were limited only to accredited investors, and were understood by all investors to be investments in portions of a loan.  <u>See</u> <u>id</u>. at 305-11.

As such, the Bear Grylls Notes do not satisfy the definition of "securities" under applicable law and Markel, in turn, cannot rely on Exclusion J.2 to avoid its coverage obligation for this Claim.

---

[6] Markel's position on Schmidt's receipt of a commission or other remuneration in connection with the Bear Grylls Notes is puzzling.  As noted above, in order for Schmidt to trigger coverage under the Policy, it must be paid a fee or other remuneration for its services. For Markel to take the position that coverage to Schmidt can be withheld because it received such a fee or remuneration would render the coverage offered through this professional liability/investment adviser liability coverage to be illusory – a result that courts do not countenance. At worst, the exclusion cited by Markel contains an error and is ambiguous, which would require any court to construe the exclusion against Markel and in favor of coverage. <u>See</u> <u>Paradigm Care & Enrichment Ctr., LLC v. W. Bend Mut. Ins. Co.</u>, 33 F.4th 417, 420 (7th Cir. 2022) ("An insurance policy under Illinois law is to be construed as a whole, giving effect to every provision, if possible.") (quotations omitted); <u>Murray Ohio Mfg. Co. v. Cont'l Ins. Co.</u>, 705 F. Supp. 442, 444 (N.D. Ill. 1989) ("ambiguous language" and "contracts are to be construed in favor of the insured and that the law does not countenance illusory coverage.").



Mr. Leonard B. Cooper                                                                  January 22, 2024
Markel Claims
Page 5

**<u>Schmidt Has Coverage Under the Policy</u>**

As explained above, Schmidt has received a request for a tolling agreement for an alleged Wrongful Act, and thus has received a Claim.  The allegations are for Professional Services and/or Investment Advisory Services performed by Schmidt, specifically for services Schmidt provided in connection with Creative Wealth Media; thus, the allegations are for Wrongful Acts potentially covered under the Policy.  Further, Mr. Lorenzen and Ms. Fowler alleged Interrelated Wrongful Acts, as the allegations stem from the "common nexus" of services provided by Schmidt regarding investment with Creative Wealth Media; thus, the allegations constitute a single Claim.  The underlying Bear Grylls Notes are not Securities as defined by federal securities laws and the <u>Kirschner</u> Court and are therefore not Securities as defined by the Policy.  At ***worst***, it is unclear whether they are Securities, and therefore Markel must defend Schmidt, as this Claim is "***potentially***" covered.  <u>See</u> <u>Solo</u>, 619 F.2d at 1183.

***

For all these reasons, Schmidt expects that Markel will immediately acknowledge its obligation to provide Schmidt defense, and if necessary indemnity, coverage under the Policy for this Claim.

Pending final resolution of this Claim, Schmidt fully reserves all of its rights under the Policy, at law, and in equity.

Very truly yours,

Lynda Bennett

Enclosures

45352/2
01/22/2024 215322256.1



# EXHIBIT A



111 East Wacker Drive, Suite 2600
Chicago, IL 60601-4208
Tel: 312.527.4000 | Fax: 312.527.4011
taftlaw.com

**William J. Serritella, Jr.**
312.840.4396
wserritella@taftlaw.com

December 7, 2023

<u>**VIA EMAIL AND REGULAR MAIL**</u>
Sanford A. Schmidt
Schmidt Financial Group, LLC
450 Skokie Boulevard, Suite 507
Northbrook, Illinois 60062
sandy@schmidtfinancial.com

Re: *Young Bear Grylls* – **Demand for Misappropriated Investor Funds**

Mr: Schmidt:

Our firm has been retained to represent Christopher Lorenzen ("Lorenzen") in connection with the above-referenced matter. Please refer all further communications relating to this matter to the undersigned.

As you are aware, Lorenzen is one of multiple investors who were deceived and defrauded into funding the *Young Bear Grylls* ("YBG") animated feature trilogy in 2020. To date, the films remain uncompleted, more than $3 million in investor funds has gone missing, and Lorenzen has recouped none of his initial $750,000 investment. Further, and in spite of this years-long deception, Lorenzen has repeatedly, and audaciously, been asked by one of your affiliates—Jeff Krol—to invest additional dollars into a "Completion Fund" to raise the $3 million shortfall. We write today to highlight the egregious deception and misrepresentation that has plagued every stage of this failed project, to place you on notice of our investigation of potential claims against you, and to demand that you return to Lorenzen his $750,000 investment within the next 21 days. Please be advised that we will aggressively pursue all available legal remedies against you if this payment is not made.

