# EXHIBIT I



**Michael R. Delhagen**
(646) 833-0880
mdelhagen@tresslerllp.com

One Penn Plaza
Suite 4701
New York, NY 10119
646/833-0900
646/833-0877 fax
www.tresslerllp.com

May 2, 2024

<u>**VIA E-MAIL**</u> - lbennett@lowenstein.com

Lynda A. Bennett, Esq.
Lowenstein Sandler
One Lowenstein Drive
Roseland, New Jersey 07068

| | | |
|---|---|---|
| Re: | Insured: | Schmidt Advisory Services, Inc. d/b/a Catalyst Wealth Management |
| | Insurer: | Markel American Insurance Company |
| | Policy: | Investment Advisor, Professional Services and Directors and Officers Liability Policy |
| | Policy No.: | PL86085C |
| | Policy Period: | January 30, 2023 to January 30, 2024 |
| | Matters: | (1) *CBL Investments, LLC v. Sanford Schmidt, Schmidt Advisory Services, Inc., d/b/a Catalyst Wealth Management;* (2) A January 22, 2024 email from James P. Muraff to Sanford Schmidt; and (3) *Diane Fowler, et al. v. Schmidt Advisory Services, Inc. d/b/a Catalyst Wealth Management, et al.* |
| | Markel Ref. No: | FA400829 |
| | Tressler File No.: | 10988-390 |

Dear Lynda:

This firm represents Markel Service, Inc. ("MSI"), the claim service manager for Markel American Insurance Company ("MAIC"), in connection with following matters:

(1) *CBL Investments, LLC v. Sanford Schmidt, Schmidt Advisory Services, Inc., d/b/a Catalyst Wealth Management, and Schmidt Financial Group, LLC,* Case No. 2024L001179, filed on February 1, 2024 in the Circuit Court of Cook County, Illinois, (the "*Lorenzen* Lawsuit");

(2) A January 22, 2024 email from James P. Muraff to Sanford Schmidt requesting a tolling agreement from Schmidt Advisory and seeking information pertaining to Schmidt Advisory's insurance policy (the "Muraff Matter"); and

(3) *Diane Fowler, et al. v. Schmidt Advisory Services, Inc. d/b/a Catalyst Wealth Management, Sanford Schmidt, Ethan Schmidt, Jordan Schmidt, and Jason Cloth,* Case No. 2024CH01610 filed on March 5,

California | Illinois | New Jersey | New York | Pennsylvania

2024 in the Circuit Court of Cook County, Illinois, (the "*Fowler* Lawsuit").

(collectively, the "Noticed Matters").

This letter responds to your letter dated January 22, 2024 and is further to the various e-mail correspondence and telephone discussions between Leonard Cooper and Sanford Schmidt regarding coverage for this matter. We are sending this letter to you in your capacity as the authorized insurance representative for the **Insureds**.[1] If you are not acting in that capacity, please advise accordingly.

As discussed below, MAIC has concluded that coverage is unavailable for the Noticed Matters based upon one or more provisions of the Policy, as follows:

Exclusion J.2.: Coverage for the Noticed Matters is excluded pursuant to Exclusion J.2. (the "Sale of Securities Exclusion"), which excludes coverage for any **Loss** in connection with any **Claim** alleging, arising out of, based upon, or attributable to any "[p]urchase or sale of **Securities** or insurance products for which an **Insured** received commission or other remuneration[.]" You have advised that the **Insured** received a facilitation fee for each of the investments at issue in the Noticed Matters. In addition, and as discussed below, MAIC has concluded that the investments at issue in the Noticed Matters are **Securities** as defined in the Policy. Accordingly, MAIC must respectfully decline coverage for the Noticed Matters pursuant to the Sale of Securities Exclusion.

Specified Organization Exclusion Endorsement: Coverage for the Muraff Matter is also excluded pursuant to the Specified Person, Organization, Service Or Activity Exclusion Endorsement (the "Specified Organization Exclusion Endorsement"), which excludes coverage for any "**Loss** in connection with any **Claim** alleging, arising out of, based upon, or attributable to . . . [a]ny of the Specified Person(s), Organization(s), Investment Vehicle(s), Service(s), or Activitie(s) described in the Schedule of this endorsement, including the purchase, sale, servicing or management of, advice relative to, or recommendation to purchase, sell, or hold any investment interest in the described Investment Vehicle(s), Services(s) or Activity(ies)." The Schedule of the Specified Organization Exclusion Endorsement lists Catalyst Wealth Management Media Fund I, LLC (the "Catalyst Wealth Fund") as a specified organization or investment vehicle. As discussed below, the Muraff Matter arises out of Muraff's purchase of Limited Liability Company Interests in the Catalyst Wealth Fund, and thus, coverage for the Muraff Matter is excluded by the Specified Organization Exclusion Endorsement. Accordingly, MAIC respectfully declines coverage for the Muraff Matter on this basis.

