# **EXHIBIT J**

# ANSPACH LAW OFFICE

**Kenneth G. Anspach**
*Attorney*

111 West Washington Street
Suite 1625
Chicago, IL 60602
(312) 407-7888
Fax: (312) 372-3206
ken@anspachlawoffice.com

June 3, 2024

VIA ELECTRONIC MAIL ONLY –
mdelhagen@tresslerllp.com

Michael R. Delhagen, Esq.
Tressler LLP
One Penn Plaza
Suite 4701
New York, NY 10119

Re: Policy: Markel American Insurance Company No. PL86085C
Policy Period: 1/30/23-1/30/24
Policy Limits: $2,000,000/$2,000,000
Insured: Schmidt Advisory Services, Inc. d/b/a Catalyst Wealth Management
Underlying Suits: 1) *CBL Investments, LLC v. Sanford Schmidt, et al.*, docketed in the Circuit Court of Cook County, Illinois as Case No. 2024L001179;
2) *Diane Fowler v. Schmidt Advisory Services, Inc.*, docketed in the Circuit Court of Cook County, Illinois as Case No. 2024CH01610

Dear Mr. Delhagen:

    I represent the insureds, Sanford Schmidt and Schmidt Advisory Services, Inc. d/b/a Catalyst Wealth Management ("Schmidt Advisory") (collectively, the "Insureds") under Markel American Insurance Company No. PL86085C (the "Policy"), and, in that capacity, I am authorized to respond to your letter dated May 2, 2024 (the "Tressler Letter") to Lynda A. Bennett, Esq. of Lowenstein Sandler. I am further authorized to advise you that Ms. Bennett and Lowenstein Sandler no longer represent the Insureds and that all future correspondence regarding this coverage matter should be directed to me. Because for the reasons set forth below the above referenced suits, *i.e.*, 1) *CBL Investments, LLC v. Sanford Schmidt, et al.*, docketed in the Circuit Court of Cook County, Illinois as Case No. 2024L001179 (the "Lorenzen Suit") and 2) *Diane Fowler v. Schmidt Advisory Services, Inc.*, docketed in the Circuit Court of Cook County, Illinois as Case No. 2024CH01610 (the "Fowler Suit") (collectively, the "Underlying Suits") are covered under the Policy," on behalf of the Insureds I am herewith demanding that on or before June 24, 2024 Markel

Michael R. Delhagen, Esq.
Tressler LLP
June 3, 2024
Page 2

American Insurance Company ("Markel") agree to defend and indemnify the Insureds and to defend Ethan Schmidt, Jordan Schmidt and Schmidt Financial Group, LLC in the Underlying Suits.

I. The Terms of the Policy.

The Limits of Liability under the Policy are set forth in the Declarations. The "Named Entity," Schmidt Advisory Services, Inc, DBA: Catalyst Wealth Management ("Schmidt Advisory") is insured for Investment Adviser Professional Liability Insurance: Limits of Liability: $2,000,000 Each Loss; Retentions: $100,000 Each Loss. Schmidt Advisory is also insured for Professional Liability Insurance, subject to the same Limits of Liability and Retentions, with an Aggregate Limit of Liability of $2,000,000. Payment of defenses costs under the Policy erodes these limits.

The Policy provides that Markel owes the Insureds a duty to indemnify such Insureds for any loss that arises. In that regard, Section I.A.1, Coverage, Insuring Agreements for Investment Adviser Professional Liability Insurance ("Insuring Agreement 1") provides that: "The Insurer will pay, on behalf of an insured adviser or its insured persons, loss which they become legally obligated to pay as a result of a claim…" The Policy provides in Section I.A.2, Coverage, Insuring Agreements for Professional Liability Insurance ("Insuring Agreement 2"), that: "The Insurer will pay, on behalf of an…professional service provider or their insured persons, loss which they become legally obligated to pay as a result of a claim …" Nothing in the Insuring Agreements states that such Insuring Agreements are subject to, or otherwise limited by, any other provision of the Policy.

The Policy also provides that Markel owes the insureds a duty to defend the insured for any loss that arises. In that regard, Section VII – Defense Costs, Settlement and Cooperation (the "Defense Costs Provision") provides that: "A. The Insurer will have the right and duty to defend the insured and investigate any claim as a result of a wrongful act brought against the insured and to which this insurance applies, even if such claim is groundless, false or fraudulent…" Nothing in the Defense Costs Provision states that such payment of defense costs is subject to, or otherwise limited by, any other provision of the Policy.