*A.* ***You made false promises about how investor funds would be used, the status of the films, and an investor "exit" that never came to fruition.***

Our firm has reviewed numerous documents and emails dating back to 2020 reflecting a continuous pattern of deceit. Investors were repeatedly promised that all film projects were carefully vetted by both Creative Wealth Media Finance Corp. ("CWM") and your company,

Mr. Sanford Schmidt
December 7, 2023
Page 2

Schmidt Advisory Services, Inc., d/b/a Catalyst Wealth Management ("Catalyst"). In an email dated August 12, 2020, you claimed that CWM had "opened up" an opportunity for Lorenzen to invest in the Catalyst Wealth Management Media Fund I and urged him to invest $1 million in that fund. You stated that the investment would provide "capital out" in just a year, plus ongoing merchandising and licensing returns for years to come, and that profit estimates showed "double on the overall animated slate." Another CWM investor had previously cashed out in 12 months, you claimed.

In August of 2020, Lorenzen ultimately agreed to lend CWM $750,000 through a participation note, which his Participation Agreement promised would be used "used exclusively to finance the pre-production, production, post-production and delivery of the [YBG] Project." Based on this promise, Catalyst investors like Lorenzen raised more than $10 million to allegedly produce high-quality feature films that they believed would generate significant merchandising and licensing opportunities. CWM, in turn, had already promised to loan the funds to an entity called YBG Commercial Ltd. ("Commercial") to produce the subject films. What we know today is that only $7,555,000.00 ever made its way to Commercial. We believe you were aware of this misappropriation from the beginning, and certainly well before investors were notified.

Throughout your communications with investors, you repeatedly made misrepresentations regarding the status of the films and their anticipated profitability. On December 30, 2020, you advised Lorenzen that two of the three YBG films were already "complete," that sales efforts were underway, and that a "bidding war" was expected to ensue. Even though the films were not fully funded—much less complete—you hyped up supposed merchandising and licensing deals, advising Lorenzen that "investors will be out in Q2 with their invested capital along with a nice return."

In 2021, CWM and its owner Jason Cloth, along with Bron Studios USA, all of whom are strategic partners of Catalyst, were sued in separate actions in the U.S. District Court for the Southern District of New York by investors who claimed that CWM misrepresented that their funds—like Lorenzen's here—would be used exclusively to finance certain films. *See, e.g., Hudson Private LP v. Bron Studios USA, Creative Wealth Media Finance Corp. et al.* No. 21-cv-8259 (S.D.N.Y.). Just as in this case, investors learned that CWM had diverted millions of dollars in funds earmarked for the films. You said nothing about these legal actions to investors, and instead continued to represent that sales and merchandising discussions regarding the underfunded, and uncompleted, YBG films were still happily underway.

Even as the New York litigation ensued, you told investors on May 10, 2022 that the YBG films were "out for sale" at the Cannes film festival and that investors could expect an exit by the end of the month. "Your investment is not at risk of loss of principal," you reassured investors. "Unfortunately, it is just taking longer than expected," you said. Two months later, on July 20, 2022, you again falsely reported that the films were "completed" and that there was substantial interest from the streaming service Netflix. On July 26, 2022, you forwarded investors an email

Mr. Sanford Schmidt
December 7, 2023
Page 3

from YBG producer Nigel Stone drumming up excitement for the films and once again anticipating an all-out "bidding war."

Again and again, your emails deferred and delayed a promised exist strategy. On September 1, 2022, you told investors that you were still "working on determining the exit," and admitted that the "timing was misrepresented." "I strongly believe this will be an excellent investment," you wrote. "Just taking longer than we had hoped." At the same time, you emailed investors a projected financial outlook for the YBG franchise, which promised "80 million of potential revenue."

Another six months passed. On February 15, 2023, you told investors that you expected "YBG to be monetized" within the year, now claiming that only one of the films was completed and another in "post." Unsurprisingly, no one was interested in the incomplete films, which were still being shopped around for a buyer.