Insuring Agreement: Pursuant to the definition of **Insured**, the Policy provides limited coverage to Schmidt Financial under Insuring Agreement 2. as a **life and health insurance agency**. Because that coverage is not implicated here, there is no coverage for Schmidt Financial, nor anyone acting on behalf of Schmidt Financial, in connection the Noticed Matters and MAIC respectfully declines coverage for Schmidt Financial on that basis.

---

[1] Bolded terms are as defined in Investment Advisor, Professional Services and Directors and Officers Liability Policy No. PL86085C (the "Policy") issued to Schmidt Advisory Services, Inc., d/b/a Catalyst Wealth Management ("Schmidt Advisory") for the period January 30, 2023 to January 30, 2024 (the "**Policy Period**").

**Background**

  MAIC understands that Sanford Schmidt is the president of Schmidt Advisory, a Chicago-based corporation that provides independent advice and investment management services to various clients, including family offices and pension plans. The services provided by Schmidt Advisory include, *inter alia*, investment management, client education, as well as financial, estate, and retirement planning. According to its website, Schmidt Advisory offers advice on a range of securities including equities, fixed income, mutual funds, ETFs, and other investments. Schmidt is also the managing member of Schmidt Financial, which advertises itself as a "boutique financial planning firm," serving the high-net-worth marketplace.

**Summary of the Noticed Matters**

  **The *Lorenzen* Lawsuit**

    **Summary**

  On February 1, 2024, the plaintiff, CBL Investments LLC ("CBL"), filed a lawsuit against Sanford Schmidt, Schmidt Advisory, and Schmidt Financial in the Circuit Court of Cook County, Illinois. According to the complaint, on May 4, 2020, pursuant to a loan and security agreement, Creative Wealth agreed to loan approximately $11 million to an entity called YBG Commercial Ltd. ("YBG Commercial") to fund the production of Young Bear Grylls ("YBG") animated trilogy (the "YBG Trilogy"), with distribution to be handled by BRON Studios ("BRON").

  The complaint alleges that in or around July or August 2020, the defendants approached CBL's manager, Lorenzen, with an opportunity for CBL to become an investor in the financing of the YBG Trilogy. On August 17, 2020, Lorenzen – on behalf of CBL – allegedly entered into the Participation Agreement with Creative Wealth, in which it agreed to lend Creative Wealth $750,000 through a participation note. The term sheet allegedly provided that the proceeds of the loan would be used exclusively for the YBG Trilogy, with a loan term of 18 months.

  The plaintiff alleges that CBL agreed to help finance the YBG Trilogy based on the defendants' representations that the timeline of the investment would be short, the films had been carefully vetted, and that CBL's investment would be used solely to fund the Trilogy. CBL alleges that Schmidt repeatedly made misrepresentations to CBL about the status of the films, the prospects for distribution, and the timelines for investors' exit. According to the complaint, "[g]iven Schmidt's close relationship to and involvement with the [Creative Wealth] Fund's strategic partners Creative Wealth and Bron, Schmidt knew or reasonably should have known these statements were false." Further, the complaint alleges that CBL remained invested in the YBG Trilogy based upon false assurances from the defendants that the films were near completion and an exit was imminent.

  The complaint alleges that after securing the funding for Creative Wealth's loan to YBG Commercial, the defendants continued to make misrepresentations to CBL. For example, CBL alleges that on December 30, 2020, the defendants falsely asserted to CBL and others that two out of the three films were complete, and that a bidding was imminent. Further, on June 9, 2021, Sanford Schmidt allegedly emailed investors, including CBL, advising that production was underway and sales discussions regarding distribution rights were ongoing. On July 10, 2022, Sanford Schmidt allegedly reported that the films were still "out for sale," and that he hoped the investors' exit would occur by the end of the month.