"Claim" is defined in the Policy under Section II, Definitions, par. E.2, in pertinent part, as "A civil proceeding commenced by the service of a complaint…" "Loss" is defined in the Policy, Illinois Amendatory Endorsement, in pertinent part, as "the amount that an insured becomes legally obligated to pay on account of any claim, including but not limited to, damages, judgments, settlements and defense costs."

Michael R. Delhagen, Esq.
Tressler LLP
June 3, 2024
Page 3

## II. The Underlying Suits.

The Lorenzen Suit alleges that CBL Investments, LLC ("CBL"), based upon representations by Schmidt Advisory, purchased $750,000 of syndicated loan notes issued by YBG Commercial Ltd. ("YBG") to CBL and other investors in a feature film trilogy, *i.e.* Young Bear Grylls, and that as a result of Schmidt Advisory's allegedly deceptive acts and misrepresentations lost this investment and was damaged in the amount of $750,000. Neither Sanford Schmidt nor Schmidt Advisory had a 5% or more equity interest in YBG. The named defendants in the Lorenzen Suit are Sanford Schmidt, Schmidt Advisory Services, Inc. d/b/a Catalyst Wealth Management, and Schmidt Financial Group, LLC.

The Fowler Suit alleges that Diane Fowler ("Fowler"), based upon representations by Schmidt Advisory, invested $1,000,000 in Creative Wealth Media Fund ("CWMF") via a Series B note, which was a total loss. The Fowler Suit alleges claims on behalf of Fowler and a class of similarly situated investors in CWMF for negligent misrepresentation against, *inter alia,* Schmidt Advisory, that allegedly led the class to sustain a loss of over $80,000,000. Neither Sanford Schmidt nor Schmidt Advisory had a 5% or more equity interest in CWMF. The named defendants in the Fowler Suit are Schmidt Advisory Services, Inc. d/b/a Catalyst Wealth Management, Sanford Schmidt, Ethan Schmidt, Jordan Schmidt and Jason Cloth.

## III. The Underlying Suits are Covered under the Policy.

Markel has a duty to defend and indemnify Schmidt Advisory under the Policy as the "Named Entity" under the Policy,[1] pursuant to Insuring Agreement 1 and Insuring Agreement 2, as well as pursuant to the Defense Costs Provision. Markel owes these duties to Sanford Schmidt, as set forth more fully below, pursuant to the Life Product Sales Coverage – Named Individuals Professional Liability Endorsement MPL 1224 07 17, under which he is a "covered insured," and pursuant to Insuring Agreement 2 and the Defense Costs Provision.

## IV. By Misdirection of its Insureds and Misrepresentation of the Terms of the Policy, Markel has Incorrectly Denied Coverage under the Policy.

Both Underlying Suits were tendered for coverage to Markel. Markel responded to these claims (the "Claims") pursuant to a letter dated May 2, 2024 from attorney Michael R. Delhagen of Tressler LLP (the "Tressler Letter").

---

[1] The Policy, Section II, par. P provides that "Insured(s) means the Named Entity, insured entity(ies) and the insured person(s)."

Michael R. Delhagen, Esq.
Tressler LLP
June 3, 2024
Page 4

### A. Markel Incorrectly Limits its Consideration of Coverage under the Policy to Insuring Agreement 1.

The Tressler Letter asserts that "MAIC has concluded that only the Investment Adviser Professional Liability Insurance Insuring Agreement ("Insuring Agreement 1.") is triggered by the Noticed Matters." ("Noticed Matters" as referenced in the Tressler Letter includes the Underlying Suits; it also includes the Muraff Matter, which appears to be no longer an issue.) However, its assertion that coverage is only triggered under Insuring Agreement 1 is incorrect. The Tressler Letter provides no reason or reference to any provision of the Policy in support of this assertion. Accordingly, this assertion is a misrepresentation to its Insureds of the terms of the Policy.