**B.**    ***After losing his initial investment, you encouraged Lorenzen to invest in the Completion Fund, even though a modification to the original loan agreement disadvantaged investors.***

In August of 2023, a Completion Fund was set up to complete the unfinished YBG films and ostensibly enable original investors to recover some of their investments. Remarkably, however, CWM amended the original loan agreement dated May 4, 2020—in which it agreed to provide approximately $11 million to Commercial —"to enable the Completion Funds . . . to be recouped by those providing the Completion Funds ahead of Lender [CWM] recouping sums due to it pursuant to the [Loan and Security Agreement]." Original investors like Lorenzen will now only see a return once the $3 million is repaid. CWM's agreement to give the Completion Fund repayment priority over the repayment of the original is baffling to us and raises the question of whether the entire YGB project is nothing more than a Ponzi scheme.

Earlier this year, Lorenzen received a series of communications from you and Krol regarding the Completion Fund. You claimed in your email to Lorenzen dated August 22, 2023 that you learned only six months earlier that the YBG project was "underfunded" and that its producer had never received the promised capital. This is implausible, at best, and should this matter proceed to litigation, we believe that discovery will show you were aware that investor funds would be misappropriated much earlier—likely at the time of the initial offering. And certainly given your professional background and fiduciary duties to your clients, you would have been on notice that the project had run aground much earlier than August of 2023. After all, you had initially promised investors "capital out" in twelve months, yet more than three years into the project, the films had still not found a buyer. Added to this, the similar lawsuits against CWM would have made any investor—let alone a financial advisor—skeptical of the repeated delays. Your statement to Lorenzen on October 3 2023 that you never could have imagined you would be "investing with a con man" is, quite frankly, disingenuous.

Mr. Sanford Schmidt
December 7, 2023
Page 4

Given his experience so far, the repeated misrepresentations regarding how his funds were to be used and the status of the films, his missing $750,000 investment, and the highly suspect subordination agreement, Lorenzen has no interest in participating in the Completion Fund. Nor is he interested at this time in navigating CWM's bankruptcy proceeding currently pending in Canada. Instead, he intends to pursue all legal remedies against you, as an advisor, financial planner, and the sponsor of this ill-fated investment scheme.

**C.    *Lorenzen will pursue legal action against you if this matter cannot be privately resolved.***

We are continuing to evaluate potential legal claims against you in light of the information currently in our possession. While our investigation is ongoing, we believe there are actionable claims against you under federal and state securities laws, as well as Illinois common law. In addition, your misrepresentations throughout the YBG affair clearly violate your ethical duties under the CFP Board's Code of Ethics and Standards of Conduct and would likely support professional discipline against you.

As you are no doubt aware, Section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act"), prohibits "any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Securities and Exchange Commission Rule 10b-5, in in turn, prohibits the use of any "device, scheme, or artifice to defraud," including untrue statements of material facts or omissions, "in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5. In addition, the Illinois Securities Law of 1953 prohibits a variety of conduct in connection with the sale of a security, including, relevant here: (1) engaging in in any "transaction, practice or course of business in connection with the sale or purchase of securities which works or tends to work a fraud or deceit upon the purchaser or seller thereof," and (2) obtaining "money or property through the sale of securities by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 815 ILCS 5/12(f), (g). We are currently investigating your statements relating to the initial offering, including your promise to fully vet the YBG project, the assurance that investor funds would be used "exclusively" to fund the project, and your statement that Lorenzen could expect "capital out" within a year. We are also closely examining the ways in which your later misrepresentations regarding the films precluded Lorenzen from exercising certain rights.

Of course, Lorenzen's legal rights are not confined to federal and state securities laws. Illinois common law provides additional avenues for relief in relation to sale and post-sale misrepresentations—both fraudulent and negligent. Further, a fiduciary relationship clearly existed between you, Lorenzen, and other Catalyst investors. In failing to fully vet the films and keep investors informed with accurate and up-to-date information, you breached your fiduciary duty and misplaced investors' trust. In addition to these and other common law causes of action,

Mr. Sanford Schmidt
December 7, 2023
Page 5

the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/2, prohibits unfair and deceptive acts or practices and notably requires neither scienter nor reliance. *See Martin v. Heinold Commodities, Inc.*, 163 Ill. 2d 33, 76 (1994). Although we are hopeful that this matter may be resolved without litigation, please be advised are preparing to pursue every legal remedy at our disposal.

*       *       *

The deception of Lorenzen and other investors gone on for far too long. This is a serious matter that requires your immediate attention and a timely response to our demand of $750,000. Please have your attorney contact me at once.