CBL alleges that, in reality, the films remain unfinished and $3 million in investor funding is missing.  According to the complaint, Sanford Schmidt and an individual named Jeff Krol are alleged to have set up a "Completion Fund" to raise additional funds for completion of the YBG Trilogy to the disadvantage of CBL and other original investors.  On September 27, 2023, CBL and other Schmidt Advisory investors allegedly participated in a conference call hosted by Krol and Sanford Schmidt, wherein Schmidt admitted that he had known for at least a year that the YBG Trilogy was underfunded.  In October 2023, Creative Media and Bron both filed for bankruptcy.

CBL brings the following causes of action: (1) Violation of the Illinois Securities Law of 1953 815 ILCS 5/12(f), (g), and (j); (2) Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act 815 ILCS 505/2; (3) fraudulent misrepresentation; (4) negligent misrepresentation; (5) breach of fiduciary duty; and (6) unjust enrichment.  CBL requests the court to declare the sale of the security void and award CBL the amount CBL paid for the security with interest, compensatory and punitive damages, as well as attorneys' fees and costs.

### Status

The complaint was filed on February 1, 2024.  Defendants' answer has not yet been filed.

### The Muraff Matter

By email dated January 22, 2024 (the "January 22, 2024 Email"), James Muraff asked Sanford Schmidt for a draft tolling agreement and information about Schmidt's insurance policy so that he could "consider filing a claim."  By letter dated January 31, 2024, Muraff's counsel advised that Schmidt convinced Muraff to invest $450,000 in the Catalyst Wealth Fund for the production of creative works which were to be produced by Bron.  Muraff alleges that Schmidt and Schmidt Advisory both breached their duties to Muraff and that he sustained substantial damages as a result.  The Catalyst Wealth Fund's Subscription Agreement confirms Muraff's investment was in the Catalyst Wealth Fund.

### The *Fowler* Lawsuit

### Summary

On March 5, 2024, plaintiff Diane Fowler filed a class action against Schmidt Advisory, Sanford Schmidt, Ethan Schmidt, Jordan Schmidt, and Jason Cloth in the Circuit Court of Cook County, Illinois.  According to the complaint, Cloth, the owner and managing director of Creative Wealth, purported to raise money for specific movie projects but instead commingled all the invested funds and moved money from entity to entity without the consent of investors.  The complaint alleges that Sanford Schmidt, Ethan Schmidt, Jordan Schmidt, and Schmidt Advisory served as brokers for Cloth by selling notes for investment in Creative Wealth's film projects.  The plaintiff states that she invested $1 million in Creative Wealth via a Series B Note. The plaintiff alleges that she invested in unregistered securities and further alleges that Schmidt received compensation from the investment, although the compensation was not disclosed.

The plaintiff brings the following causes of action: (1) Fraudulent Misrepresentation (Cloth Class v. Jason Cloth); (2) Violation of 815 ILCS 5/12(i) (Class v. Jason Cloth); (3) Violation of 815 ILCS 5/12(g) (Schmidt Class v. Schmidt); (4) Negligent Misrepresentation (Schmidt Sub Class v. Schmidt Defendants); (5) Unjust Enrichment (Cloth Class v. Cloth); (6) Unjust Enrichment (Schmidt Sub Class v. Schmidt Defendants); and (7) Respondent in Discovery (C2).  Fowler seeks

class certification, designation as the representative of the proposed class, attorneys' fees, compensatory damages including loss of interest and reasonable costs in excess of $80 million, and punitive damages against Cloth in excess of $100 million.

### Status

A case management call is scheduled for July 8, 2024.

## The Policy

MAIC issued the Policy to the **Insureds** on a Claims made and reported basis for the policy period effective January 30, 2023 to January 30, 2024 (the "**Policy Period**"). The Policy provides Investment Adviser Professional Liability Insurance coverage and Professional Liability Insurance coverage only with a $2 million each loss limit of liability and a $2 million aggregate limit of liability, subject to a $100,000 each loss retention. Defense costs and loss reduce both the limit of liability and retention. Coverage is subject to a December 31, 2020 "Prior Knowledge Date" and the following Endorsements:

1. MPL 1216 07 17    Life Product Sales Coverage – Named Individuals
2. MPL 1230 07 17    Schedule Of Life And Health Insurance Agencies
3. MPL 1313 05 19    Exclusion – Prior Knowledge
4. MPL 1315 07 17    Exclusion – Reimbursement Of Fees
5. MPL 1323 05 19    Exclusion – Specified Person, Organization, Service Or Activity
6. MPL 1484-IL 05 19    Illinois Amendatory