Under the terms of the Policy, as set forth above, coverage is available both under Insuring Agreement 1 and under Insuring Agreement 2. Insuring Agreement 2 provides indemnity coverage for "a…professional service provider." The term "professional service provider" is defined in the Policy, Section II, Definitions, par. GG, as meaning "any individual or entity specifically listed on the Schedule Of Professional Service Providers endorsement or other endorsement to this Policy that renders professional services, but only while such individual or entity is acting on behalf of the Named Entity." Here, Sanford Schmidt is under contract with, and acts on behalf of the "Named Entity." Moreover, as acknowledged in the Tressler Letter at 7, Sanford Schmidt is listed on the Schedule to the Life Product Sales Coverage – Named Individuals Professional Liability Endorsement MPL 1224 07 17, which is an "other endorsement to this Policy." "Professional services" is defined in the Policy, Section II, Definitions, par. FF, as meaning "services rendered for or advice given to others by an insured for a fee, remuneration, pro bono or other consideration in an insured's business and explicitly listed on the Schedule Of Professional Service Providers endorsement or other endorsement to this Policy." The services provided by Sanford Schmidt are set forth on the Schedule to the Life Product Sales Coverage – Named Individuals Professional Liability Endorsement MPL 1224 07 17 as "Registered Investment Adviser Services." The Tressler Letter at 7 acknowledges that "the Insured was paid a facilitation fee in connection the investments at issue in the Noticed Matters." Therefore, Sanford Schmidt is covered under Insuring Agreement 2. "If the words used in the policy are clear and unambiguous, they must be given their plain, ordinary, and popular meaning." *Central Illinois Light Co. v. Home Insurance Co.*, 213 Ill. 2d 141, 153, 821 N.E.2d 206, 213 (2004). Here, the plain meaning of the clear and unambiguous words used in the Policy are that coverage is provided both under Insuring Agreement 1 and Insuring Agreement 2.

### B. Markel Incorrectly Applies Exclusion J.2 to Deny Coverage where that Exclusion Specifically does not Apply to Coverage under the Life Product Sales Coverage – Named Individuals Professional Liability Endorsement MPL 1224 07 17.

The Tressler Letter at 3 further misrepresents the terms of the Policy when it asserts that the Claims are subject to an exclusion under the Policy, Section III, Exclusions, J.2

Michael R. Delhagen, Esq.
Tressler LLP
June 3, 2024
Page 5

("Exclusion J.2"), and that, on that purported basis, Markel declines coverage for the Underlying Suits. Exclusion J.2 states:

> SECTION III – EXCLUSIONS This Policy provides no coverage for any loss in connection with any claim alleging, arising out of, based upon, or attributable to:
> J. Any:
> ***
> 2. Purchase or sale of securities or insurance products for which an insured received commission or other remuneration or where an insured had a 5% or more equity interest in the issuer of such securities;

Yet, the Tressler Letter and Markel are mistaken in their assertion that the Claim is excluded under Exclusion J.2 for three reasons. First, the Schedule to the Life Product Sales Coverage – Named Individuals Professional Liability Endorsement MPL 1224 07 17 expressly provides that Sanford Schmidt is a "covered insured." Paragraph B of Life Product Sales Coverage – Named Individuals Professional Liability Endorsement adds an exclusion to the Policy, Section III, stating that:

> This Policy provides no coverage for any loss in connection with any claim alleging, arising out of, based upon, or attributable to:
>
> The purchase or sale of securities or investments as a registered representative or insurance products as a life insurance agent; however, this exclusion will not apply to the Named Individuals shown in the Schedule of this endorsement, solely with respect to wrongful acts in the rendering of or failure to render professional services:
>
> 1. Directly involved in the purchase or sale of insurance products as a life insurance agent, provided a Pending And Prior Proceeding Date For Purchase Or Sale Of Insurance As A Life Insurance Agent is shown in the Schedule of this endorsement; or
>
> 2. As a registered investment adviser only when rendered on behalf of or under contract with the Named Entity and provided a Pending And Prior Proceeding Date For Registered Investment Adviser Services is shown in the Schedule of this endorsement;

and occurring on or after the applicable Pending And Prior Proceeding Date and prior to the applicable Termination Date, if any, shown in the Schedule of this endorsement.