Sincerely,

Taft Stettinius & Hollister LLP

*/s/ William J. Serritella, Jr.*

William J. Serritella, Jr.

WJS

cc: Jeffrey M. Friedman (jfriedman@taftlaw.com)
Christopher Lorenzen (chris.lorenzen1@gmail.com)

130055869v3

# EXHIBIT B

**From:** Serritella Jr., William J. <wserritella@taftlaw.com>
**Sent:** Thursday, January 18, 2024 4:38 PM
**To:** Daniel Hetzel <dhetzel@ohaganmeyer.com>
**Subject:** [EXTERNAL] Young Bear Grylls

**CAUTION:** This email originated from outside the organization.
Do not click links or open attachments unless you are expecting them from the sender.

Following up on our call earlier today, please send me a draft tolling agreement with respect to my client's claims against yours.

**William J. Serritella, Jr.**
Partner
wserritella@taftlaw.com
**Dir:** 312.840.4396
**Tel:** 312.527.4000  |  **Fax:** 312.966.8564
111 E. Wacker Drive, Suite 2600
Chicago, Illinois 60601-4208

**taftlaw.com**

2

This message may contain information that is attorney-client privileged, attorney work product or otherwise confidential. If you are not an intended recipient, use and disclosure of this message are prohibited. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.

# EXHIBIT C

## TOLLING AGREEMENT

This Tolling Agreement (the "Agreement") is entered into by and between Christopher Lorenzen and CBL Investments, LLC on the one hand, and Sanford A. Schmidt, Schmidt Financial Group, LLC and Schmidt Advisory Services, Inc. d/b/a Catalyst Wealth Management on the other hand, (collectively referred to as the "'Parties") on this ____ day of January 2024.

RECITALS

WHEREAS, the Parties hereby agree to toll any applicable statute of limitations that could apply to any claims amongst them regarding the $750,000 investment that Mr. Lorenzen made on behalf of CBL Investments, LLC in the Young Bear Grylls Project (the "YBG Project") animated feature trilogy via a Participation Agreement dated August 17, 2020;

NOW, THEREFORE, in consideration of the mutual covenants set forth herein, which are good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the undersigned Parties, and fully intending to be legally bound, the Parties agree as follows:

AGREEMENT

1.      Effective Date. The "Effective Date" of this Agreement shall be January __, 2024.

2.      Tolling Agreement: The running of time under any statute of limitations shall be tolled and suspended and is hereby tolled from the Effective Date until after either Party terminates this Agreement (the "Tolling Period"), with respect to any claim regarding the YBG Project.

3.      Termination. This Agreement may be terminated by any party for any reason by providing thirty (30) days written notice of termination to the other parties.

4.      The time elapsed during the Tolling Period shall not be used in the calculation of statute of limitations defenses which would otherwise arise during such Tolling Period with respect to any claim or counterclaim subject to this Agreement.

5.      This Agreement shall not be construed as a waiver of any statute of limitations defense that has become wholly or partially established as of the Effective Date of this Agreement or which would arise after the date of termination of this Agreement, excluding the period during which this Agreement has operated to toll any applicable statute of limitations.

6.      The running of all applicable statute of limitations shall automatically commence again on the termination of this Agreement as provided for in paragraph 3 of this Agreement.

7.      Standstill Agreement. The Parties shall not file or initiate any claim, arbitration, action or lawsuit during the Tolling Period against each other.

1

8.      It is understood that by entering into this Agreement, none of the Parties are waiving any statute of limitations defenses that may have accrued prior to the Effective Date, except as expressly set forth herein.

9.      <u>Miscellaneous</u>.

9.1     <u>Governing Law</u>. This Agreement is made and entered into in the State of Illinois and the rights and obligations of the Parties shall in all respects be construed and enforced in accordance with, and governed by, the laws of the State of Illinois.

9.2     <u>Integration</u>. This Agreement contains the entire agreement and understanding of the Parties concerning the specific subject matter of this Agreement and merges, supersedes and replaces all prior discussions, understandings, negotiations, agreements, representations, conditions, warranties, covenants, and all other communications between the Parties, whether written or oral, relating to such subject matter.

9.3     <u>Waiver</u>. No provision herein may be waived unless in writing and signed by the Party whose rights are thereby waived. Waiver of any one provision herein shall not be deemed to be a waiver of any other provision herein. This Agreement may be modified or amended only by written agreement executed by all of the Parties.