## Coverage Analysis

### Date of Claim

By e-mail dated November 13, 2023, Schmidt Advisory provided MAIC with notice of Creative Wealth's intention to file for bankruptcy in the District of Ontario, Toronto Division. MAIC accepted the November 13, 2023 e-mail as a notice of circumstances pursuant to Section VI – Notice B. of the Policy, which provides:

> If, during the **Policy Period**, an **insured** becomes aware of any circumstances which may reasonably be expected to give rise to a **claim** being made against an **insured** and gives written notice to the Insurer of the circumstances, the anticipated allegations of the **wrongful act** and the reasons for anticipating such a **claim**, with full particulars as to dates, persons and entities involved, then any **claim** subsequently made against the **insured** and reported to the Insurer for any **wrongful act** or **interrelated wrongful acts** will be deemed to have been made at the time such notice was received by the Insurer under this provision.

On January 22, 2024, Lowenstein sent a letter on behalf of Schmidt Advisory to MAIC, providing notice of demand letters from Christopher Lorenzen (the "Lorenzen Demand") and Diane Fowler (the "Fowler Demand"), both of whom requested tolling agreements in connection with their allegations that Schmidt made misrepresentations regarding investments in Creative

Lynda A. Bennett, Esq.
May 2 2024
Page 6 of 10

Wealth and its various film projects. On January 26, 2024, the **Insured** provided notice of the January 22, 2024 Email from Muraff. Each of the Noticed Matters is a **Claim**[2] and pursuant to Section VI – Notice B., because each of the Noticed Matters arises out of the **Insured's** misrepresentations regarding investments in Creative Wealth, each is deemed to have been made on November 13, 2023 when the notice of circumstances was provided.

MAIC has also concluded that the Noticed Matters constitute a single **Claim** pursuant to Section IV.A.3. (the "Interrelated Wrongful Acts Provision") of the Policy, which provides:

> "[a]ll **claims** for the same **wrongful acts** or **interrelated wrongful acts**[3] will be considered a single **claim** and will be deemed to have been made when the earliest **claim** was first made, or when the earliest **claim** is treated as having been made in accordance with Section VI – Notice, whichever is earliest, whether before or during the Policy Period."

Based on MAIC's review of the Noticed Matters, MAIC has concluded that there is a common nexus of fact among all of the lawsuits and allegations: the defendants' alleged misrepresentations and omissions in connection with their advice to invest in Creative Wealth and/or Bron film productions. Accordingly, MAIC will treat the Noticed Matters as single **Claim** deemed to be first made on November 13, 2023, when Schmidt Advisory provided the Notice of Circumstances to MAIC.

**The Insuring Agreements**

MAIC has concluded that only the Investment Adviser Professional Liability Insurance Insuring Agreement ("Insuring Agreement 1.") is triggered by the Noticed Matters. Insuring Agreement 1. provides:

> The Insurer will pay, on behalf of an **insured adviser** or its **insured persons**, **loss** which they become legally obligated to pay as a result of a **claim** first made against them and reported during the Policy Period or Extended Reporting Period, if applicable.

The term **Insured Adviser** is defined to mean "the Named Entity that is a registered 'investment advisor' as defined in the Investment Advisors Act of 1940, and its amendments, and which renders **Investment Advisory Services** to others." Schmidt Advisory is the only Named Insured, and MAIC has concluded that Schmidt Advisory is an **Insured Adviser** as that term is defined in the Policy. **Insured person(s)** is defined to mean, in relevant part, "[t]he **Insured Executives**." **Insured executive** is defined to mean "any person who has been, now is or becomes a duly elected or appointed partner, director, officer, chief compliance officer, managing

---

[2] **Claim** is defined to include, in relevant part, "[a]ny written request to toll . . . any statute of limitations commenced by the receipt of such request." Accordingly, the Lorenzen Demand, the Fowler Demand, and the January 22 E-mail (i.e., the Noticed Matters) are each a **Claim** as defined in the Policy.

[3] **Interrelated Wrongful Acts** is defined in the Policy to mean "**wrongful acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes, including, but not limited to a Pyramid Scheme or Ponzi Scheme." **Wrongful Act** is defined, in relevant part, to mean "any actual or alleged error, misstatement, misleading statement, negligent act or omission, or neglect or breach of duty by any insured adviser or its insured persons, solely in their capacities as such, in rendering or failing to render investment advisory services."

member, manager or trustee of an **insured entity.**" Sanford Schmidt is an **Insured Executive**, as that term is defined in the Policy, because he is a managing member and/or director of Schmidt Advisory.