Thus, the exclusion at paragraph B pertaining to "[t]he purchase or sale of securities or investments as a registered representative…" does not apply to "[n]amed Individuals shown in the Schedule of this endorsement, solely with respect to wrongful acts in the rendering of or failure to render professional services… [a]s a registered investment adviser only when rendered on behalf of or under contract with the Named Entity and provided a Pending And Prior Proceeding Date For Registered Investment Adviser Services is shown in the Schedule of this endorsement." Here, Sanford Schmidt is named in the Schedule to this endorsement, and he is, therefore exempt from this exclusion for "wrongful acts in the rendering of…professional services." Further, Sanford Schmidt is a registered investment advisor who is under contract with the Named Entity, Schmidt Advisory Services, Inc. d/b/a Catalyst Wealth Management. Accordingly, for the rendering of professional services, which is covered under Insuring Agreement 2,[2] Sanford Schmidt is a "covered insured," who is not subject to the exclusion in paragraph B.

The Life Product Sales Coverage – Named Individuals Professional Liability Endorsement, paragraph 2, provides that **"[w]ith respect to coverage provided by this endorsement, exclusion J.2. does not apply."** (Bold added.) Accordingly, the Policy expressly provides that Sanford Schmidt, who is a defendant in both Underlying Suits, is a covered insured for the rendering of professional services, who is not subject to Exclusion J.2.

i. Markel Engages in Sanctionable Conduct in order to Misdirect the Insured Away from Coverage under the Life Product Sales Coverage – Named Individuals Professional Liability Endorsement MPL 1224 07 17.

The Tressler Letter attempts to mislead the Insured regarding Markel's coverage obligations under the Life Product Sales Coverage – Named Individuals Professional Liability Endorsement MPL 1224 07 17. In that regard, the Tressler Letter at 7 states that:

> Mr. Schmidt is listed on the Policy's LIFE PRODUCT SALES COVERAGE – NAMED INDIVIDUALS endorsement. As this matter does not involve the sale of life insurance products, it is not implicated by the Claim.

---

[2] The Policy provides in Insuring Agreement 2, Section I.A.2, Coverage, Insuring Agreements for Professional Liability Insurance, that: "The Insurer will pay, on behalf of an…professional service provider or their insured persons, loss which they become legally obligated to pay as a result of a claim …" The term "professional service provider" is defined in the Policy, Section II.GG, as meaning "any individual or entity specifically listed on the Schedule Of Professional Service Providers endorsement or other endorsement to this Policy *that renders professional services*, but only while such individual or entity is acting on behalf of the Named Entity. (Emphasis added).

This statement is a blatant misdirection of the Insured and is a misrepresentation of the terms of this endorsement. As set forth above, the Life Product Sales Coverage – Named Individuals Professional Liability Endorsement plainly states that Sanford Schmidt is a "covered insured" for the rendering of "professional services." As further set forth above, "Professional services" is defined in the Policy, Section II, Definitions, par. FF, as meaning "services rendered for or advice given to others by an insured for a fee, remuneration, pro bono or other consideration in an insured's business and explicitly listed on the Schedule Of Professional Service Providers endorsement or other endorsement to this Policy." The services provided by Sanford Schmidt are set forth on the Schedule to the Life Product Sales Coverage – Named Individuals Professional Liability Endorsement MPL 1224 07 17 as "Registered Investment Adviser Services." The Tressler Letter at 7 acknowledges that "the Insured was paid a facilitation fee in connection the investments at issue in the Noticed Matters." Therefore, Markel's assertion that the LIFE PRODUCT SALES COVERAGE – NAMED INDIVIDUALS endorsement is limited to "the sale of life insurance products," is a misrepresentation of the terms of the Policy.

"Knowingly misrepresenting to…insureds relevant policy provisions relating to coverages at issue" is an act constituting an improper claims practice pursuant to Section 5/154.6(a) if the Illinois Insurance Code, 215 ILCS 5/154.6(a). Acts identified as improper claims practices under 215 ILCS 5/154.6 are illustrative of conduct by an insurer that may give rise to a remedy for vexatious or unreasonable conduct under 215 ILC 5/155. *Zagorski v. Allstate Insurance Co.*, 2016 IL App (5th) 140056, ¶ 26, 54 N.E.3d 296 (5th Dist. 2016); *Charter Properties, Inc. v. Rockford Mut. Ins. Co.*, 2018 IL App (2d) 170637 ¶ 38 (2nd Dist. 2018). When determining whether an insurer's conduct in a given case is vexatious and unreasonable under the totality of the circumstances, a court may properly consider actions identified as improper claims practices under section 154.6 as relevant to a section 155 claim. Id. Markel's blatant misrepresentation of the terms of the Life Product Sales Coverage – Named Individuals Professional Liability Endorsement pursuant to the Tressler Letter at 7 is, therefore, sanctionable conduct under Section 155 of the Illinois Insurance Code, 215 ILCS 5/155.