9.4     <u>Binding Effect</u>. This Agreement shall bind, and shall inure to the benefit of the Parties and their respective successors, assigns, and/or subsidiaries.

9.5     <u>Preparation of Document</u>. Each Party has cooperated in the drafting and preparation of this Agreement and, accordingly, the normal rule of construction to the effect that ambiguities are to be resolved against the drafting Party shall not be employed in the interpretation of this Agreement.

9.6     <u>No Admission</u>. Neither the execution of this Agreement nor any of the provisions herein shall operate in any way as an admission of fact, liability or responsibility by any Party in any way regarding the subject matter of this Agreement.

9.7     <u>Counterparts</u>. This Agreement and any extension may be executed in counterparts and, when each Party has signed and delivered at least one such counterpart, each counterpart shall be deemed an original and, when taken together with other signed counterparts, shall constitute one Agreement, which shall be binding upon and effective as to all Parties.

9.8     <u>Authority</u>. Each Party represents and warrants that the individuals whose signatures appear below are duly authorized to execute this Agreement on behalf of the respective Parties.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first listed above.

2

On Behalf of CHRISTOPHER LORENZEN and CBL INVESTMENTS, LLC

On Behalf of SANDFORD A. SCHMIDT, SCHMIDT FINANCIAL GROUP, LLC AND SCHMIDT ADVISORY SERVICES, INC. D/B/A CATALYST WEALTH MANAGEMENT

_____

William J. Serritella, Jr.
Taft
111 East Wacker Drive, Suite 2600
Chicago, IL 60601

_____

David A. Baugh
O'Hagan Meyer
One East Wacker Dr., Ste. 3400
Chicago, IL 60601

# EXHIBIT D



BUSINESS TRIAL LAWYERS

161 North Clark Street
Suite 1600
Chicago, Illinois 60601

LoftusandEisenberg.com

Office: 312.899.6625

DIRECT DIAL
312.899.6625
alex@loftusandeisenberg.com

January 12, 2024

**VIA EMAIL**

Sanford Schmidt
Schmidt Financial Group, LLC
450 Skokie Blvd #507
Northbrook, IL 60062

      Re:    *Diane Fowler v. Sanford Schmidt, Schmidt Financial Group, and Schmidt Advisory Services, Inc.*

Mr. Schmidt,

Please be advised Loftus & Eisenberg, Ltd. has been retained by Diane Fowler to pursue a claim based on your alleged negligence when performing services on his behalf with regards to investment in Creative Wealth Media Fund.

I write you at this time to request that you make available any potentially applicable insurance policy(ies) for inspection which may cover some or all of the claims my clients intend to make against you and related individuals and entities who may also be insured.

The failure to provide a copy of the policy and declarations page would expose your insurer(s) to additional liability if not produced now even before a lawsuit is filed. *See e.g. Powell v. Prudential P&C Ins. Co.*, 584 So. 2d 12 (Fla. 1991) *citing Cernocky v. Indemnity Ins. Co.*, 69 Ill.App.2d 196, 216 N.E.2d 198 (1966) ("The refusal to inform a claimant of the policy limits deprives the claimant of a basis for evaluating the case, thus hindering settlement."). Of course, the failure to allow me to engage directly with your insurance carrier could necessitate filing suit publicly over a claim that could otherwise be resolved privately.

We request the aforementioned policy information within seven (7) business days.

Please call me if you have any questions regarding this. All would benefit from at least attempt to resolve this quickly and quietly within your insurance policy limits prior to filing suit.

Very truly yours,

Alexander Loftus

# EXHIBIT E

**From:** Alexander Loftus <alex@loftusandeisenberg.com>
**Sent:** Thursday, January 18, 2024 11:28 AM
**To:** Daniel Hetzel <dhetzel@ohaganmeyer.com>
**Subject:** [EXTERNAL] Fwd: Insurance Info

**CAUTION:** This email originated from outside the organization.
Do not click links or open attachments unless you are expecting them from the sender.

Dan,

Nice talking to you today. Please send me a draft tolling agreement for my client's claims against the Schmidt parties.

I'll get more detail on the other claim for you when I'm back in office. Daughter's name is Kris Miller. It's a trust in dads name.

Thanks,

Alex

Get Outlook for iOS

1