Schmidt Financial is not a Named Entity and is therefore not an **Insured Adviser** as that term is defined in the Policy. MAIC respectfully declines to provide coverage for Schmidt Financial, nor anyone acting on behalf of Schmidt Financial, on that basis.[4] Jason Cloth is not an **Insured Person** because he is not an employee of Schmidt Advisory. MAIC must respectfully decline to provide coverage for Jason Cloth on that basis. It is not clear whether either Ethan Schmidt or Jordan Schmidt is a "duly elected or appointed partner, director, officer, chief compliance officer, managing member, manager or trustee" of Schmidt Advisory. MAIC therefore reserves the right to deny coverage to Ethan and Jordan Schmidt in the event that it is determined that they are not **Insured Persons** for purposes of Insuring Agreement 1.

Moreover, contrary to the assertions of your January 22, 2024 letter, Sanford Schmidt is not listed on a Schedule Of Professional Service Providers and, therefore, is not covered for Professional Services under Insuring Agreement 2. Your letter cites to the Policy's Schedule of Life and Health Insurance Agencies, which, as discussed above, applies only to Schmidt Financial. Rather, Mr. Schmidt is listed on the Policy's LIFE PRODUCT SALES COVERAGE – NAMED INDIVIDUALS endorsement. As this matter does not involve the sale of life insurance products, it is not implicated by the **Claim**.

### Denial of Coverage – Exclusion J.2.

MAIC has concluded that each of the Noticed Matters is excluded pursuant to Sale of Securities Exclusion, which provides:

> This Policy provides no coverage for any **loss** in connection with any **claim** alleging, arising out of, based upon, or attributable to: … [a]ny Purchase or sale of **securities** or insurance products for which an **insured** received commission or other remuneration or where an **insured** had a 5% or more equity interest in the issuer of such **securities.**

Lowenstein has advised that the **Insured** was paid a facilitation fee in connection the investments at issue in the Noticed Matters. The application of the Sale of Securities Exclusion thus turns on whether the investments at issue in the Noticed Matters are **Securities** as that term is defined in the Policy.

The Policy provides that the term **Security** has the meaning assigned to that term by the following:

1. The Securities Exchange Act of 1934;
2. The Securities Act of 1933;
3. The Investment Advisors Act of 1940 as amended; or

---

[4] Pursuant to the definition of **Insured**, the policy provides limited coverage to Schmidt Financial as a **life and health insurance agency** and that coverage is not implicated here. Accordingly, there is no coverage for Schmidt Financial in connection the Noticed Matters.

> 4. Any Rules issued by the Securities Exchange Commission pursuant to any of these acts[.]

The Securities Act of 1933 defines "security", in relevant part, as a "note" or an "investment contract." In your January 22, 2024 letter, you assert that Exclusion J.2. does not apply because the investments at issue in the Noticed Matters are "syndicated loan notes," and thus not securities pursuant to the "family resemblance test" set forth in *Kirschner v. J.P. Morgan Chase Bank, N.A.,* 79 F.4th 290 (2nd Cir. 2023); see also *Reves v. Ernst Young,* 494 U.S. 56, 110 S. Ct. 945 (1990). MAIC has reviewed the relevant caselaw on this issue and has concluded that the investments at issue in the Noticed Matters are different than the "syndicated loan notes" at issue in *Kirschner.*

A note is "presumed to be a 'security,' and that presumption may be rebutted only by a showing that the note falls within, or 'bears a strong resemblance to', one of the following categories of instruments, which are 'not securities':

> the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a 'character' loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business (particularly if, as in the case of the customer of a broker, it is collateralized) [,and] ... notes evidencing loans by commercial banks for current operations.

*United States Securities and Exchange Commission v. Hartman Wright Group,* 2020 WL 8186477 (D. Col. 2020) (quoting *Reves,* 494 U.S. at 65, 67). In determining whether an instrument "bears a strong resemblance" to the instruments on that list, four factors must be considered: (1) the motivation of the buyer and seller, (2) the plan of distribution, (3) the reasonable expectations of the investing public, and (4) the presence of alternate regulatory regimes that may protect investors. *See Reves,* 494 U.S. at 66-67.