Moreover, Markel is not saved from its own sanctionable conduct by its self-serving assertion in the Tressler Letter at 6 that "MAIC has concluded that only the Investment Adviser Professional Liability Insurance Insuring Agreement ("Insuring Agreement 1.") is triggered by the Noticed Matters." As set forth above, this assertion is another misrepresentation of the terms of the Policy made in an obvious attempt to mislead the Insured into believing that coverage is not available for "professional services" pursuant to the Life Product Sales Coverage – Named Individuals Professional Liability Endorsement which is the subject of Insuring Agreement 2. Markel's attempt to skirt coverage for Sanford Schmidt under the Life Product Sales Coverage – Named Individuals Professional Liability Endorsement by unilaterally asserting, without even identifying any supporting language in the Policy, that only Insuring Agreement 1 and not Insuring Agreement 2 is "triggered" is also an improper claims practice pursuant to Section 5/154.6(a) if the Illinois Insurance

Code, 215 ILCS 5/154.6(a). It is also, therefore, sanctionable conduct under Section 155 of the Illinois Insurance Code, 215 ILCS 5/155.

<u>ii. Given that Coverage is Provided to Sanford Schmidt under the Life Product Sales Coverage – Named Individuals Professional Liability Endorsement MPL 1224 07 17 and Insuring Agreement 2, then Markel is not only Obligated to Defend and Indemnify Sanford Schmidt, but is also Obligated to Defend the other Defendants in the Underlying Suits.</u>

With respect to the Lorenzen Suit, the Complaint names Sanford Schmidt as a defendant thereunder, as well as, Schmidt Advisory Services, Inc. d/b/a Catalyst Wealth Management and Schmidt Financial Group, LLC. Similarly, with respect to the Fowler Suit, the Complaint names Sanford Schmidt as a defendant, as well as, Schmidt Advisory Services, Inc. d/b/a Catalyst Wealth Management, Ethan Schmidt, Jordan Schmidt and Jason Cloth.[3] In both of these Underlying Suits, the same factual allegations made against all these defendants are incorporated into each count of each of these Complaints. Since the claims made in the Underlying Suits against Sanford Schmidt are the same as against the other defendants, one cannot subdivide the claims. The same facts are stated against all, so there is no way one can defend one without defending all. The court in *Dearborn Ins. Co. v. International Surplus Lines Ins. Co.*, 308 Ill.App.3d 368, 375, 719 N.E.2d 1092, 1097-1098 (1st Dist. 1999) came to the same conclusion in a similar situation. There the court found that the defendant insurer was obligated to share in the defense costs of three parties' defendant in the underlying suit, even though the defendant insurer only insured one of those parties' defendant. The court reasoned that since the allegations were the same against all parties' defendant there could be "no distinction" between the defense of each of them. *Dearborn Ins. Co.,* 308 Ill.App.3d at 375, 719 N.E.2d at 1097-1098. Similarly, here, there can be no distinction between the defense of Sanford Schmidt and the defense of all the defendants. Thus, Markel must defend all defendants under both Underlying Suits pursuant to the Policy, Section VII, Defense Costs, Settlement and Cooperation. Moreover, Markel must indemnify Sanford Schmidt under Insuring Agreement 2.

<u>C. Exclusion J.2 does not Operate to Exclude Coverage for the Other Defendants in Addition to Sanford Schmidt.</u>

The second reason that Exclusion J.2 does not apply to exclude coverage here is that, in the alternative and in addition to the coverage provided to Sanford Schmidt and the other defendants in the Underlying Suits pursuant to the Life Product Sales Coverage – Named Individuals Professional Liability Endorsement and pursuant to the holding in *Dearborn Ins. Co. v. International Surplus Lines Ins. Co.*, 308 Ill.App.3d at 375, 719 N.E.2d at 1097-1098 as set forth above, Exclusion J.2 does not operate to exclude coverage for insureds in addition to Sanford Schmidt. In order for Exclusion J.2 to apply to exclude the Underlying Suits from coverage under the Markel Policy, the investments in YBG and

---

[3] Ethan Schmidt and Jordan Schmidt have now been dismissed.