The investments at issue in the Noticed Matters do not fall into any one of the categories of instruments that are "not securities." In addition, each of the *Reves* factors weigh in favor of finding that the investments at issue in the Noticed Matters are **Securities**. Specifically, both the sellers' and buyers' participation was motivated by an investment in the YBG Trilogy production; the investments were distributed to unsophisticated investors (like Lorenzen, Muraff and Fowler); the buyers could reasonably expect that the instruments they were purchasing were securities, especially since the various investment agreements referred to the instruments at securities; and there does not appear to be a regulatory framework for these types of investments such that the Securities Act would be helpful to reduce risks associated with the instruments. Accordingly, MAIC must respectfully decline to extend coverage for each of the Noticed Matters on this basis.

**Denial of Coverage for Muraff Matter – Specified Organization Exclusion Endorsement**

The Specified Organization Exclusion Endorsement modifies Section III – Exclusions of the Policy and provides:

> This Policy provides no coverage for any **loss** in connection with any **claim** alleging, arising out of, based upon, or attributable to:
>
> Any of the Specified Person(s), Organization(s), Investment Vehicle(s), Services(s) Or Activity(ies) described in the Schedule of this endorsement, including the purchase, sale, servicing or management of, advice relative to, or recommendation to purchase, sell, or hold any investment interest in the described Investment Vehicle(s), Services(s) or Activity(ies).

The Schedule of the Specified Organization Exclusion Endorsement lists the Catalyst Wealth Fund as a Specified Organization. As discussed above, Muraff invested directly in the Catalyst Wealth Fund. Because Muraff invested in the Catalyst Wealth Fund, the Muraff Matter alleges, arises out of, is based upon, or is attributable to the purchase, sale, servicing or management of, advice relative to, or recommendation to purchase, sell, or hold any investment interest in the Catalyst Wealth Fund, and thus the Policy provides no coverage for any **loss** in connection thereto. MAIC therefore also must respectfully decline to provide coverage for the Muraff Matter on the basis that the Specified Organization Endorsement Exclusion excludes coverage. MAIC also reserves the right to deny coverage for the *Lorenzen* Lawsuit and the *Fowler* Lawsuit in the event that either of those matters involved investments in the Catalyst Wealth Fund.

**Other Coverage Defenses**

The following additional coverage defenses may also preclude or limit coverage under the Policy.

**Prior Knowledge**

The Exclusion – Prior Knowledge Endorsement modifies Section III - Exclusions and provides:

> This Policy provides no coverage for any **loss** in connection with any **claim** alleging, arising out of, based upon, or attributable to:
>
> Any **wrongful act** or **interrelated wrongful acts** related to the Insuring Agreement(s) shown in the Schedule of this endorsement and occurring prior to the applicable Date shown in the Schedule of this endorsement which any **insured** knew or could reasonably have foreseen that such **wrongful act** or **interrelated wrongful acts** could lead to a **claim** under this Policy.
>
> For the purpose of this exclusion, all actual or alleged **interrelated wrongful acts** will be deemed to have taken place on the date on which the earliest of such actual or alleged **wrongful acts** took place.

The Schedule of this Endorsement lists December 31, 2020 as the Prior Knowledge Date for the Investment Adviser Professional Liability Coverage Part. According to the complaint in the *Lorenzen* Lawsuit, on December 30, 2020, Mr. Schmidt falsely claimed to CBL and others that two out of the three films were complete, and that "a bidding" was imminent. Accordingly, MAIC reserves the right to deny coverage for the Noticed Matters in the event that it is determined that the **Insureds** knew or could have reasonably foreseen (prior to December 31, 2020) that such misrepresentations would lead to a **Claim**.

### Exclusion R.

Exclusion R. excludes, in relevant part, coverage for any **loss** in connection with any **claim** alleging, arising out of, based upon, or attributable to:

> Any **claim** involving the amount, return, disgorgement or reimbursement of fees, commissions or other sums paid to an **insured** for **investment advisory services** . . . rendered by an **insured;** provided, however, that this exclusion will not apply to **defense costs**.

The Noticed Matters allege that that the defendants unjustly profited from and retained compensation as a result of CBL's investment. Accordingly, MAIC reserves the right to deny coverage for the Noticed Matters to the extent any settlement involves the return of, disgorgement of, or reimbursement of sums paid to an **insured** for **investment advisory services** rendered by an **insured.**

### Reservation of Rights

MAIC reserves all other rights, remedies and defenses under the Policy and applicable law. Nothing stated herein, or not stated, shall be deemed to be a waiver or compromise of any rights, remedies or defenses which MAIC has or may obtain.

Please do not hesitate to contact me if you would like to discuss any of the above.

Very truly yours,

Michael R. Delhagen