Michael R. Delhagen, Esq.
Tressler LLP
June 3, 2024
Page 9

CWMF must be deemed a "security." The loan note purchases from YBG and CWMF are known as "syndicated loan transactions" or "syndicated loan notes." As set forth below, these syndicated loan notes are not "securities" subject to Exclusion J.2.

The definition of a syndicated loan is set forth in *Kirschner v. JP Morgan Chase Bank, N.A.*, n. 12, 79 F.4th 290 (2nd Cir. 2023) as follows: "In the finance community, a '[l]oan syndication' refers to '[t]he process of involving multiple lenders in providing various portions of a loan.' Off. of the Comptroller of Currency, Leveraged Lending: Comptroller's Handbook 63 (2008)." The Tressler Letter at 8 disputes that the loan note purchases at issue are syndicated loan notes, citing the test for what is a security in *Reves v. Ernst Young*, 494 U.S. 56, 110 S. Ct. 945 (1990) and *United States Securities and Exchange Commission v. Hartman Wright Group*, 2020 WL 8186477 (D. Colo. 2020). Yet, neither *Reves* nor *Hartman* expressly dealt with syndicated loans, and are distinguishable on that basis alone. Moreover, *Hartman* is the opinion of a U.S. Magistrate and is not precedential here. By contrast, no court applying the *Reves* test has ever held a syndicated loan to be a security.[4] Unlike *Reves* and *Hartman*, *Kirschner*, the leading case on loan syndication, did address whether the syndicated loans there were securities, and many of the factors the court applied there in making a determination they were not securities apply equally here.

The *Kirschner* court did apply the four factors from *Reves* to determine whether the syndicated loan transactions at issue there were securities. In so doing, the *Kirschner* court gave importance to the second, third and fourth factors. The second factor is, as interpreted and applied by the *Kirschner* court, "if there are limitations in place that 'work to prevent the [notes] from being sold to the general public." *Kirschner v. JP Morgan Chase Bank, N.A.*, 79 F.4th at 306. In the Underlying Suits here, the multiple lenders are a limited group who purchased notes from YBG or CWMF. Limitations preventing the loans from being sold to the general public were in place here, where the loans to YBG and CWMF had an extremely limited distribution, lacked a secondary market entirely, were limited only to accredited investors, and were understood by all investors to be investments in portions of a loan.

Moreover, the presence of these limitations also satisfies the third *Reves* factor of the "Public's Reasonable Perceptions..." under which the *Kirschner* court found determinative that "the lenders certified that they were 'sophisticated and experienced'..." *Kirschner v. JP Morgan Chase Bank, N.A.*, 79 F.4th at 308. Here, the lenders are all accredited investors, meaning, according to the website of the Securities and Exchange Commission, having "Net worth over $1 million, excluding primary residence" and having "Income over $200,000 (individually) or $300,000 (with spouse or partner)."

The *Kirschner* court also found determinative the fourth *Reves* factor of "whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary.'" *Kirschner v. JP Morgan Chase Bank, N.A.*, 79 F.4th at 309. In this regard, the *Kirschner*

---

[4] *Id.* at 982.

Michael R. Delhagen, Esq.
Tressler LLP
June 3, 2024
Page 10

court found that test was satisfied due to "the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, and the Federal Deposit Insurance Corporation (jointly, the "Bank Regulators") having issued "specific policy guidelines" addressing syndicated term loans. *Kirschner v. JP Morgan Chase Bank, N.A.*, 79 F.4th at 309. Such policy guidelines would apply equally here. As such, under *Kirschner*, the loans at issue in the Underlying Suits do not satisfy the definition of security under applicable law. Therefore, coverage is not excluded under Exclusion J.2. Therefore, Markel is obligated to defend and indemnify the Insureds.

F. The Insuring Agreements are not Subject to Exclusion J.2

The third reason why Exclusion J.2 does not exclude coverage under the Insuring Agreements is that nothing in Section I, the Insuring Agreements, states that the Markel's duty to indemnify is limited by, or subject to, the Exclusions in Section III of the Policy, including Exclusion J.2. By the same token, nothing under Section VII, Defense Costs, Settlement and Cooperation, states that Markel's duty to defend is limited by, or subject to, Section III of the Policy. Moreover, nothing in Section III of the Policy states that the exclusions set forth therein limit or exclude coverage available under Sections I and VII of the Policy. Where an insuring agreement "is not subject to..." an exclusion, that exclusion does not affect the coverage provided in the insuring agreement. *Kim v. State Farm Fire and Cas. Co.*, 312 Ill. App.3d 770, 728 N.E.2d 530, 536 (1st. Dist. 2000). Accordingly, because the Insuring Agreement in the Policy does not expressly state it is subject to the exclusions in Section III of the Policy, it is not subject to the exclusion at Section III.J.2.

V. Exclusion R Simply does not Apply to the Allegations of the Underlying Suits.

Moreover, because the Insuring Agreement does not expressly state it is subject to the exclusions in Section III of the Policy, it is also not subject to the Exclusion -- Prior Knowledge, Endorsement MPL 1313 05 19, and Section III, Exclusions, par. R, ("Exclusion R") under which the Tressler Letter at 9-10 purports to reserve the purported right for Markel to deny coverage. Moreover, Exclusion R simply does not apply. Exclusion R states:

> This Policy provides no coverage for any loss in connection with any claim alleging, arising out of, based upon, or attributable to:
> Any claim involving the amount of, return of, disgorgement of or reimbursement of fees, commissions or other sums paid to an insured for accounting services, investment advisory services, life and health services or professional services rendered by an insured; provided, however, that this exclusion will not apply to defense costs.

Neither of the Underlying Suits allege "[a]ny claim involving the amount of, return of, disgorgement of or reimbursement of fees, commissions or other sums paid to an insured." Therefore, Exclusion R is inapplicable and does not exclude coverage for the Underlying Suits. Moreover, even if for the sake of argument it did exclude coverage, by its own terms "this exclusion will not apply to defense costs."

## VI. Markel is Estopped from Asserting any Purported Policy Defenses to Coverage.

To determine an insurer's duty to defend its insured, the court must look to the allegations of the underlying complaints. *U.S. Fidelity & Guar. Co. v. Wilkin Insulation Co.*, 144 Ill.2d 64, 73, 578 N.E.2d 926, 930 (1991). If the underlying complaints allege facts within or potentially within policy coverage, the insurer is obliged to defend its insured even if the allegations are groundless, false, or fraudulent. *Id.* An insurer may not justifiably refuse to defend an action against its insured unless it is clear from the face of the underlying complaints that the allegations fail to state facts which bring the case within, or potentially within, the policy's coverage. *Id.* Both the underlying complaint and the insurance policy should be liberally construed in favor of the insured. *Id.*, 144 Ill.2d at 74, 578 N.E.2d at 930. "Any doubts about coverage are to be resolved in the insured's favor." *Schal Bovis, Inc. v. Casualty Ins. Co.*, 315 Ill.App.3d 353, 732 N.E.2d 1179, 1188 (1st Dist. 2000).

The general rule of estoppel provides that an insurer which takes the position that a complaint potentially alleging coverage is not covered under a policy that includes a duty to defend may not simply refuse to defend the insured. *Employers Ins. of Wausau v. Ehlco Liquidating Trust*, 186 Ill.2d 127, 708 N.E.2d 1122, 1134 (1999). Rather, the insurer has two options: (1) defend the suit under a reservation of rights or (2) seek a declaratory judgment that there is no coverage. *Id.*, 708 N.E.2d at 1134-1135. If the insurer fails to take either of these steps and is later found to have wrongfully denied coverage, the insurer is estopped from raising policy defenses to coverage. *Id.*, 708 N.E.2d at 1135.

## VII. Conclusion.

Given that there unquestionably is coverage for the Underlying Suits under the Policy as set forth above, Markel has wrongfully denied coverage and is estopped from raising any of its purported policy defenses set forth in the Tressler Letter. Because for the reasons set forth above, the Underlying Suits are covered under the Policy, on behalf of the Insureds I am herewith demanding that on or before June 24, 2024 Markel agree to defend and indemnify the Insureds and to defend Schmidt Financial Group, LLC in the Underlying Suits.

Very truly yours,

Kenneth Anspach